~~Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order~~

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**(BID PROTEST)**

| | |
|---|---|
| **MICRODYNE OUTSOURCING, INC., a subsidiary of L-3 COMMUNICATIONS CORP. TECHNOLOGIES CORP.,** | |
| *Plaintiff,* | **AGREED-UPON REDACTED VERSION** |
| v. | |
| **THE UNITED STATES,** | **No. 06-498** |
| | **Judge L. Margolis** |
| *Defendant,* | |
| **and** | |
| **DATATRAC INFORMATION SERVICES, INC., and LOCKHEED MARTIN ASPEN SYSTEMS CORP.,** | |
| *Intervenors.* | |

**DATATRAC'S AND ASPEN'S JOINT MOTION TO DISMISS PLAINTIFF'S COMPLAINT FOR LACK OF JURISDICTION AND FOR FAILURE TO STATE A CLAIM**

Intervenors Datatrac Information Services, Inc. ("Datatrac") and Lockheed Martin Aspen Systems Corp. ("Aspen") respectfully move this Court to dismiss Microdyne Outsourcing Inc.'s ("L-3/MOI's") July 6, 2006 Complaint for lack of jurisdiction under RCFC 12(b)(1) or, alternatively, for failure to state a claim upon which relief can be granted under RCFC 12(b)(6). This Court lacks jurisdiction because L-3/MOI is not an "interested party" under 28 U.S.C. § 1491(b)(1) in light of the fact that L-3/MOI (A) submitted a proposal that failed to comply with mandatory requirements of the Solicitation, and (B) falsely represented its compliance with those requirements. Alternatively, Count I of L-3/MOI's Complaint fails to state a claim upon which relief can be granted given that L-3/MOI has failed to allege a conflict of interest as a matter of

law. Accordingly, Datatrac and Aspen request that the Court immediately dismiss the above-captioned action with prejudice.

Respectfully submitted,

s/Rand L. Allen
by Daniel P. Graham
Rand L. Allen
WILEY REIN & FIELDING LLP
1776 K Street, N.W.
Washington, DC 20006
(202) 719-7329 (O)
(202) 719-7049 (F)

*Counsel of Record for*
*Datatrac Information Systems, Inc.*

Of counsel:
Daniel P. Graham
Kevin J. Plummer
WILEY REIN & FIELDING LLP

Respectfully submitted,

s/ Thomas L. McGovern III
Thomas L. McGovern III
HOGAN & HARTSON LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5784 (O)
(202) 637-5910 (F)

*Counsel of Record for*
*Lockheed Martin Aspen Systems Corp.*

Of counsel:
Michael D. McGill
HOGAN & HARTSON LLP

Dated: July 12, 2006

~~Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order~~

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**(BID PROTEST)**

| | |
|---|---|
| **MICRODYNE OUTSOURCING, INC., a subsidiary of L-3 COMMUNICATIONS CORP. TECHNOLOGIES CORP.,** | |
| ***Plaintiff,*** | |
| **v.** | |
| **THE UNITED STATES,** | **No. 06-498** **Judge L. Margolis** |
| ***Defendant,*** | |
| **and** | |
| **DATATRAC INFORMATION SERVICES, INC., and LOCKHEED MARTIN ASPEN SYSTEMS CORP.,** | |
| ***Intervenors.*** | |

**ORDER**

Intervenors Datatrac Information Services, Inc. ("Datatrac") and Lockheed Martin Aspen Systems Corp. ("Aspen") have moved to dismiss Microdyne Outsourcing Inc.'s ("L-3/MOI's") July 6, 2006 Complaint for lack of jurisdiction under RCFC 12(b)(1) or, alternatively, for failure to state a claim upon which relief can be granted under RCFC 12(b)(6). Having considered this Motion, as well as all other relevant materials and arguments, it is hereby

ORDERED that the Motion be and hereby is GRANTED.

________________________________
Judge Lawrence S. Margolis, U.S. Court of Federal Claims

Dated: July __, 2006

~~Protected Information to be Disclosed Only in Accordance with~~
~~U.S. Court of Federal Claims Protective Order~~

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**(BID PROTEST)**

| | |
|---|---|
| **MICRODYNE OUTSOURCING, INC., a subsidiary of L-3 COMMUNICATIONS CORP. TECHNOLOGIES CORP.,** | |
| ***Plaintiff,*** | **AGREED-UPON REDACTED VERSION** |
| **v.** | |
| **THE UNITED STATES,** | **No. 06-498** |
| | **Judge L. Margolis** |
| ***Defendant,*** | |
| **and** | |
| **DATATRAC INFORMATION SERVICES, INC., and LOCKHEED MARTIN ASPEN SYSTEMS CORP.,** | |
| ***Intervenors.*** | |

**DATATRAC'S AND ASPEN'S MEMORANDUM IN SUPPORT OF THEIR JOINT MOTION TO DISMISS PLAINTIFF'S COMPLAINT FOR LACK OF JURISDICTION AND FOR FAILURE TO STATE A CLAIM**

Rand L. Allen
WILEY REIN & FIELDING LLP
1776 K Street, N.W.
Washington, DC 20006
(202) 719-7329 (O)
(202) 719-7049 (F)

*Counsel of Record for*
*Datatrac Information Systems, Inc.*

Of counsel:
Daniel P. Graham
Kevin J. Plummer
WILEY REIN & FIELDING LLP

Thomas L. McGovern III
HOGAN & HARTSON LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5784 (O)
(202) 637-5910 (F)

*Counsel of Record for*
*Lockheed Martin Aspen Systems Corp.*

Of counsel:
Michael D. McGill
HOGAN & HARTSON LLP

Dated: July 12, 2006

**Protected Information to be Disclosed Only in Accordance with
U.S. Court of Federal Claims Protective Order**

## TABLE OF CONTENTS


Page

I. STATEMENT OF THE ISSUES ..... 1

II. STATEMENT OF THE CASE ..... 3

A. The RFP ..... 3

B. Evaluation and Source Selection Decision ..... 4

C. GAO's Dismissal of L-3/MOI's Protest for Failure to Prosecute ..... 5

III. ARGUMENT ..... 6

A. Legal Standard for a Motion to Dismiss ..... 6

B. The Court Lacks Jurisdiction Because L-3MOI is Not an Interested Party ..... 7

1. L-3/MOI Falsely Represented that it Would Comply with the SCA When, In Fact, L-3/MOI Based Its Proposal On Non-SCA Labor Rates ..... 8

2. L-3 Failed to Meet the Mandatory Minimum Requirement to Staff 80 Percent of Its CSRs in a Single HUBZone ..... 13

3. L-3/MOI Has No Right to Amend Its Proposal to Cure Its Noncompliances ..... 15

C. Count I of the Complaint Fails to State a Claim Upon Which Relief Can Be Granted Because L-3/MOI Alleges No Conflict of Interest as a Matter of Law ..... 18

1. L-3/MOI Has Not Alleged a Violation of a Conflict of Interest Statute or Regulation ..... 18

2. The Cases Cited by L-3/MOI Confirm that No Actual or Apparent Interest Exists ..... 23

3. L-3 Cannot Establish Prejudice Due to an "Apparent"—But Not Actual—Conflict of Interest ..... 26

IV. CONCLUSION ..... 27

## TABLE OF AUTHORITIES

Page

### CASES

*ACR Elecs., Inc.*, B-266201, Jan. 24, 1996, 1996 CPD ¶ 19 ..........16

*Alaska Central Express, Inc. v. United States*, 50 Fed. Cl. 510 (2001) ..........6

*Alder Terrace, Inc. v. United States*, 161 F.3d 1372 (Fed. Cir. 1998) ..........6

*Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365 (Fed. Cir. 1999) ..........7

*ACS Government Services, Inc.*, B-293014, Jan. 20, 2004, 2004 CPD ¶ 18 ..........13

*Advanced Systems Technology, Inc.*, B-241530, Feb. 12, 1991, 91-1 CPD ¶ 153 ......22, 23

*Am. Fed. of Gov't Employees, AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) ..........7

*American Heritage Bancorp v. United States*, 61 Fed. Cl. 376 (2004) ..........12

*Ameriko, Inc.*, B-266034, Mar. 18, 1996, 96-1 CPD ¶ 17612 ..........12

*Architectural Preservation Consultants*, B-200872, Dec. 8, 1981, 81-2 CPD ¶ 446 ........22

*Banknote Corp. v. United States*, 365 F.3d 1345 (Fed. Cir. 2004) ..........26

*Beta Analytics International, Inc. v. United States*, 44 Fed. Cl. 131 (1999) ..........14, 15

*CACI, Inc.-Federal v. United States*, 719 F.2d 1567 (Fed. Cir. 1983) .......... *passim*

*CHE Consulting, Inc. v. United States*, 47 Fed. Cl. 331 (Fed. Cl. 2000) ..........7, 8, 12

*Colonial Storage Co.*, B-253501, Oct. 19, 1993, CPD ¶ 234 ..........15

*E.W. Bliss Co. v. United States*, 77 F.3d 445 (Fed. Cir. 1996) ..........7

*Ensign-Bickford Co.*, B- 211790, Apr. 18, 1984, 84-1, CPD ¶ 439 ..........22

*Express One International Inc. v. USPS*, 814 F. Supp. 93 (D.D.C. 1993) ..........23, 24, 25

*Frazier v. United States*, 67 Fed. Cl. 56 (2005) ..........3

*Galen Medical Associates v. United States*, 369 F.3d 1324 (Fed. Cir. 2004) ...... ....*passim*

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324 (Fed. Cir. 2001) ....................26

*Indium Corp. of America v. Semi-Alloys, Inc.*, 781 F.2d 879 (Fed. Cir. 1985) ....................6

*Information Technology & Applications Corp. v. United States*, 316 F.3d 1312 (Fed. Cir. 2003)....................7

*International Resources Recovery, Inc. v. United States*, 60 Fed. Cl. 1 (2004) ....................14

*JWK International Corp. v. United States*, 52 Fed. Cl. 650 (2002)....................16

*Keco Industrial, Inc. v. United States*, 203 Ct. Cl. 566, 492 F.2d 1200 (1974)....................26

*Linguistic Systems, Inc.*, B-296221, June 1, 2005, 2005 CPD ¶ 104....................15

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ....................6

*Lujan v. National Wildlife Fed.*, 497 U.S. 871 (1990)....................6

*Mangi Environmental Group, Inc. v. United States*, 47 Fed. Cl. 10 (2000) ....................10

*Mantech Telecommunications & Information System Corp.*, 49 Fed. Cl. 57 (2001) ....................8, 18

*Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618 (1978)....................25

*Myers Investigative & Security Services, Inc. v. United States*, 275 F.3d 1366 (Fed. Cir. 2002)....................7, 15, 16

*Newport News Shipbuilding & Dry Dock Co. v. Garrett*, 6 F.3d 1547 (Fed. Cir. 1993) ....................25

*Northern Virginia Service Corp.*, B-258036, Jan. 23, 1995, 95-1 CPD ¶ 36 ....................12

*Northrop Grumman Corp. v. United States*, 50 Fed. Cl. 443 (2001)....................8, 9, 12

*PSI Energy, Inc. v. United States*, 59 Fed. Cl. 590 (2004), *rev'd on other grounds*, 411, F.3d 1347 (Fed. Cir. 2005)....................27

*Planning Research Corp v. United States.*, 971 F.2d 736 (Fed. Cir. 1992)....................12

*Prospective Computer Analysts*, B-275262.2, Feb. 24, 1997, 97-2 CPD ¶ 22 ....................12

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Rex Service Corp. v. United States*, 448 F.3d 1305 (Fed. Cir. 2006) ....7

*Reynolds v. Army &Air Force Exchange Service*, 846 F.2d 746 (Fed. Cir. 1988) ....6

*Rig Masters, Inc. v. United States*, 70 Fed. Cl. 413 (2006) ....16

*Statistica, Inc. v. Christopher*, 102 F.3d 1577 (Fed. Cir. 1996) ....2, 27

*Synetics, Inc. v. United States*, 45 Fed. Cl. 1 (1999) ....8, 13

*TRW Environmental Safety Systems, Inc. v. United States,* 18 Cl. Ct. 33 (1989) ....24, 25

*United States v. International Business Machines Corp.*, 892 F.2d 1006 (Fed. Cir. 1990) .... *passim*

*United States v. Mississippi Valley Generating Co.*, 364 U.S. 520 (1961) .... *passim*

**STATUTES**

18 U.S.C. § 208 ....19, 20, 23

18 U.S.C. § 209 ....19

28 U.S.C. § 1491 ....7

31 U.S.C. § 3556 ....6

40 U.S.C. § 759 (repealed 1996) ....7

41 U.S.C. § 351 ....9

42 U.S.C. § 7216 (repealed) ....24, 25

**REGULATIONS**

4 C.F.R. § 21.3 ....6

5 C.F.R. § 735.201a ....20

29 C.F.R. § 4.3 ....9

48 C.F.R. (FAR) § 3.101-1 ....20, 21, 26

**TABLE OF AUTHORITIES**
(continued)

**Page**

48 C.F.R. (FAR) Subpt. 19.13 ....................4

48 C.F.R. (FAR) § 52.222-41 ....................9

48 C.F.R. (FAR) § 52.222-47 ....................9

**RULES**

RCFC 10 ....................3

RCFC 12 ....................1, 6

**MISCELLANEOUS**

Black's Law Dictionary (6th ed. 1990) ....................8

S. Rep. No. 170, 95th Cong., 2d Sess. 32 (1977), *reprinted in* 1978 U.S.C.C.A.N. 4216....................20

**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**(BID PROTEST)**

| | | |
|---|---|---|
| **MICRODYNE OUTSOURCING, INC., a subsidiary of L-3 COMMUNICATIONS CORP. TECHNOLOGIES CORP.,** | ) | |
| ***Plaintiff,*** | ) | **PROPOSED REDACTED VERSION** |
| **v.** | ) | |
| **THE UNITED STATES,** | ) | **No. 06-498** **Judge L. Margolis** |
| ***Defendant,*** | ) | |
| **and** | ) | |
| **DATATRAC INFORMATION SERVICES, INC., and LOCKHEED MARTIN ASPEN SYSTEMS CORP.,** | ) | |
| ***Intervenors.*** | ) | |

**DATATRAC'S AND ASPEN'S MEMORANDUM IN SUPPORT OF THEIR JOINT MOTION TO DISMISS PLAINTIFF'S COMPLAINT FOR LACK OF JURISDICTION AND FOR FAILURE TO STATE A CLAIM**

Intervenors Datatrac Information Services, Inc. ("Datatrac") and Lockheed Martin Aspen Systems Corp. ("Aspen") respectfully file this memorandum in support of their contemporaneously filed motion to dismiss Microdyne Outsourcing Inc.'s ("L-3/MOI's") July 6, 2006 Complaint for lack of jurisdiction under RCFC 12(b)(1) or, alternatively, for failure to state a claim upon which relief can be granted under RCFC 12(b)(6).

## I. STATEMENT OF THE ISSUES

L-3/MOI brazenly levels serious, but baseless, accusations against United States Citizenship and Immigration Services ("USCIS") and one of its senior employees. Ultimately, L-3/MOI's allegations are of no moment because L-3/MOI is not an "interested party" with

standing to protest the contract awards to Intervenors under 28 U.S.C. § 1491(b)(1). L-3/MOI failed to submit a proposal that conformed to the mandatory requirements of the RFP and was therefore ineligible for award. *Infra* § III.B. L-3/MOI compounded its nonresponsiveness by falsely representing that it had complied with certain mandatory requirements. *Infra* § III.B.1. Accordingly, regardless of any procurement violation alleged in the Complaint, L-3/MOI has no chance—let alone a "substantial chance"—of receiving a contract award under the Solicitation. *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996).

Even assuming, for the sake of argument, that L-3/MOI has standing to maintain this protest, Count I of the Complaint fails to state a claim upon which relief can be granted. Count I questions the personal integrity of a senior USCIS official and boldly accuses that official of suffering from an "apparent"—but not actual—conflict of interest by virtue of his former employment with Intervenors. Compl. ¶ 97. A conflict of interest, however, requires two current conflicting interests, and precedent in both this Court and GAO is clear that former employment by a competitor does not create a conflict, actual or apparent.

Intervenors' motion therefore presents the following issues:

1. Whether this Court lacks jurisdiction because L-3/MOI is not an "interested party" under 28 U.S.C. § 1491(b)(1) in light of the fact that L-3/MOI (A) submitted a proposal that failed to comply with mandatory requirements of the Solicitation, and (B) falsely represented its compliance with those requirements.

2. Whether Count I of L-3/MOI's Complaint states a claim upon which relief can be granted given that L-3/MOI has failed to allege a conflict of interest as a matter of law.

Intervenors submit that both questions should be answered in the negative, and that for the reasons set forth below, the Court should immediately dismiss L3/MOI's protest with prejudice.

## II. STATEMENT OF THE CASE

### A. The RFP

USCIS released the RFP on September 28, 2005 to procure call-center services in support of USCIS's National Customer Service Center ("NCSC"). Compl. Ex. Vol. I, Tab 5 at 83.[1] The NCSC supports USCIS's critical homeland security function of administering U.S. citizenship and immigration laws by providing nationwide assistance to customers who contact USCIS by telephone with questions about immigration services and benefits. *Id.* at 84. The RFP supported this program by soliciting offers for "Tier 1 Call Center services." *Id.* at 83.[2]

The RFP called for a "best value" source selection based on three evaluation factors: Technical Capability, Past Performance, and Price. *Id.* at 169. Technical Capability was the most important factor and, when combined with past performance, was "significantly more important than price." *Id.*[3] The RFP advised offerors that USCIS would "award without discussions," and that, "[c]onsequently, each offer should be submitted on the most favorable terms that the offering firm is able to submit to the Government." *Id.* at 168.

The RFP contained two mandatory requirements pertinent to this motion. First, the RFP informed offerors that the any resulting contract would be subject to the McNamara-O'Hara Service Contract Act ("SCA"), 41 U.S.C. § 351. In order to evaluate each offeror's compliance

---

[1] Because these documents are attached to the Complaint, they are considered part of the Complaint for purposes of a motion to dismiss. RCFC 10(c); *Frazier v. United States*, 67 Fed. Cl. 56, 59-60 (2005).

[2] All calls to the USCIS general service number are routed at first to an automated system. Compl. Ex. Vol. I, Tab 5 at 85. If it is unable to answer the customer's question, then the call is routed to contractor-run Tier 1 Customer Service Representatives, which "use Frequently Asked Questions (FAQ) scripts, and operational guidelines developed by USCIS to assist customers. More than 90% of callers requesting live assistance currently receive answers to their questions at the Tier 1 level." *Id.* If a call becomes too complicated or cannot be answered via the USCIS-provided information, then it is routed to a Tier 2 call center, which is staffed by USCIS employees. *Id.*

[3] All emphasis in this Memorandum is added unless otherwise indicated.

with the SCA, the RFP required each offeror to "include a breakdown of the labor classifications along with the corresponding rates, and all other costs necessary to provide the service required to allow for a comprehensive evaluation." Compl. Ex. Vol. I, Tab 5 at 175. The RFP further required each offeror to "certify that their rates properly reflect applicable Department of Labor Wage Determinations, if any, and identify those wage determinations that apply." *Id.*; *accord id.* at 167 ("The Offeror shall certify that their proposal properly reflects applicable Department of Labor Wage Determinations, and state the applicable DOL Wage Determination numbers, if any.").

Second, the RFP required each offeror to staff a minimum number of Customer Service Representatives ("CSRs") in a call center located in a single Historically Underutilized Business Zone ("HUBZone"). *Id.* at 91; *see generally* FAR Subpt. 19.13 (discussing the HUBZone program). The minimum number depended on whether the total staffing level across all call centers was greater or less than 300 CSRs:

> The Contractor shall locate one of its call centers in a HUBZone area. The Contractor shall have a minimum of 250 CSR's at its location within the HUBZone.
>
> If through contract performance and diminished call volume during the term of this contract the Contractor's total CSR staffing falls below 300 CSR's, it shall maintain a minimum of 80% of its total CSR complement at that location.

*Id.*

**B. Evaluation and Source Selection Decision**

A Technical Evaluation Committee ("TEC") evaluated the technical proposals and past performance of the offerors, while a Business Evaluation Committee ("BEC") evaluated the pricing and business proposals. *Id.* at 169. On April 3, 2006, the Source Selection Authority

("SSA") drafted his Source Selection Decision Document ("SSDD") in which he decided to award contracts to Datatrac and Aspen. *Id.*, Vol. II, Tab 26, at 193-97.[4]

The Contracting Officer ("CO") and members of the Department of Homeland Security's Office of Procurement Operations ("OPO"), though, did not believe that the SSDD was comprehensive enough. *See id.* at 190, 219-20. OPO was concerned that the decision did not adequately address the differences in price between Datatrac's and L-3/MOI's proposals. *See id.* at 245, 260. Similarly, the CO noted [redacted]. To allay these concerns, more information about the technical advantages of Datatrac's proposal was added to the SSDD. Also, additional information was provided by the BEC regarding the staffing levels proposed by Datatrac and L-3/MOI. *Id.*, Vol. I, Tab 16 at 571.

On April 27, 2006, the day after he received this BEC Addendum, the SSA finalized and signed the SSDD. *Id.*, Vol. II, Tab 26, at 327. The final SSDD still awarded the two contracts to Aspen and Datatrac; in fact, at no time did the SSA deviate in any way from its original decision to award to Aspen and Datatrac. The updated SSDD included the information from the BEC Addendum and many of the other changes suggested by OPO, including a comparison between the corporate experience of Datatrac and L-3 and more information about the importance to USCIS of Datatrac's technical advantages. *Id.*, Vol. I, Tab 13 at 537-40.

**C. <u>GAO's Dismissal of L-3/MOI's Protest for Failure to Prosecute.</u>**

L-3/MOI filed a protest of the awards to Datatrac and Aspen before the GAO on May 16, 2006. *Id.*, Tab 1. Aspen and Datatrac moved to dismiss that protest for lack of standing based

---

[4] Plaintiff has not provided Intervenors with a copy of Volume II of the Exhibits to the Complaint. However, Intervenors understand that Volume II, Tab 26 of the Exhibits is identical to Volume II, Tab 26 of the Agency Report filed at GAO. Accordingly, pinpoint citations to Tab 26 in this Memorandum are to USCIS's pagination, which is a six-digit bates stamp number.

on L-3/MOI's failure to submit a compliant proposal. These motions were rendered moot when, on June 30, 2006, GAO dismissed L-3/MOI's protest for failure to prosecute. Appendix at 2-4.[5] Specifically, GAO ruled that L-3/MOI had not filed its Comments on the Agency Report submitted by USCIS within the required 10-day period. *Id.*; 4 C.F.R. § 21.3(i).

## III. ARGUMENT

### A. Legal Standard for a Motion to Dismiss.

The burden of proving that the Court of Federal Claims has subject matter jurisdiction over a claim rests with the party seeking to invoke its jurisdiction. *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998). At the pleading stage, general factual allegations may suffice to meet this burden, for on a motion to dismiss the court "presumes that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. National Wildlife Fed.*, 497 U.S. 871, 889 (1990). However, because proper jurisdiction is not merely a pleading requirement, "but rather an indispensable part of the plaintiff's case, each element [of subject matter jurisdiction] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Therefore, "on a motion to dismiss for lack of subject matter jurisdiction under RCFC 12(b)(1), the court may consider all relevant evidence in order to resolve a factual dispute, including evidentiary matters outside the pleadings." *Alaska Central Express, Inc. v. United States*, 50 Fed. Cl. 510, 513 (2001) (citing *Indium Corp. of Am. v. Semi-Alloys, Inc.*, 781 F.2d 879, 884 (Fed. Cir. 1985)); *accord Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988).

[5] GAO's decision is part of the administrative record per 31 U.S.C. § 3556.

**B. The Court Lacks Jurisdiction Because L-3MOI is Not an Interested Party.**

Standing is a threshold jurisdictional issue. *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002). In order to establish standing under 28 U.S.C. § 1491(b)(1), L-3/MOI must show that it is an "actual or prospective bidder[] or offeror[] whose direct economic interest would be affected by the award of the contract or by failure to award the contract,' *i.e.*, that [it is] an interested party, prejudiced by the award." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (quoting *Am. Fed. of Gov't Employees, AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001)) (first and second alteration in original).

It is well-settled that a protester that fails to comply with a mandatory requirement in a Solicitation is not an "interested party" because it is ineligible for award and therefore has no economic interest in the procurement: "A nonresponsive bidder is the epitome of one who lacks a direct economic interest. This is not a mere technicality; it is the predicate for the [Court's] right to intervene in governmental procurements." *United States v. Int'l Bus. Machines Corp.*, 892 F.2d 1006, 1012 (Fed. Cir. 1990)[6]; *CHE Consulting, Inc. v. United States*, 47 Fed. Cl. 331, 337 (2000) ("The *IBM* decision plainly instructs that the phrase 'interested party' does not include a party that makes a nonresponsive bid."); *see generally Myers*, 275 F.3d at 1370-71 ("Although [the protester] need not show that it would have received the award in competition with other hypothetical bidders, it had to show that it would have been a qualified bidder."). Agencies are "strictly bound" to the terms and requirements set forth in a solicitation, and any proposal that fails to meet those provisions may not be considered for award. *Alfa Laval*

[6] Although *IBM* involved the application of the term "interested party" in the Brooks Automatic Data Processing Act, 40 U.S.C. § 759 (repealed 1996) ("Brooks Act"), the Federal Circuit has held that "the definition of 'interested party' in the Brooks Act applies to the Tucker Act with equal force." *Rex Service Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006).

*Separation, Inc. v. United States*, 175 F.3d 1365, 1367-68 (Fed. Cir. 1999). The Court of Federal Claims has consistently held that an award cannot be based on a proposal that does not comply with material solicitation specifications. *E.g., Mantech Telecommunications & Info. Sys. Corp.*, 49 Fed. Cl. 57, 71 (2001) ("It is fundamental that a materially noncompliant proposal cannot form the basis of an award."). Accordingly, the Court must independently determine whether the protester's proposal complied with the RFP, even where the protester was not affirmatively disqualified by the agency. *IBM*, 892 F.2d at 1012. "If a bid is not responsive, the protester has no more right to invoke the office of the [Court] than the proverbial man on the street." *Id.*; *accord CHE*, 47 Fed. Cl. at 337.

Similarly, a protester whose proposal contains a material misrepresentation cannot be an interested party. As the Court has stated,

> A bidder to a government contract who makes material misstatements in its proposal taints the award to such a bidder. Misrepresentations in bid proposals prevent government officials from determining the best value to the government and retard the competitive bidding process. When a bidder is found to have misrepresented its ability to perform a contract, that bidder will lose its right to execute the solicited work or bid on the reprocurement of the contract.

*Northrop Grumman Corp. v. United States*, 50 Fed. Cl. 443, 468 (2001). An "intentional misrepresentation occurs when a party makes a 'false statement of a substantive fact . . . [that] lead to a belief of a substantive fact material to proper understanding of the matter in hand, made with the intent to deceive or mislead.'" *Synetics, Inc. v. United States*, 45 Fed Cl. 1, 16 (1999) (quoting BLACK'S LAW DICTIONARY 1001 (6th ed. 1990)).

**1. L-3/MOI Falsely Represented that it Would Comply with the SCA When, In Fact, L-3/MOI Based Its Proposal On Non-SCA Labor Rates.**

L-3/MOI complains that USCIS's best value determination was "irrational" and that the limited price difference between the technically superior awardees and L-3/MOI constituted an

"unconscionably high price premium." Compl. ¶¶ 107-08. L-3/MOI's lower price, however, is partially explained by its refusal to pay its employees the living wage required by the SCA and the RFP. Indeed, L-3/MOI failed to comply with the RFP SCA provisions in two material respects. First, L-3/MOI took exception to the mandatory requirement, expressing an intent to pay wages that do not satisfy the SCA or the RFP. *IBM*, 892 F.2d at 1012. Second, L-3/MOI made a false, material representation in its proposal that it had complied with the SCA in pricing its proposal. *Northrop Grumman Corp.*, 50 Fed. Cl. at 468. As such, L-3/MOI is not an "interested party" with standing to protest USCIS's contract awards.

The RFP informed offerors that any resulting contract would be subject to the SCA and incorporated by reference the contract clauses at FAR §§ 52.222-41 to 52.222-47. Compl. Ex. Vol. I, Tab 5 at 140, 146.[7] These clauses and the SCA itself require that all federal service contractors with contracts exceeding $2,500 pay service employees a minimum wage determined by the Department of Labor ("DOL"). 41 U.S.C. § 351(a)(1); FAR § 52.222-41(c)(1) ("Each service employee employed in the performance of this contract by the Contractor . . . shall be paid not less than the minimum monetary wages . . . determined by the Secretary of Labor . . . ."); 29 C.F.R. § 4.3 (DOL wage determinations).

In order to evaluate compliance with the SCA, the RFP required each offeror to "include a breakdown of the labor classifications along with the corresponding rates, and all other costs necessary to provide the service required to allow for a comprehensive evaluation." Compl. Ex. Vol. I, Tab 5 at 175. The RFP further required each offeror to "certify that their rates properly reflect applicable Department of Labor Wage Determinations, if any, and identify those wage

[7] The work solicited by the RFP is comprised primarily by "the staffing and management of necessary customer service representative (CSR) support." Compl. Ex., Vol. I, Tab 5 at 83. Because of the service-intensive nature of this procurement, labor costs—particularly wages for CSRs—are the primary drivers behind each offeror's proposed price.

determinations that apply." *Id.*; *accord id.* at 167 ("The Offeror shall certify that their proposal properly reflects applicable Department of Labor Wage Determinations, and state the applicable DOL Wage Determination numbers, if any.").

L-3/MOI proposed to locate its call centers [redacted], and to employ CSRs at those locations. For the [redacted] location, L-3/MOI included, as part of its proposal, a CSR wage rate of [redacted] *Id.*, Tab 12 at 511. In [redacted] L-3/MOI proposed to pay its CSRs [redacted] L-3/MOI certified that both wages "meet or exceed the US Department of Labor Wage Determinations for those locations." *Id.* at 520. L-3/MOI, however, did not identify the wage determinations for [redacted] that it used, notwithstanding the RFP's explicit instruction that it do so. *See Mangi Envtl. Group, Inc. v. United States*, 47 Fed. Cl. 10, 17-18 (2000) (failure to provide required information renders proposal noncompliant).

Because L-3/MOI certified that it was compliant with the SCA, USCIS accepted L-3/MOI's proposal. Compl. Ex. Vol. I, Tab 15 at 569. USCIS nevertheless documented its suspicion that L-3/MOI might have misapplied the SCA in pricing its proposal. Specifically, the BEC noted that, while L-3/MOI had certified that CSRs would be paid SCA rates, [redacted] *Id.* In light of these and other problems with L-3/MOI's proposal, the BEC determined that [redacted] *Id.*

USCIS's suspicion was right. In its comments on the Agency Report filed with the GAO on June 26, 2006, L-3/MOI for the first time disclosed [redacted] These attachments, though, are not DOL prevailing wage rate determinations; rather, they are [redacted]. *Id.* at 22-25.

[redacted]

The [redacted] wage rate does not satisfy the DOL wage rate for a CSR in [redacted], as mandated by the SCA and the RFP. Although DOL does not have an occupation title called "Customer Service Representative," the appropriate DOL classification is a "General Clerk," which has a minimum wage rate of [redacted] The Employee Classification provided in the RFP is "Clerk GS-303-1/2," which maps directly to the "General Clerk I" DOL Wage Rate classification. Compl. Ex. Vol. I, Tab 5 at 140. It turns out that L-3/MOI proposed to pay its employees nearly [redacted] less than the required prevailing federal wage, in clear violation of the SCA, the RFP, and L-3/MOI's own certification in its proposal.[9]

---

[8] The wage rate is based on [redacted] hours per year ([redacted] hours a week for [redacted] weeks).

[9] Only the following occupations have a minimum federal wage rate less than [redacted]

| Occupation | Minimum Wage Rate |
|---|---|
| Food Service Worker | [redacted] |
| Dishwasher | [redacted] |
| Waiter/Waitress | [redacted] |
| Housekeeping Aid I | [redacted] |
| Maid or Houseman | [redacted] |
| Various Laundry, Dry Cleaning, Pressing and Related Occupations | [redacted] |
| Personal Needs Chore Aid | [redacted] |
| Parking and Lot Attendant | [redacted] |
| Animal Caretaker | [redacted] |
| School Crossing Guard | [redacted] |

[redacted] Intervenors cannot fathom how L-3/MOI could have thought it appropriate to classify its CSRs among these occupation fields.

L-3/MOI's failure to comply with the requirements of the SCA and the RFP renders L-3/MOI ineligible for award. *IBM*, 892 F.2d at 1012; *CHE*, 47 Fed. Cl. at 337. The Comptroller General has held:

> In situations where there is an indication on the face of an offer that the offeror does not intend to pay SCA mandated wage rates, that offer cannot be accepted, as is, without either an adjustment in the cost evaluation, if any is conducted, or some other method of ensuring that other offerors, who have in fact complied with the SCA, are not prejudiced.

*Northern Virginia Serv. Corp.*, B-258036, Jan. 23, 1995, 95-1 CPD ¶ 36 (internal citations omitted). Where, as here, an offeror "takes exception to the terms of the solicitation" with regards to the SCA, then such a proposal is non-responsive and the offeror is ineligible for award. *See Prospective Computer Analysts*, B-275262.2, Feb. 24, 1997, 97-2 CPD ¶ 22; *Ameriko, Inc.*, B-266034, March 18, 1996, 96-1 CPD ¶ 176. L-3/MOI, having admitted in its GAO comments that it priced its proposal using [redacted] lower [redacted] wage rates, has demonstrated a clear intention to evade the SCA. As a result, L-3/MOI did not submit a responsive proposal, is ineligible for award, and lacks standing to maintain this protest.

Further, L-3/MOI's certification that its rates "meet or exceed the US Department of Labor Wage Determinations" is clearly false. Compl. Ex. Vol. I, Tab 12 at 520; *id.* Tab 5 at 167, 175. A false certification is, as a matter of law, a material misrepresentation. *See Am. Heritage Bancorp v. United States*, 61 Fed. Cl. 376, 393 (2004). As courts repeatedly have stated, material misrepresentations require that the offending proposal be disqualified from competition or recompetition. *Planning Research Corp. v. United States,* 971 F.2d 736, 740-41 (Fed. Cir. 1992); *Northrop Grumman Corp.*, 50 Fed. Cl. at 468. As the offeror of such a proposal, L3/MOI cannot be considered an interested party, for its connection to the solicitation and its particular interest in the awarding of the contract no longer exists. *IBM*, 892 F.2d at

1012. The Comptroller General's decisions are fully in accord. *E.g., ACS Gov't Servs., Inc.*, B-293014, Jan. 20, 2004, 2004 CPD ¶ 18 (citing a number of protests where an offeror's bid or proposal was rejected because it contained a materially false certification); *see also Synetics, Inc.*, 45 Fed. Cl. at 16 (providing GAO cases where misrepresentations were found).

The Court cannot allow a contractor to avail itself of the protest process and challenge the agency's conduct of a procurement when that contractor itself refused to comply with the basic rules and requirements of the RFP and made false representations to the agency. For these reasons, L-3/MOI's protest should be dismissed.

**2. L-3 Failed to Meet the Mandatory Minimum Requirement to Staff 80 Percent of Its CSRs in a Single HUBZone.**

L-3/MOI is not an interested party for the additional reason that its proposal fails to satisfy a mandatory requirement regarding staffing at a single HUBZone location. Specifically, L-3/MOI proposed to staff the contract work with only [redacted] CSRs (out of a total of [redacted] proposed) in the [redacted] HUBZone, which falls short of the explicit mandatory requirement to locate a minimum of 80 percent of the CSRs at a single HUBZone location.

Under the "Facilities" specifications, the following RFP provision mandated that, if the total staffing was less than 300 CSRs, offerors were required to propose to staff at least 80 percent of its CSRs at a single HUBZone call center:

> The Contractor shall locate one of its call centers in a HUBZone area. The Contractor shall have a minimum of 250 CSR's at its location within the HUBZone.
>
> If through contract performance and diminished call volume during the term of this contract the Contractor's total CSR staffing falls below 300 CSR's, it shall maintain a minimum of 80% of its total CSR component at that location.
>
> The Contractor shall maintain a minimum of 2 call centers. No one site may have more than 80% of the Contractor total CSR staffing.

Compl. Ex. Vol. I, Tab 5 at 91. By stating that offerors "shall" comply with the 80 percent requirement, the RFP established a minimum mandatory requirement.[10]

USCIS also emphasized and explained this mandatory minimum specification through numerous "questions and answers" ("Q&As") issued in connection with amendments to the RFP. For example, Amendment 000001 included the following Q&A:

> QUESTION: Section 4 Facilities, page I-9, says, "The Contractor shall locate one of its call centers in a HUBZONE area. The contractor shall have a minimum of 250 CSR's at its location within the HUBZone." May the contractor split the 250 CSR's between facilities, if each is in a HUBZone? Can the 250-CSR minimum include both full-time and part-time CSR's?
>
> ANSWER: <u>250 CSR's must be within the same HUBZone</u>.
>
> QUESTION: Section I, paragraph 4, Facilities, page I-9. Does the minimum number of CSR's (250) in a HUBzone location have to be dedicated to the NCSC call center?
>
> ANSWER: Yes.

Compl. Ex. Vol. I, Tab 6 at 208, 210. Similarly, Amendment 000002 explained:

> QUESTION: On page I-9, you require that each call center have a minimum complement of 50 CSR's; that one of the Call Centers be located in a HUBZone area and have a minimum of 250 CSR's within that HUBZone location. Next you state that if the CSR staffing falls below 300 CSR's, the contract[or] shall maintain a minimum of 80% of its total complement at that location. Are you referring to maintaining 80% at the HUBZone location?
>
> ANSWER: Yes.

*Id.* Tab 7 at 227.[11] Thus, this mandatory requirement—which L-3/MOI's proposal failed to comply with—was clearly and explicitly stated in the RFP.

---

[10] *See Int'l Res. Recovery, Inc. v. United States*, 60 Fed. Cl. 1, 7 (2004) (use of word "must" in technical specification created a minimum mandatory requirement); *Beta Analytics Int'l, Inc. v. United States*, 44 Fed. Cl. 131, 139 (1999) (use of terms such as "shall" and "must" "reinforce[ ] interpretation that a compliant proposal required" labor categories prefaced with those terms).

L-3/MOI's Cost Analysis Schedule (Attachment 8 to its proposal) indicates its intent to [redacted]. *Id.*, Tab 12 at 511. Since L-3/MOI proposed only [redacted], it was required to propose to staff 80 percent of its CSRs—[redacted]—at a call center within a single HUBZone. (The agency clearly stated that CSRs staffed at separate call centers located in separate HUBZones could not be combined for purposes of the 80 percent requirement. *See id.*, Tab 6 at 208.) In fact, L-3/MOI concedes in its TRO Motion that its proposal was based on only maintaining [redacted] CSRs, regardless of the total staffing level at all sites, at any of its locations. Memorandum of Points and Authorities In Support of Plaintiff's Application for Temporary Restraining Order and Motion for Preliminary Injunction (July 6, 2006) ("TRO Br.") at 15. Accordingly, L-3/MOI's proposal is not responsive to the RFP and L-3/MOI lacks standing because it does not comply with this mandatory requirement. *See IBM Corp.*, 892 F.2d at 1012 (offeror that fails to submit a responsive proposal lacks standing to protest); *Myers*, 275 F.3d at 1370-71 (offeror that is ineligible for award lacks standing).

**3. L-3/MOI Has No Right to Amend Its Proposal to Cure Its Noncompliances.**

The RFP put offerors on clear notice that USCIS intended to make an award without discussions: "The Government intends to award without discussions with Offerors (except

[11] L-3/MOI has no basis to argue that the Q&As should be ignored when determining the meaning of the CSR/HUBZone requirement because these Q&As simply explain and do not modify the terms of the RFP. *See Beta Analytics*, 44 Fed. Cl. at 139-40 (Q&As reinforced the solicitation's minimum mandatory requirements); *see also Linguistic Sys., Inc.*, B-296221, June 1, 2005, 2005 CPD ¶ 104 (protestor could not ignore the Q&As and was required to protest objectionable answers before deadline for receipt of quotations); *cf. Colonial Storage Co.*, B-253501, Oct. 19, 1993, 93-2 CPD ¶ 234 (although Q&As not expressly incorporated into RFP, agency is "bound by its responses, particularly where the RFP is not otherwise clear and one or more offerors would be prejudiced if the agency does not adhere to its statements").

communications conducted for the purpose of clarification). Consequently, each offer should be submitted on the most favorable terms that the offering firm is able to submit to the Government." Compl. Ex. Vol. I, Tab 5 at 168. Consistent with this statement, the BEC recognized that L-3/MOI did not submit a compliant proposal and noted that it could not award a contract to L-3/MOI based on the proposal. *Id.*, Tab 15 at 569 ("These issues will need to be clarified and remedied before an award could be made to L3."). The BEC further recognized that L-3/MOI's proposed rates did not match the wage rate for any labor category at the [redacted] but ultimately accepted L-3/MOI's false certification that it had complied with the SCA. *Id.*

Because USCIS decided to make an award without discussions, *id.*, Tab 13 at 532, L-3/MOI was not entitled to remedy these defects in its proposal. *Rig Masters, Inc. v. United States*, 70 Fed. Cl. 413, 421 (2006) (where "[t]he Solicitation placed all potential bidders, including plaintiff, on notice that the [agency] intended to award the contract without discussion," agency "was not obligated to enter into discussions with plaintiff" to allow it "to revise deficiencies in its proposal"); *JWK Int'l Corp. v. United States*, 52 Fed. Cl. 650, 662-63 (2002) (rejecting plaintiff's bid protest and stating that "what plaintiff seeks here is precisely that which the Solicitation warned it might not have—an opportunity, via further discussions, to correct major deficiencies in its proposal"); *see also ACR Elecs., Inc.*, B-266201, Jan. 24, 1996, 96-1 CPD ¶ 19 at *4[12] (burden is on protestor to submit initial proposal that "met the salient characteristics of the solicitation, and the protestor ran the risk of having its proposal rejected by failing to do so"). Moreover, insofar as L-3/MOI has never challenged USCIS's decision to

[12] Pinpoint citations to GAO bid protest decisions refer to the pagination as reported by Westlaw.

award without discussions, there is no pending protest ground that L-3/MOI might argue would permit it to cure this defect or any other noncompliant aspect of its proposal.

Because the HUBZone staffing requirement and L-3/MOI's related standing defect was raised at GAO prior to the dismissal of L-3/MOI's protest,[13] L-3/MOI attempts to side-step the HUBZone staffing requirement in its Complaint. *See* Compl. ¶ 56. Conspicuously absent from L-3/MOI's allegations, however, is any attempt to demonstrate compliance with the 80 percent HUBZone minimum requirement. To the contrary, L-3/MOI alleges that the requirement was ambiguous and insists that it only was required to [redacted]" TRO Br. at 15. L-3/MOI's Complaint references Attachment 8 of its pricing proposal (the very document that reveals the inadequate staffing) and attempts to defend it by stating that [redacted] *Id.* ¶ 57. This statement does nothing to justify the noncompliant proposal, but rather acknowledges that the proposal on its face does not comply with the 80 percent requirement at this call volume. Moreover, the [redacted] and at that level L-3/MOI's proposal clearly fails to satisfy the minimum mandatory 80 percent HUBZone staffing requirement.

The Solicitation dictated that the 80 percent HUBZone staffing specification was a minimum mandatory requirement. *Supra* § III.B.2. Likewise, the RFP required offerors to comply with the SCA and certify that their proposals were priced in accordance with the SCA. *Supra* § III.B.1. Because L-3/MOI's proposal, on its face, does not comply with either requirement, L-3/MOI did not submit a responsive proposal and would not be in line for award if

---

[13] Although Aspen requested dismissal of L-3/MOI's protest for failure to comply with the RFP's staffing requirements, Aspen's motion to dismiss became moot when GAO dismissed L-3's protest for failure to file comments to the USCIS's agency report.

the protest were sustained. *Mantech*, 49 Fed. Cl. at 71 (noting that failure to comply with Solicitation would preclude offeror from receiving award). Accordingly, as a nonresponsive offeror, L-3/MOI does not have standing to protest USCIS's award decisions. *IBM Corp.*, 892 F.2d at 1012.

## C. <u>Count I of the Complaint Fails to State a Claim Upon Which Relief Can Be Granted Because L-3/MOI Alleges No Conflict of Interest as a Matter of Law.</u>

### 1. L-3/MOI Has Not Alleged a Violation of a Conflict of Interest Statute or Regulation.

"In order to prevail on its conflict of interest claim, [a protester] must establish a violation of statutory or regulatory conflict of interest provisions." *Galen Med. Assocs. v. United States*, 369 F.3d 1324, 1335 (Fed. Cir. 2004). Count I of the Complaint alleges that [redacted], suffered from an "apparent" conflict of interest because he "is a former employee of both Datatrac and Aspen." Compl. ¶ 27. Because these facts fail to establish a violation of any statute or regulation, Count I should be dismissed for failure to state a claim.

First things first—L-3/MOI does not affirmatively allege that [redacted] suffered from an <u>actual</u> conflict of interest. Instead, L-3/MOI alleges only that:

> [redacted] a former employee of the Apparent Awardees was associated with the technical evaluations of the proposals in this Procurement including the proposals submitted by his former employers creating <u>at a minimum, and apparent conflict of interest expressly prohibited by FAR 3.101-1</u>.

Compl. ¶ 97.

L-3/MOI cannot allege an actual conflict of interest for the simple reason that L-3/MOI cannot allege two conflicting interests. The primary case cited in L-3's Motion for a Temporary Restraining Order ("TRO"), *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 548-49 (1961), makes clear that a conflict of interest arises only when one tries to simultaneously

"serve two masters." Here, nothing in L-3/MOI's Complaint supports an inference that [redacted] has any ongoing interest in either Datatrac or Aspen, or any other interest that arguably conflicts with the interests of the Government.

Actual conflicts of interest are governed by the Ethics in Government Act. 18 U.S.C. §§ 201-218. L-3/MOI makes no allegation that [redacted] violated any of these provisions. Specifically, 18 U.S.C. § 208 (the successor statute to the provision at issue in *Mississippi Valley*, 364 U.S. at 524 & n.2) provides that a Federal Government employee may not participate in a particular matter in which the employee or certain others specified in the statute "has a financial interest." 18 U.S.C. § 208(a). Section 208's use of the present tense is unmistakable—the focus is on current financial interests that would be directly affected by the official's performance of her duties.[14]

L-3/MOI's allegations do not establish an apparent conflict of interest either. The Federal Circuit's decisions in *Galen Medical*, 369 F.3d 1324, and *CACI, Inc.-Federal v. United States*, 719 F.2d 1567 (Fed. Cir. 1983), are dispositive on this point. The protester in *CACI* alleged a conflict of interest based on the fact that four of the five members of the proposal evaluation board were alleged to have "prior professional or social relationship[s]" with a Mr. Stevens, the vice president of the successful bidder. *Id.* 1567, 1571. Specifically, the Chairman of the Technical Evaluation Committee—a Mr. Anderson—"had worked either directly or indirectly for Stevens since 1971, in both the government and the private sector." *Id.* at 1571. The Federal Circuit reversed the Claims Court's injunction against the contract award, holding

[14] Section 208's use of the present tense parallels 18 U.S.C. § 209(a), which prohibits any outside "contribution to or supplementation of salary, as compensation for . . . services as an officer or employee of the executive branch of the United States Government." Again, the question is whether two current interests are in conflict—Section 209 focuses on outside payments made while the official is employed by the Government.

that the evaluators' prior relationship with the contractor did not violate any statute or regulation or otherwise undermine the agency's award decision. *Id.* at 1575-82.

In reversing the Claims Court, the Federal Circuit in *CACI* criticized the Claims Court for sustaining the protest based on "the appearance of evil":

> A major thrust of the decision of the Claims Court was that there was both the opportunity for and the appearance of impropriety in that process. That was not an adequate or proper basis for enjoining the award of the contract to Sterling.

*Id.* at 1581. Specifically, the Federal Circuit criticized the Claims Court's reliance on 5 C.F.R. § 735.201a (repealed), which, like FAR § 3.101-1, instructed Federal employees to "avoid any action, whether or not specifically prohibited by this subpart, which might result in or create the appearance of . . . (d) Losing complete independence or impartiality; . . . or (f) Affecting adversely the confidence of the public in the integrity of the Government." According to the Federal Circuit:

> This regulation merely provides general standards to guide government employees in the performance of their duties. It does not create specific and precise standards, the violation of which would justify enjoining the Department from awarding a contract.

*CACI*, 719 F.2d at 1581. The Court further recognized that conflict of interest laws must be carefully applied so as to not interfere with the effective functioning of the government:

> "Conflict of interest standards must be balanced with the government's objective in attracting experienced and qualified persons to public service. . . . There can be no doubt that overly stringent restrictions have a decidedly adverse impact on the government's ability to attract and retain able and experienced persons in federal office."

719 F.2d at 1578 (quoting S. Rep. No. 170, 95th Cong., 2d Sess. 32 (1977), *reprinted in* 1978 U.S.C.C.A.N. 4216, 4248).

The Federal Circuit reiterated the *CACI* holding in *Galen Medical*, 369 F.3d 1324, which L-3/MOI cites with approval. TRO Br. at 10. The protester in *Galen Medical* argued that an appearance of impropriety was created because one of the evaluators was a past performance reference for the awardee. 369 F.3d at 1335. The Court found it:

> significant that no code section forbids an agency official listed as one to validate past performance reference from serving as an evaluator. This gap is especially noteworthy in light of the specificity with which the regulations restrict certain activities such as: employment negotiations (48 C.F.R. § 3.104-3), receipt of gifts or favors (48 C.F.R. § 3.101-2), and disclosure of proposal information (48 C.F.R. § 603.104-4).

*Galen Medical*, 369 F.3d at 1336.

With respect to the protester's argument that an appearance of a conflict was created that would violate FAR § 3.101-1,[15] the *Galen Medical* Court made clear that "[f]or even an appearance of a conflict of interest to exist, a government official must at least appear to have some stake in the outcome of government action influenced by that individual." 369 F.3d at 1336. Because no actual or apparent conflicting interest was shown, the Court affirmed the denial of the protest:

> And even to the extent the regulations require that any conflict of interest or even the appearance of a conflict of interest in government-contractor relationships be avoided, 48 C.F.R. § 3.101-1, Galen has failed to show any potential symbiotic relationship between the technical evaluators and Downing. Indeed, Galen has not shown that Kirkpatrick or any other evaluator had any "interest" or any appearance of an "interest" in an award of the contract to Downing. Galen has presented no evidence of any impact an award of the contract to either Downing or Galen would have on any of the evaluators. . . . The mere presence of an individual's name on list of past

[15] The Court declined to decide whether a violation of FAR § 3.101-1, standing alone, would provide sufficient grounds to enjoin a contract award. *Galen Medical*, 369 F.3d at 1336. Instead, the Court assumed, for the sake of argument, that it would and ruled that no appearance of a conflict existed. *Id.* at 1336-37.

> performance references does not indicate any "interest" on the part of that individual in the final outcome of the evaluation.

*Id.* at 1336-37.

Here, and contrary to the holdings in *Galen Medical* and *CACI*, L-3/MOI has not alleged that [redacted] "had any 'interest' or any appearance of an 'interest' in an award of the contract" to Datatrac or Aspen. *Id.* at 1336. Nor has L-3/MOI alleged that the awards to Intervenors had any financial impact on [redacted]. *Id.* As in *Galen Medical* and *CACI*, the mere fact that [redacted] worked for Intervenors in the past "does not indicate any 'interest' on the part of that individual in the final outcome of the evaluation." *Id.* at 1337; *accord CACI*, 719 F.2d at 1575-82 (fact that evaluator worked for contractor's vice president did not establish an actual or apparent conflict of interest).

The Comptroller General has reached the same conclusion as the Federal Circuit and has long recognized that "<u>[t]here is no rule or regulation . . . that prohibits an evaluator from participating in the evaluation of a proposal submitted by an offeror by which he previously was employed some years ago</u> so long as there is no <u>actual</u> bias or conflict of interest." *Ensign-Bickford Co.*, B- 211790, Apr. 18, 1984, 84-1 CPD ¶ 439 at *5-6; *accord Architectural Pres. Consultants*, B-200872, Dec. 8, 1981, 81-2 CPD ¶ 446 at *2; *see also Advanced Sys. Tech., Inc.*, B-241530, Feb. 12, 1991, 91-1 CPD ¶ 153 at *9 (rejecting conflict of interest allegation and adopting the Agency's response that "the fact that this individual was once employed by TBE does not disqualify her from serving on an evaluation panel here and does not create a conflict of interest with her service on the SSEB"). These cases establish that former employment by a competitor, standing alone, cannot establish a conflict of interest. Instead, consistent with the Federal Circuit's decision in *Galen Medical*, the protester must establish that the official retains some actual interest in the former employer. 369 F.3d at 1336-37.

Because L-3/MOI's Complaint fails to allege that [redacted] has a current interest in this procurement that conflicts with the interests of the Government, Count I of the Complaint fails to state a claim for which relief can be granted and should be dismissed.

**2. The Cases Cited by L-3/MOI Confirm that No Actual or Apparent Interest Exists.**

Besides *Mississippi Valley*, which involved an actual conflict of interest in violation of the predecessor statute to 18 U.S.C. § 208, 364 U.S. at 562,[16] L-3/MOI relies on two other cases in its Motion for a TRO as support for the proposition that [redacted] involvement in this procurement violated a statute or regulation because of an "apparent" conflict. Like *Mississippi Valley*, however, both of these cases involved actual, and not apparent, conflicts of interest, and therefore provide no support to L-3/MOI. L-3/MOI can cite no case in which a contract award was overturned based on an apparent—as opposed to actual—conflict of interest.

*Express One International Inc. v. USPS*, 814 F. Supp. 93 (D.D.C. 1993), involved an actual conflict of interest. The Court says as much in the opening paragraph of its discussion: "There existed a conflict of interest on the part of William G. Cole due to his contacts with Conrad Kalitta." *Id.* at 96; *accord id.* at 98 (concluding that "a conflict of interest existed"). In *Express One*, Mr. Cole, a USPS evaluator, conducted employment discussions with Mr. Kalitta, the Chief Executive Officer of a contractor that was bidding on the procurement for which Mr. Cole was an evaluator. *Id.* at 95-96. As such, *Express One* is a classic case of a Government Official trying to "serve two masters": the interests of the Government as well as the evaluator's conflicting interest in obtaining employment with the contractor.

---

[16] The Court "emphasize[d] that our specific holding, on the facts before us, is that § 434 forbids a government agent from engaging in business transactions on behalf of the Government if, by virtue of his private interests, he may benefit financially from the outcome of those transactions." *Miss. Valley*, 364 U.S. at 562.

> The fact that Mr. Cole deferred interviewing until after August 28 is therefore of no moment; Mr. Cole still had an ongoing relationship with Mr. Kalitta and therefore still was subject to the influence of his potential future employer. The temptation to assist the source of future employment—here AIA—is exactly the type of conflict of interest that statutes and ethical principles are designed to prevent. And it is exactly the type of conflict of interest the government must—and should have here—prevented.

*Id.* at 98.

As discussed above, it is precisely because L-3/MOI has pled no "ongoing relationship" between [redacted] and either of the Intervenors that Count I fails to state a claim. *Id.* Nor has L-3/MOI alleged any facts that would support an inference that [redacted] is "subject to the influence" of Datatrac or Aspen. *Id.* *Express One* is therefore easily distinguished.

The other case cited in L-3/MOI's Motion for a TRO, *TRW Environmental Safety Systems, Inc. v. United States*, 18 Cl. Ct. 33 (1989), further confirms that L-3/MOI has failed to plead a conflict of interest. The Court in that case sustained a protest based on "the violation of a distinctly focused conflict of interest statute." 18 Cl. Ct. at 65. *TRW* turned on a unique statute applicable to the Department of Energy that provided:

> For a period of one year after terminating any employment with any energy concern, no supervisory employee shall knowingly participate in any Department proceeding in which his former employer is substantially, directly, or materially involved, other than in a rulemaking proceeding which has a substantial effect on numerous energy concerns.

42 U.S.C. § 7216 (repealed). The Court in *TRW* overturned the contract award in that case because a subcontractor to the awardee had employed the Chairman of the SSEB within one year of his activities on the SSEB, in violation of § 7216. 18 Cl. Ct at 44-64.[17]

[17] L-3/MOI incorrectly states that "[t]he Court found the appearance of bias resulting from this conflict—in and of itself—was sufficient to justify permanently enjoining" the contract award. TRO Br. at 10. The Court's opinion in *TRW* says no such thing. Instead, the Court makes clear

L-3/MOI, of course, does not allege a violation of a "distinctly focused conflict of interest statute" for the Department of Homeland Security or USCIS. *Id.* at 65. Indeed, the fact that Congress would pass such a statute for the Department of Energy, but not for other agencies, demonstrates that Congress believed, as a general matter, that there is no conflict of interest when someone moves from the private sector to the public sector. Had such conduct already been prohibited, there would have been no need for § 7216. In fact, § 7216 itself no longer exists, having been repealed in 1993. Accordingly, Congress determined that § 7216 set too stringent a standard, even for the Department of Energy.

*Express One* and *TRW* therefore confirm the insufficiency of L-3/MOI's allegations. L-3/MOI deliberately chose not to allege an actual conflict of interest (*Express One*), and has not alleged a violation of a conflict of interest statute (*TRW*). Instead, L-3/MOI argues that there is an "apparent" conflict of interest, but fails to identify any interest—real or apparent—that supposedly conflicts with the interests of the Government. According to clear Federal Circuit precedent, such allegations are patently insufficient. *Galen Medical*, 369 F.3d at 1337; *CACI*, 719 F.2d at 1575-82.

Ultimately, L-3/MOI invites the Court to rewrite the conflict of interest laws and regulations, and to substitute its own, more expansive, requirements for those chosen by Congress and the FAR Council. This the Court cannot do. *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 626 (1978) ("[Courts] have no authority to substitute [their] views for those expressed by Congress in a duly enacted statute."); *Newport News Shipbuilding & Dry Dock Co. v. Garrett*, 6 F.3d 1547, 1558 (Fed. Cir. 1993) ("This court is empowered to rewrite neither

---

that its holding is based on "the violation of a distinctly focused conflict of interest statute." 18 Cl. Ct. at 65.

statutes nor regulations, however unwise, nor does it have the information base nor expertise to do so effectively.").

### 3. L-3 Cannot Establish Prejudice Due to an "Apparent"—But Not Actual—Conflict of Interest.

Where, as here, a challenge to a contract is based on alleged violations of "regulation or procedure," a claimant must show "'a clear and prejudicial violation of applicable statutes or regulations.'" *Banknote Corp. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001)). To establish prejudice, the claimant must show that there was a "substantial chance it would have received the contract award but for that error." *Statistica,* 102 F.3d at 1582. "Not every regulation is established for the benefit of bidders as a class, and still fewer may create enforceable rights for the awardee's competitors." *Galen Med.*, 369 F.3d at 1330 (quoting *Keco Indus., Inc. v. United States*, 203 Ct. Cl. 566, 492 F.2d 1200, 1206 (1974)).

Assuming, for the sake of argument, that [redacted] suffered from an apparent, but not actual, conflict of interest, L-3/MOI necessarily is not prejudiced. This is because [redacted] still would not actually be subject to influence by an interest that conflicts with his duties to the Government—there would only be a reasonable, but ultimately incorrect, suspicion that he might be subject to such a conflict. Nothing that occurred during this procurement would change because there was no actual improper influence.

L-3/MOI will likely attempt to avoid this inevitable conclusion by arguing that an apparent violation of FAR § 3.101-1 relieves it of its obligation to demonstrate prejudice. In its Motion for a TRO, L-3/MOI cites *Mississippi Valley* for the proposition that "the hurdle of prejudice is removed because of the purpose of conflict of interest statutes, which is 'to ensure honesty in the Government's business dealings.'" TRO Br. at 9 (quoting *Mississippi Valley*, 364

U.S. at 548). As discussed above, since L-3/MOI has not even alleged a violation of any of the "conflict of interest statutes," *Mississippi Valley* is plainly inapplicable. Indeed, the Court expressly distinguished its holding from cases in which no violation of a conflict of interest statute had been shown. *Miss. Valley*, 364 U.S. at 564 & n.18. Just as L-3/MOI can cite no case sustaining a protest because of an apparent conflict of interest, L-3/MOI can cite no case in which prejudice was presumed or not required to be shown because of an apparent conflict.

Finally, even further assuming for the sake of argument, that L-3/MOI's accusations state a viable claim for relief, L-3/MOI has not alleged, and cannot show, that [redacted] had anything at all to do with USCIS's evaluation of Aspen's proposal or USCIS's cost-technical tradeoff analysis leading to the separate award to Aspen over L-3/MOI. [redacted] was not involved with the evaluation of Aspen's proposal or the decision to make the [redacted] award to Aspen. The analysis prepared by [redacted] that L-3/MOI asserts is unreasonable was generated solely to provide [redacted], and is totally irrelevant to the [redacted] award to Aspen. The documents that L-3/MOI attached to its complaint leave no room for debate on that point. Thus, even if a conflict of interest claim can be based solely on former private sector employment—which it cannot under well established law—L-3/MOI makes no allegation that [redacted] involvement in the procurement, limited as it was, prejudiced L-3/MOI vis-à-vis Aspen. To the extent that L-3/MOI states a conflict of interest claim upon which relief could be granted, it certainly has not stated one against the award to Aspen.

## IV. CONCLUSION

L-3/MOI failed to submit a proposal that conformed to the mandatory requirements of the RFP and was therefore ineligible for award. Accordingly, even without the alleged procurement violations, L-3/MOI has no chance—let alone a "substantial chance"—of securing a contract

award under the Solicitation. L-3/MOI compounded its nonresponsiveness by falsely representing that it would comply with the SCA when, in fact, its proposal was based on non-SCA labor rates. Nevertheless, L-3/MOI protests the awards to Intervenors, based primarily on an "conflict of interest" that fails to allege two conflicting interests and thus fails to state a viable claim for relief. The Court should not allow the procurement process to be delayed in this manner. For the foregoing reasons, Intervenors respectfully request that the Court dismiss the Complaint with prejudice for lack of jurisdiction, or dismiss Count I for failure to state a claim upon which relief may be granted.

Respectfully submitted,

s/Rand L. Allen
by Daniel P. Graham
Rand L. Allen
WILEY REIN & FIELDING LLP
1776 K Street, N.W.
Washington, DC 20006
(202) 719-7329 (O)
(202) 719-7049 (F)

*Counsel of Record for*
*Datatrac Information Systems, Inc.*

Of counsel:
Daniel P. Graham
Kevin J. Plummer
WILEY REIN & FIELDING LLP

Dated: July 12, 2006

Respectfully submitted,

s/ Thomas L. McGovern III
Thomas L. McGovern III
HOGAN & HARTSON LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5784 (O)
(202) 637-5910 (F)

*Counsel of Record for*
*Lockheed Martin Aspen Systems Corp.*

Of counsel:
Michael D. McGill
HOGAN & HARTSON LLP

**Protected Information to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Order**

## APPENDIX – TABLE OF CONTENTS


1. GAO Decision re Protest B-298319 (June 30, 2006) .......................................................... 1
2. L3/MOI'S Comments To The Agency Report (June 26, 2006) ........................................ 5
3. U.S. Department Of Labor Wage Determination No. 94-2507 Rev. (27) )..................... 26