Agreed-Upon Redacted Copy
May Be Made Public

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | |
|---|---|
| **MICRODYNE OUTSOURCING, INC., a subsidiary of L-3 COMMUNICATIONS CORPORATION,** | |
| **Plaintiff,** | **FILED UNDER SEAL** |
| v. | **Case Number: 06-498C** |
| **THE UNITED STATES of AMERICA,** | **Judge Robert H. Hodges, Jr.** |
| **Defendant, and** | |
| **DATATRAC INFORMATION SERVICES, INC.,** | |
| **Defendant-Intervenor, and** | |
| **LOCKHEED MARTIN ASPEN SYSTEMS CORP.,** | |
| **Defendant-Intervenor.** | |

**BRIEF IN SUPPORT OF MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD BROUGHT BY PLAINTIFF AS CROSS-MOVANT**

Attorney of Record

John H. Horne
POWELL GOLDSTEIN LLP
One Atlantic Center
Fourteenth Floor
1201 West Peachtree Street, NW
Atlanta, GA 30309-3488
Telephone Number: (404) 572-6600
Facsimile Number: (404) 572-4527

Of Counsel:

Carl A. Gebo
Diane Festin LaRoss
Mark B. Carter
Christopher R. Jordan

POWELL GOLDSTEIN LLP
One Atlantic Center
Fourteenth Floor
1201 West Peachtree Street, NW
Atlanta, GA 30309-3488
Telephone Number: (404) 572-6600
Facsimile Number: (404) 572-4527

W. Bruce Shirk
Kathleen M Hamann

POWELL GOLDSTEIN LLP
901 New York Avenue, N.W.
3rd Floor
Washington, DC 20001
Telephone Number: (202) 347-0066
Facsimile Number: (202) 624-7222

Agreed-Upon Redacted Copy
May Be Made Public

# TABLE OF CONTENTS

Page(s)

I. STATEMENT OF FACTS ........ 2

A. Background ........ 2

1. Procedural History ........ 3

2. USCIS Relied Upon Undisclosed Criteria That Were Not Consistent With The Solicitation's Requirements for the Best Practices Of The Commercial Call Center Industry ........ 4

3. USCIS' Award To Datatrac Was Pretextual And Its Justification Was Flawed And Improper. ........ 5

4. USCIS' Pre-decision To Award The Contracts To Datatrac and Aspen Was Based On An Improper And Inaccurate Evaluation. ........ 7

5. Datatrac and Aspen's Proposals Were Not Responsive To The 50 CSR Requirement. ........ 10

B. Jurisdiction ........ 10

C. Standard of Review ........ 11

II. ARGUMENT ........ 13

A. USCIS Improperly and Irrationally Subverted The Core Purpose Of This Procurement By Abandoning The Solicitation's Stated Purpose of Acquiring Services Consistent With Commercial Best Practices In The Call Center Industry and Use of Undisclosed Evaluation Criteria. ........ 13

1. USICS Used Undisclosed Criteria in Evaluating Proposals by Measuring Proposed Staffing Levels and Price Realism Against an Evaluation Factor Based on a Methodology That Used a Staffing Calculation That Was Not Disclosed in the Solicitation and Is Not a An Industry Standard or a Commercial Best Practice. ........ 13

2. USCIS Impermissibly Tailored the Procurement Inconsistent with Customary Commercial Practice, as Required by FAR § 12.302(c).. 32

B. USCIS Misread Or Misunderstood L-3/MOI's Proposed Staffing Solution And Improperly Downgraded L-3/MOI's Proposal ........ 38

Agreed-Upon Redacted Copy
May Be Made Public

C. **Intervenors' Proposals Failed to Meet the Solicitation's Staffing Requirements and Improperly Received High Ratings from USCIS. ........... 40**

D. **The Solicitation's CSR Staffing Requirements Contained Latent Ambiguities Which Improperly Prejudiced L-3/MOI And Which Warrant A Full Re-Procurement Of The Contracts. ........................................................ 43**

1. **The Presence of a Latent Ambiguity in the Solicitation Requires Procurement. ........................................................................................ 44**

2. **L-3/MOI Reasonably Interpreted The Solicitation's Staffing Requirements To Require A Minimum Of 50 CSRs. .......................... 46**

3. **USCIS Interpreted The Staffing Requirements Differently Than L-3/MOI, Giving Rise To Latent Ambiguities In The Solicitation......... 48**

4. **Given The Solicitation's Latent Ambiguities, This Court Should Order a Reprocurement of the Contract............................................. 50**

E. **USCIS' Violated Its Duty To Seek Clarifications Regarding Staffing and Wage Rates With A View To A Possible Award to L-3/MOI. ....................... 52**

F. **USCIS Failed To Conduct Discussions ........................................................... 55**

G. **USCIS Breached Its Duty To Conduct A Fair Procurement And The Implied Covenant Of Good Faith, Fair Dealing, And Honest Consideration ............ 57**

1. **Predetermining an Awardee and Justifying It Post-Hoc on a Pretextual Basis is a Violation of the Duty to Conduct a Fair Procurement and a Breach of the Covenant of Good Faith, Fair Dealing, and Honest Consideration...................................................... 57**

2. **USCIS Determined Awardees Prior to Conducting a Proper Evaluation, Then Engaged in Pretextual Evaluation to Justify Its Determination After the Fact............................................................. 59**

3. **Prior Findings of This Court Support the Determination that USCIS' Actions in This Procurement Violated the Duty to Conduct a Fair Procurement and Breached the Covenant of Good Faith, Fair Dealing, and Honest Consideration..................................................... 63**

4. **USCIS' Violations Prejudiced L-3/MOI and Subverted the Fundamental Purposes of This Procurement,..................................... 67**

Agreed-Upon Redacted Copy
May Be Made Public

**III. RELIEF REQUESTED ........ 67**

**A. Declaratory Relief ........ 68**

**B. Injunctive Relief ........ 69**

**1. Public Interest ........ 70**

**2. Irreparable Harm to Plaintiff ........ 72**

**3. Balance of Harms ........ 73**

**C. Recovery of Costs ........ 74**

**1. Bid Preparation Costs ........ 74**

**2. Costs and Expenses of Litigation, including Attorneys' Fees ........ 75**

**IV. CONCLUSION ........ 75**

Agreed-Upon Redacted Copy
May Be Made Public

# TABLE OF AUTHORITIES

Page(s)

## Cases

126 Northpoint Plaza Ltd. Partnership v. United States, 34 Fed. Cl. 105 (1995)........................ 64

Alfa Laval Separation Inc. v. US, 175 F.3d 1365 (Fed. Cir. 1999)........................................ 12, 75

Am. Fed'n of Gov't Employees v. United States, 258 F3d 1294 (Fed. Cir. 2001)...................... 10

Arch Chems., Inc. v. United States, 64 Fed. Cl. 380 (2005)................................................ 11, 70

Asia Pac. Airlines v. United States, 68 Fed. Cl. 8 (2005)........................................................ 70

Baltimore Gas & Electric Co. v. Natural Resource Defense Council, 462 U.S. 87 (1983).......... 16

Banknote Corp. of America. v. United States, 365 F.3d 1345 (Fed. Cir. 2004).................... 12, 40

Bannum, Inc. v. U.S., 404 F.3d 1346 (Fed. Cir. 2005)............................................ 11, 12, 16, 76

Beta Analytics Int'l v. United States, 44 Fed. Cl. 131 (1999).................................................. 12

Beta Analytics Int'l, Inc. v. United States, 67 Fed. Cl. 384 (2005)........................................... 11

CACI, Inc.-Fed. v. United States, 719 F.2d 1567 (Fed. Cir. 1983)........................................... 12

Candle Corp. v. United States, 40 Fed. Cl. 658 (1998)............................................................ 18

Community Heating & Plumbing Co. v. Kelso, 987 F.2d 1575 (Fed. Cir. 1993)....................... 44

Day & Zimmerman Svcs. v. United States, 38 Fed. Cl. 591 (1997).......................................... 55

Dubinsky v. U.S., 43 Fed. Cl. 243 (1999)................................................................................ 16

Dubinsky v. United States, 43 Fed. Cl. 243 (1999)............................................................ 18, 66

Dynalantic Corp. v. United States, 945 F.2d 416 (Fed. Cir. 1991)........................................... 36

FMC Corp. v. United States, 3 F.3d 424 (Fed. Cir. 1993)........................................................ 70

Fortec Constructors v. United States, 760 F.2d 1288 (Fed. Cir. 1985)..................................... 40

Gentex Corp. v. United States, 58 Fed. Cl. 634 (2003)............................................................ 70

Heyer Products Co. v. United States, 135 Ct. Cl. 63 (1956) ........ 57

Hills Materials Co. v. Rice, 982 F.2d 514 (Fed. Cir. 1992)........ 44, 45

HPI/GSA-3C, LLC v. Perry, 364 F.3d 1327 (Fed. Cir. 2004)........ 45

Hunt Bldg. Co. v. United States, 61 Fed. Cl. 243 (Ct. Cl. 2004)........ 70

Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324 (Fed. Cir. 2001) ........ 12

Impresa Construzioni Geon. Domenico Garufi v. United States, 52 Fed. Cl 826 (2002) ........ 71

In re Orion Technology, Inc., 2006 WL 1064133, (A.S.B.C.A.), 06-1 BCA ¶ 33266, ASBCA No. 54608 (A.S.B.C.A., Mar. 28, 2006) ........ 52

Keco Industries v. United States, 203 Ct. Cl. 566 (1974)........ 58

Kropp Holdings, Inc. v. United States, 63 Fed. Cl. 537 (2005)........ 10

Labat-Anderson, Inc. v. United States, 65 Fed. Cl. 570 (2005) ........ 68

Metcalf Construction Co., Inc. v. United States, 53 Fed. Cl. 617 (2002)........ 44, 50

Metric Constructors, Inc. v. National Aeronautics And Space Administration, 169 F.3d 747 (Fed. Cir. 1999)........ 44

Naplesyacht.com, Inc. v. United States, 60 Fed. Cl. 459 (2004)........ 68, 75

Newsom v. United States, 676 F.2d 647 (Ct. Cl. 1982) ........ 50

Parcel 49C Ltd. P'ship v. United States, 31 F.3d 1147 (Fed. Cir. 1994)........ 58, 68

PGBA, LLC v. United States, 389 F.3d 1219 (Fed. Cir. 2004)........ 70

Placeway Constr. Corp. v. United States, 920 F.2d 903 (1990) ........ 68

Prineville Sawmill Co. v. United States, 859 F.2d 905 (1988)........ 57

Rig Masters, Inc. v. United States, 70 Fed. Cl. 413 (2006) ........ 10, 12

Rotech Healthcare Inc. v. United States, 2006 WL 2055882 (Fed. Cl. 2006)........ 40

Six v. United States, 2006 WL 1836070 (Fed. Cl. June 30, 2006) ........ 11

Statistica, Inc. v. Christopher, 102 F.3d 1577 (Fed. Cir. 1996) ........ 12

Sturm v. United States, 421 F.2d 723 (Ct. Cl. 1970) ........ 44, 50

Transatlantic Lines LLC v. United States, 68 Fed. Cl. 48 (2005) ........ 70

Triax Pac, Inc. v. West, 130 F.3d 1649 (Fed. Cir. 1997) ........ 44

United International Investigative Services, Inc. v. United States, 41 Fed. Cl. 312 (1998) ........ 66

United Pac. Ins. Co. v. United States, 497 F.2d 1402 (Ct. Cl. 1974) ........ 45

**Statutes**

5 U.S.C. § 706(2)(A) (2000) ........ 16, 76

10 U.S.C. § 2305(a)(1)(A)(i) ........ 19

10 U.S.C. § 2305(b)(1) ........ 19

10 U.S.C. § 2306(b)(1) (1994) ........ 14

28 U.S.C. § 1491(b) ........ 68

41 U.S.C. § 253b(a) (1994) ........ 14

48 C.F.R. § 15.206 ........ 19

**Rules**

Contracting Act, 31 U.S.C. § 3553 ........ 3

**Regulations**

FAR § 12.203(c) ........ 35

FAR § 12.301(a) ........ 33

FAR § 12.302 ........ i, 33, 34, 36

FAR § 15.305(a) ........ 19

Agreed-Upon Redacted Copy
May Be Made Public

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | |
|---|---|
| **MICRODYNE OUTSOURCING, INC., a subsidiary of L-3 COMMUNICATIONS CORPORATION,** | |
| **Plaintiff,** | **FILED UNDER SEAL** |
| v. | **Case Number: 06-498C** |
| **THE UNITED STATES of AMERICA,** | **Judge Robert H. Hodges, Jr.** |
| **Defendant, and** | |
| **DATATRAC INFORMATION SERVICES, INC.,** | |
| **Defendant-Intervenor, and** | |
| **LOCKHEED MARTIN ASPEN SYSTEMS CORP.,** | |
| **Defendant-Intervenor.** | |

**BRIEF IN SUPPORT OF MOTION**
**FOR JUDGMENT ON THE ADMINISTRATIVE**
**RECORD BROUGHT BY PLAINTIFF AS CROSS-MOVANT**

COMES NOW, Plaintiff Microdyne Outsourcing, Inc., a subsidiary of L-3 Communications Corporation ("L-3/MOI"), and hereby files, as a Cross-Movant, its Brief in Support of its Motion for Judgment on the Administrative Record.

Agreed-Upon Redacted Copy
May Be Made Public

## I. STATEMENT OF FACTS

### A. Background

The United States Citizenship and Immigration Service ("USCIS") of the Department of Homeland Security ("DHS") has a demonstrated history of an inability to provide information regarding citizenship and immigration services and benefits in a timely and effective manner through its telephone information system. A Congressional Inquiry was commenced due to complaints from USCIS' customers, and a formal Government Accountability Office ("GAO") investigation that found significant quality control issues with USCIS' approach and recommended several actions for immediate and long term improvements. See GAO-05-526, June 2005, Better Contracting Practices Needed at Call Centers, available at www.gao.gov.

On September 28, 2005, USCIS issued Solicitation Number HSSCCG-05-R-00012 (the "Solicitation"), a full and open competitive commercial item acquisition to provide call center services to their National Customer Service Center ("NCSC"). AR, Tab 1, p. 4, Tab 5, p. 80. The Solicitation focused on capturing the industry's best practices to accomplish the following: 1) continuously improve customer service; 2) incorporate leading edge technology; 3) ensure accountability in meeting customer expectations; 4) promote efficient operations and effective use of technology; and 5) respond to cyclical and fluctuating call volume patterns. AR, Tab 5, pp. 86-87. The Solicitation contemplated that USCIS award the contracts to the offeror(s) whose proposal(s) represented the "best value" for the Government (the "Contract"). AR, Tabs 13, 14 & 15. After proposals were submitted, USCIS determined that only three bidders offered proposals that would most likely result in the best value to the government; Aspen and Datatrac, both of whom were awarded contracts, and L-3/MOI. AR, Tab 13, p. 533.

Aspen and particularly [redacted] While Aspen and Datatrac's total evaluated prices were [redacted]

[redacted] respectively, L-3/MOI's total evaluated price was [redacted]. AR, Tab 13, p. 531. Further, at the 400,000 call level, Aspen and Datatrac proposed pricing of [redacted] and [redacted] respectively, while L-3/MOI's pricing was [redacted]. AR, Tab 13, p. 531.

USCIS stayed performance of the Contract in response to L-3/MOI's protest filed at the Government Accountability Office ("GAO") on May 16, 2006, based on the automatic stay provision of the Competition in Contracting Act, 31 U.S.C. § 3553 ("CICA"). See In re Microdyne Outsourcing, Inc., B-298319, May 16, 2006. On June 29, 2006, the GAO dismissed L-3/MOI's Protest based on a procedural technicality, without considering the merits of L-3/MOI's Protest.

**1. Procedural History**

On July 5, 2006, L-3/MOI filed its Complaint in this Court for Declaratory and Injunctive Relief and its Application For Temporary Restraining Order And Motion For Preliminary Injunction. Intervenors' filed a joint motion to dismiss on July 12, 2006. On July 19, 2006, L-3/MOI filed a response in opposition to the motion to dismiss and also filed its First Amended Complaint for Injunctive and Declaratory Relief (the "Amended Complaint"). Intervenors filed a reply in support of their motion to dismiss on July 25, 2006 and L-3/MOI filed a supplemental response in opposition on August 1, 2006. On August 8, 2006, this Court issued an order granting in part and denying in part Intervenors' motion to dismiss.

L-3/MOI seeks from this Court an order (i) setting aside the NCSC Contract Award to Intervenors; (ii) to conduct a re-competition of the procurement; (iii) awarding L-3/MOI its costs for pursuing this action, including attorney's fees and expenses; and (iv) such other relief as the Court may deem just and proper.

### 2. USCIS Relied Upon Undisclosed Criteria That Were Not Consistent With The Solicitation's Requirements for the Best Practices Of The Commercial Call Center Industry.

USCIS was to evaluate proposals based solely upon the factors identified in the Solicitation. In evaluating the offerors' proposals, however, USCIS deviated from the criteria set forth in the Solicitation by selecting Datatrac on the basis of factors such as Productivity Rates and Occupancy Rates. The government admitted that their application of these two factors was a determinative consideration as to why Datatrac was awarded the contract over L-3/MOI.

In the Source Selection Decision Document ("SSDD") dated April 27, 2006, [redacted] AR, Tab 13, p. 535. The SSDD explicitly states that, [redacted] AR, Tab 13, p. 536.

There is, however, no mention of either of the "call center industry staffing standard" or any of its constituent elements in the Solicitation and no reference to such criteria in the Administrative Record until well after the SSA made his award decision. [redacted]

[redacted].

The BEC's initial evaluation of February 24, 2006 is instructive on this point. In it, the BEC submitted its initial evaluation report on the various proposals "in accordance with the requirements of the Source Selection Plan and the FAR" and made no mention of evaluation criteria other than those identified in the Solicitation, explicitly noting that "[t]he SSP and RFP stated that the price analysis be conducted using one more of the techniques specified in FAR 15.404-1(b)." AR, Tab 15, p. 556. The BEC's price analysis revealed that [redacted] and that L-3/MOI's price was [redacted]. The report concluded that [redacted] AR, Tab 15, pp. 559-560, 567. The BEC consensus report, submitted February 28, contained substantially the same information and, again, made no mention of evaluation factors other than those called out by the Solicitation. AR, Tab 26, pp. 871-895

### 3. USCIS' Award To Datatrac Was Pretextual And Its Justification Was Flawed And Improper.

On April 26, DHS' Toi Johnson, the DHS Procurement Specialist, discussed the SSDD of April 3 that identified Datatrac as one of the two awardees, stating in part, [redacted] AR, Tab 26, p. 984. After noting that the SSDD lacks [redacted] between L-3/MOI and Datatrac, Ms Johnson promises [redacted]

[redacted] AR, Tab 26, p. 984. This memorandum was followed by a USCIS query to [redacted] as to the existence of a staffing standard that might explain why [redacted], to which the program office immediately responded with a memorandum containing a supposed industry standard staffing calculation that, through a series of unexplained arithmetic steps, yields a high [redacted]. The program office characterized this rate as "[redacted]" and "[redacted]" and therefore [redacted]. AR, Tab 26, 1018. DHS immediately perceived the undisclosed industry standard calculation to be the perfect pretext for making award to Datatrac, and undertook to rewrite the Source Selection Decision Document, adopting the undisclosed "[redacted]" without further inquiry and using it as the sole means of conducting a "[redacted]" the results of which purport to demonstrate that "[redacted]" AR, Tab 26, p. 1017. This re-evaluation of the proposals---which, again, was conducted using an arithmetic calculation not specified as an evaluation factor in the Solicitation and without consulting L-3/MOI---enabled DHS to quote the program office memorandum's enumeration of a chain of risks flowing from L-3's supposedly high occupancy rate, including "[redacted]", leading "[redacted]" which, in turn has [redacted]" and gives rise to "[redacted]" and driving up the "[redacted]

[redacted] AR, Tab 13, pp. 535-536, Tab 26, pp. 999, 1011-1018.

**4. USCIS' Pre-decision To Award The Contracts To Datatrac and Aspen Was Based On An Improper And Inaccurate Evaluation.**

Beyond relying on undisclosed evaluation factors, pursuant to [redacted] flawed "price realism" analysis, USCIS made several significant errors in applying the criteria that were contained in the Solicitation.

**a. USCIS Misapplied The SCA Wage Rate Requirements To L-3/MOI's Proposal.**

Specifically, L-3/MOI's proposal was erroneously downgraded based upon USCIS' incorrect reading of L-3/MOI's proposed wage rates under the Service Contracting Act (the "SCA"). L-3/MOI proposed to pay its CSRs at a rate of [redacted] an hour, an amount in excess of the rate established under the SCA and certified that L-3/MOI would comply with the requirements of the SCA. AR, Tab 12, p. 508. USCIS, however, mistakenly concluded that L-3/MOI's wage rate for CSRs was less than the rate required under the SCA and that L-3/MOI's was potentially not in compliance with the Solicitation requirements. Based upon this incorrect reading of L-3/MOI's price proposal, USCIS considered L-3/MOI's proposal to be risky and downgraded its scoring, resulting in a lower ranking than that received by Aspen and Datatrac. AR, Tab 13, 531.

**b. USCIS Misconstrued And Misapplied The CSR Staffing Requirements**

The Solicitation states that "[g]iven the Government provided telecommunications service described in Section 6, call centers shall have a normal minimum complement of 50 CSRs." AR, Tab 5, p. 88. The Solicitation further sets forth the staffing requirements in the Performance Work Statement ("PWS") of the Solicitation in Section 4 – Facilities as follows:

- The network of NCSC Tier 1 call centers shall be located geographically in such a way as to minimize the impact of weather or other localized or regionalized events that may otherwise affect collective operational performance.

- The Contractor shall locate one of its call centers in a HUBZone area. The Contractor shall have a minimum of 250 CSR's at its location with the HUBZone.

- If through contract performance and diminished call volume during the term of this Contract the Contractor's total CSR staffing falls below 300 CSR's, it shall maintain a minimum of 80% of its total CSR complement at that location.

- The Contractor shall maintain a minimum of 2 call centers. No one site may have more than 80% of the Contractor total CSR staffing. AR, Tab 5, p. 88.

Based on the 50 CSR minimum, L-3/MOI submitted a proposal that unequivocally satisfied all of the Solicitation's staffing requirements. L-3/MOI's proposal committed to employ [redacted] CSRs in its call center in Corpus Christi, Texas. AR, Tab 12, p. 400. L-3/MOI met the requirement of a second call center by locating another call center with a minimum of [redacted] CSRs in Pittsfield, Maine, another HUBZone. Id.

As evidenced in the Source Selection Decision Document, however, USCIS not only misread L-3/MOI's proposal, it also used a different interpretation of Section 4, both of which improperly undercut L-3/MOI's chances for award, as set forth in detail in the Argument section herein. Mr. Mike Aytes, in the Source Selection Decision Document, relied on input and suggestions from the Contracting Officer and numerous others at USCIS and DHS. This decision was supported by erroneous facts supplied by the BEC. It is clear this document included information, not from L-3/MOI's technical proposal, but rather from a costing worksheet which purported showed L-3's proposal as risky. As a result, the Contracting Officer downgraded L-3/MOI's proposal, resulting in L-3/MOI receiving a lower evaluation on this factor than Aspen and Datatrac. AR, Tab 15, p. 565 and Tab 25, pp. 720-724. Ultimately, however, USCIS' misreading of L-3/MOI's proposal, and its divergent interpretation of the CSR

staffing requirement, let it to conclude "[redacted]" Id.

**c. USCIS' Scored Datatrac's And Aspen's Proposals Too Highly And Inaccurately.**

USCIS' decision to award a contract to Aspen and not L-3/MOI was based, in part, on USCIS' incorrect conclusion that both L-3/MOI and Aspen's proposals included [redacted] as part of their technical proposals and that it was too risky to have two contractors utilizing this protocol. AR, Tab 13, p. 531. However, Aspen did not intend to use [redacted] at its two main call centers. AR, Tab 25, p. 724. If USCIS had properly understood that Aspen's proposal did not include a [redacted], instead of mistakenly concluding that it did, L-3/MOI's proposed [redacted] would not have been a risk factor. AR, Tab 13, p. 534.

USCIS further misapplied the technical criteria when it determined that Aspen and Datatrac's proposals were stronger technically than L-3/MOI's due to Aspen and Datatrac's assertion that they would have [redacted]. AR, Tab 13, p. 534 and Tab 20, pp. 617-623. The Technical Evaluation Team, however, recognized that "[redacted]" AR Tab 99, p. 1041. As such, Aspen and Datatrac's claims as to what they could accomplish in the first 45 days of the contract were irrelevant and should not have played any role in the technical scoring.

USCIS' scoring of Aspen and Datatrac's proposals was also flawed as a result of USCIS' erroneous conclusion that L-3/MOI's proposal was silent as to whether incentives earned would be shared with its employees. AR, Tab 15, pp. 561, 564. L-3/MOI proposed [redacted] AR, Tab 12, p. 413. Aspen and Datatrac were given credit for proposing to

[redacted] and L-3/MOI was not. AR, Tab 20, p. 619 and Tab 20, p. 623.

**5. Datatrac and Aspen's Proposals Were Not Responsive To The 50 CSR Requirement.**

Beyond USCIS' improper scoring of Datatrac and Aspen's proposals, USCIS failed to recognize that Intervenors' proposals were not responsive to the Solicitation's 50 CSR staffing requirements discussed above. In fact, there were certain call levels that Datatrac's and Aspen's staffing would have fallen below the 50 CSRs minimum requirement and USCIS did not downgrade Datatrac or Aspen for falling below the 50 CSR minimum. AR Tab 68, p. 1693 and Tab 49, pp. 1382 through 1389.

**B. Jurisdiction**

This Court has jurisdiction to review a post-award bid protest under the Tucker Act. 28 USC § 1491(b)(1) (the "United States Court of Federal Claims...shall have jurisdiction to render judgment on an action by an interested party objecting to... a proposed award or the award of a contract... in connection with a procurement....") While the Tucker Act does not define "interested party," the Federal Circuit has applied the definition used in the Competition in Contract Act, and has found that standing is "limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." Am. Fed'n of Gov't Employees, AFL-CIO, Local 1482 v. United States, 258 F3d 1294, 1302 (Fed. Cir. 2001); accord Kropp Holdings, Inc. v. United States, 63 Fed. Cl. 537, 549-550 (2005); accord Rig Masters, Inc. v. United States, 70 Fed. Cl. 413, 419 (2006). As this Court has already found, L-3/MOI is an "interested party" because it is an actual bidder whose direct economic interest would be affected by the award of the contract or by failure to award the contract because L-3/MOI had a substantial chance of receiving the award.

Agreed-Upon Redacted Copy
May Be Made Public

Microdyne Outsourcing, Inc. v. United States, Case No: 06-498C, Order dated August 8, 2006 granting, in part, and denying, in part, Intervenors' Motion to Dismiss (the "Order") at 8 (Fed. Cl., August 8, 2006).

**C. Standard of Review**

A Motion for Judgment on the Administrative Record is governed by RCFC 52.1, under an amendment to the RCFC effective June 20, 2006. Six v. United States, 2006 WL 1836070 (page numbers unavailable) (Fed. Cl. June 30, 2006). RCFC 52.1 replaced RCFC 56.1 in order to alleviate confusion surrounding the extent to which the standards applicable to a summary judgment determination apply to a determination for judgment on the administrative record. RCFC 52.1 Rules Committee Note. As this Court has held, "a motion for judgment on the administrative record is distinguishable from a motion for summary judgment." Six, 2006 WL 1836070 (page numbers unavailable) citing Bannum, Inc. v. U.S., 404 F.3d 1346, 1355 (Fed. Cir. 2005) (citations omitted). The difference between the two is that the existence of genuine issues of material fact does not preclude judgment on the administrative record. Beta Analytics International, Inc. v. United States, 67 Fed. Cl. 384, 394 (2005); RCFC 52.1 Rules Committee Note. Rather, "a motion for judgment on the administrative record examines whether the administrative body, given all the disputed and undisputed facts appearing in the record, acted arbitrarily, capriciously, or contrary to law." Beta Analystics, 67 Fed. Cl. at 394; citing Arch Chems., Inc. v. United States, 64 Fed. Cl. 380, 388 (2005).

The standards of the Administrative Procedures Act ("APA") apply to this Court's review of an agency action in a bid protest. 5 U.S.C. § 706; 28 USC § 1491(b)(4). Galen Med. Assoc., Inc. v. U.S., 369 F.3d 1324, 1329 (Fed. Cir. 2004). Pursuant to the APA, this Court will enjoin Government procurement actions only if the agency acts in an arbitrary or capricious manner, or otherwise not in accordance with the law. 5 USC § 706(2)(A). Under the arbitrary and

capricious standard, the final decision of the procuring agency must be the result of a process which considers the relevant factors and is within the bounds of reasoned decision-making. Rig Masters, 70 Fed. Cl. at 420 (citations omitted). Accordingly, in order for L-3/MOI to prevail in this bid protest, this Court must find either that the agency decision L-3/MOI is challenging was "irrational" or that the decision involved a "clear violation of applicable procurement law." Banknote Corp. of Am., Inc. v. US, 365 F3d 1345, 1351 (Fed. Cir. 2004) (emphasis added).

To prevail under the "clear violation of applicable procurement law" ground, this Court must find that an error by USCIS significantly "prejudiced" L-3/MOI. Bannum, Inc. v. US, 404 F.3d 1346, 1353 (Fed. Cir. 2005); see also Alfa Laval Separation Inc. v. US, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (to establish prejudice, this Court must find that L-3/MOI had a "substantial chance" of receiving the contract award, absent USCIS' error).

To prevail under the "irrational" ground, this Court must determine whether USCIS provided a "coherent and reasonable explanation" of its exercise of discretion. Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1333 (Fed. Cir. 2001). Additionally, L-3/MOI "must show a significant, prejudicial error in the procurement process." Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (1999) (emphasis added). To establish prejudice, L-3/MOI must show that, but for the procurement error, there was a "substantial chance that [it] would receive an award." Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996); see CACI, Inc.-Fed. v. United States, 719 F.2d 1567 (1574-75 (Fed. Cir. 1983). Finally, this Court may award injunctive relief by a showing of a preponderance of the evidence. See, Beta Analytics Int'l v. United States, 44 Fed. Cl. 131, 137 (1999) (citations omitted).

Agreed-Upon Redacted Copy
May Be Made Public

For L-3/MOI to prevail in this bid protest, this Court must find that *either* (1) USCIS' clearly violated applicable procurement law, and that violation prejudiced L-3/MOI, *or* (2) USCIS' decision was irrational, and that irrational decision prejudiced L-3/MOI.

## II. ARGUMENT

### A. USCIS Improperly and Irrationally Subverted The Core Purpose Of This Procurement By Abandoning The Solicitation's Stated Purpose of Acquiring Services Consistent With Commercial Best Practices In The Call Center Industry and Use of Undisclosed Evaluation Criteria.

#### 1. USICS Used Undisclosed Criteria in Evaluating Proposals by Measuring Proposed Staffing Levels and Price Realism Against an Evaluation Factor Based on a Methodology That Used a Staffing Calculation That Was Not Disclosed in the Solicitation and Is Not a An Industry Standard or a Commercial Best Practice.

USCIS awarded a contract to Datatrac rather than L-3/MOI even though (a) the latter's proposal was one of the three "[redacted]" (b) Datatrac's proposed cost was substantially higher at all evaluated call levels and (c) there was "[redacted]" at the total evaluated price. AR, Tab 13, p. 535. "[redacted]" USCIS conducted a re-evaluation of the proposals submitted by L-3 and Datatrac using a previously undisclosed "staffing calculation" that the Source Selection Authority characterized as a "call center industry staffing standard" ("industry standard"). Neither the Solicitation nor the Source Solicitation Plan specified, identified or otherwise referred in any way to the industry standard as an evaluation factor or subfactor that could affect contract award. AR, Tab 5, p. 77; AR, Tab 13, pp. 535, 568. This USCIS action violated the requirements of applicable statute, regulation and agency guidance that preclude use of factors or subfactors to evaluate proposals differently from the criteria specified in the solicitation. USCIS' use of the so-called industry standard to evaluate proposals was arbitrary, capricious or not in accordance with the law. But for USCIS' improper

use of the standard, L-3/MOI had a substantial chance of receiving award of a contract and was therefore prejudiced by USCIS' action.

**a. The Rule**

**i. Factors Used to Evaluate Proposals Must Be Clearly Stated in the Solicitation.**

The Competition in Contracting Act (CICA) provides that agencies "shall evaluate competitive proposals . . . based solely on the factors specified in the solicitation". 10 U.S.C. § 2306(b)(1) (1994); 41 U.S.C. § 253b(a) (1994). The FAR implements and extends this requirement to encompass both evaluation factors and subfactors. "An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation." FAR 1.305(a). "RFPs for competitive acquisitions shall, at a minimum, describe the . . . factors and significant subfactors that will be used to evaluate the proposal and their relative importance". FAR 15.203(a). "The source selection authority shall . . . ensure that proposals are evaluated based solely on the factors and subfactors contained in the solicitation . . . FAR 15.303(b). "*All factors and significant subfactors that will affect contract award* and their relative importance *shall be stated clearly in the solicitation.*" FAR 15.304(d) (emphasis added).

**ii. Evaluation of Price Reasonableness Through Price Analysis Must Likewise Be Based Solely on Factors Clearly Identified in the Solicitation.**

The USCIS Contracting Officer must establish the price reasonableness for proposals to furnish commercial items or services. FAR 12.209. Price reasonableness is to be established through performance of a price analysis, which "is the process of examining and evaluating a proposed price without evaluating its separate cost elements and proposed profit." FAR 15.404-1(b). Competition usually serves to establish price reasonableness, so that when contracting on

the basis of a firm-fixed price "comparison of the proposed prices will usually satisfy the requirement to perform a price analysis. . . ." FAR 15.305(a)(i). In any event, the required price analysis must, like all other aspects of proposal evaluation, be performed by USCIS using only "factors and subfactors specified in the solicitation." FAR 15.305(a)(b).

**iii. If a Trade Off Process is Appropriate, Then it Must, Like Any Other Evaluation Process, Be Conducted Using Factors and Subfactors Clearly Stated in the Solicitation.**

When a solicitation allows "award to other than the lowest priced offeror or other than the highest technically rated offer," a tradeoff process may be appropriate. FAR 15.101-1(a). In the event a tradeoff process is used -- as was the case in the subject USCIS procurement, then, again, "all evaluation factors and significant subfactors that will affect contract award shall be clearly stated in the solicitation." FAR 15.101-1(b).

**iv. The USCIS Technical Evaluation Guide Emphasizes The "Cardinal Rule" of Adherence To The Evaluation Criteria As Stated in The RFP.**

The USCIS' Technical Evaluation Guide is provided to each evaluator of proposals along with the SSP. The Guide emphasizes the critical importance of adherence to the criteria as stated in the RFP and explicates the reasons for doing so, stating in part:

> In providing guidance to the technical evaluations (sic), the contracting officer will stress two fundamental guidelines: (1) the need to adhere strictly to the evaluation criteria set forth in the RFP and (2) the need to follow the evaluation and scoring methodology that has been developed.

USCIS' procurement management has elevated this fundamental guidance to the status of a "cardinal rule":

> In sum, evaluators must keep in mind the cardinal rule that the evaluation criteria and relative weights as stated in the RFP must be adhered to and not added to or varied in any way.

**b. If USCIS in Fact Made Award Pursuant to an Evaluation Using Factors Not Clearly Stated In the Specification Then Its Actions Were Arbitrary and Capricious or, Alternatively, Contrary to Law.**

If, after a review of and inquiry into the facts, a court determines that the preponderance of the evidence shows that the agency evaluated the Datatrac and L-3/MOI proposals and selected Datatrac using factors not identified in the Solicitation, then the award may be found arbitrary and capricious or, alternatively, contrary to law. Beta Analytics International, Inc. v. U.S. 44 Fed. Cl. 131, 146-147 (1999). The CICA requirement that agencies evaluate proposals solely on factors specified in the solicitation is "in accordance with the fundamental requirement that the Government "may not solicit proposals on one basis and make award on another." Dubinsky v. U.S., 43 Fed. Cl. 243, 266 (1999) (citations omitted). "[The Court's] task is to determine whether [the agency] has considered the relevant factors and articulated a connection between the facts found and the choice made." Baltimore Gas and Electric Co. v. Natural Resource Defense Council, 462 U.S. 87, 105, 103 S. Ct. 2246, 2256 (citations omitted). "Thus,. . . the inquiry is whether the [agency's] procurement decision was 'arbitrary, capricious, an abuse of discretion or not in accordance with law'." Bannum Inc. v. U.S., 404 F.3d 1346, 1351, citing 5 U.S.C. § 706(2)(A) (2000).

**c. If Plaintiff L-3/MOI Can Show Prejudice Due to USCIS' Use of Factors Not Specified in the Solicitation Then the Court May Grant Plaintiff Judgment on the Administrative Record.**

If Plaintiff L-3/MOI establishes that, but for the agency's use of an industry standard calculation to evaluate proposals not specified in the Solicitation, there was a "substantial chance" or a "reasonable likelihood" that L-3/MOI would have been awarded the contract, then the required prejudice has been shown and the Court may grant Plaintiff judgment on the

administrative record and provide for relief appropriate to the circumstances and status of the procurement. Beta Analytics International, Inc. v. U.S., 44 Fed. Cl. at 146-147.

**d. The COFC Has Repeatedly Held That Where, In An Effort to Achieve a Desired Outcome, the Agency Evaluated Proposals Using Factors Not Specified In the Solicitation, Award Based on Those Factors Is Invalid.**

**i. The FAR Provides That, When An Agency Wishes to Change Evaluation Factors Specified In A Solicitation It Must Amend the Solicitation.**

FAR 15.2 sets out policies and procedures for "preparing and issuing requirements for proposals (RFPs)." FAR 15.200(b). FAR 15.204-5 instructs contracting officers to prepare the representations and instructions of the solicitation as follows::

> (c) *Section M, Evaluation factors for award.* Identify all significant factors and any significant subfactors that will be considered in awarding the contract and their relative importance...

FAR 15.206 provides that, when the procuring agency wishes to change the basis on which it will evaluate proposals, it must amend the solicitation and provide adequate notice to offerors that it has done so:

> (a) When, either before or after receipt of proposals, the Government changes its requirements or terms and conditions, the contracting officer shall amend the solicitation.
>
> * * *
>
> (c) Amendments issued after the established time and date for receipt of proposals shall be issued to all offerors that have not been eliminated from the competition.
>
> (d) If a proposal of interest to the Government involves a departure from the stated requirements, the contracting officer shall amend the solicitation.

FAR 15.206.

The USCIS Technical Evaluation Guide, discussed above, confirms the agency's intent to comply with this reasonable requirement, stating in relevant part:

> Proposals, as originally submitted, must be evaluated in terms of the stated criteria only. Any deviation from these criteria will necessitate a formal amendment to the RFP informing all parties of the change.

**ii. The Decisions of This Court Makes Clear That Agencies May Not Direct the Outcome of the Evaluation Process Using Undisclosed Factors.**

In Dubinsky v. United States, 43 Fed. Cl. 243 (1999), the Court held that the agency's evaluation was arbitrary and capricious because it relied on undisclosed evaluation criteria whose use would provide the agency a substantial benefit.

> The two (+ +) ratings for operational and maintenance training were arbitrary and capricious for another reason: the Academy awarded these ratings on the basis of Daktronics' offer to provide []. *See* Tr. At 71-72; Admin. R., Tab 19. The evaluation sheets and Sgt. Vaccarellas testimony revealed that the agency considered [] to be a substantial "benefit." Yet, they were expressly precluded by the RFP, which emphasized that "[a]ll training must take place on the United States Air Force Academy." Admin. R., Tab 23 at 5. As discussed above, CICA, the FAR, and court and GAO decisions require agencies to evaluate proposals solely on the basis of criteria stated in the solicitation. Because the RFP here unambiguously informed offerors that off-site training would not be acceptable, the agency's award of (+ +) ratings to Daktronics for either training subfactor was arbitrary and capricious.

43 Fed. Cl. 268.

In Candle Corp. v. United States, 40 Fed. Cl. 658 (1998) the agency ignored an evaluation factor specified in the solicitation that required offerors to demonstrate the capability to edit messages. Despite the agency's assertion that the successful offeror could achieve the capability with only "a minor adjustment," the Court held that the agency "violated applicable statute and regulations" in making award. 40 Fed. Cl. 666. The Court identified two grounds for its decision, the first being agency violation of its obligation to evaluate proposals solely on factors identified in the solicitation:

> In short, by virtue of its decision to accept a product which did not possess the capability to edit message contents but required the agency to develop or procure elsewhere the necessary script, demonstrated that it did not, in fact, require a product which, at a minimum, complied with MERs 10 and 33. As a result, its decision to award the contract to Boole was contrary to its legal obligation to "evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation." 48 C.F.R. §§ 15.305(a), 12.602(b) & (c); 10 U.S.C. § 2305(b)(1).

40 Fed. Cl 665.

The second ground was the agency's failure to comply with its obligation to notify all offerors of changed evaluation criteria:

> When the agency decided to relax the solicitation requirements and accept Boole's alternative approach, it was required to notify all offerors that the evaluation criteria had changed, and its failure to do so was contrary to the requirements of 48 C.F.R. § 15.206 and its fundamental statutory obligation to "achieve full and open competition for the procurement." 10 U.S.C. § 2305(a)(1)(A)(i).

40 Fed. Cl. 665. Pursuant to FAR 15.206, the USCIS Technical Evaluation Guide and the Court's holding in Candle, if USCIS found Datatrac's high-priced offer to be "a proposal of interest" and believed that a previously unidentified criterion for staffing was necessary to enable it "to determine where the price differences are" between Datatrac's proposal and the lower-priced L-3/MOI proposal then it was obligated to notify all eligible offerors, including L-3/MOI, "that the evaluation criteria had changed." FAR 15.206 (d).

**e. USCIS Evaluated the Proposals of L-3, Datatrac and Aspen Using An Alleged Industry Standard Not Specified in the Solicitation and Not Referenced in the Source Selection Plan**

**i. The Source Selection Plan Entailed A "Structured Process."**

The Solicitation informed offerors that the source selection procedures "involve the use of a structured process that involves a Source Selection Organization (SSO)" made up of the

Source Selection Authority (SSA), a Technical Evaluation Committee (TEC) and a Business Evaluation Committee (BEC). The TEC would evaluate technical aspects of the proposal and past performance while the BEC was responsible for review and evaluation of pricing and business aspects of the proposal. The SSA was then to make the final source selection through a best value determination, utilizing "a trade-off process between price and non-price factors to allow USCIS to accept other than the lowest priced proposal, or other than the highest technically rated offer" (AR, Tab 5, pp. 165-166).

The SSA was to base his best value analysis and award decision on "the reports and recommendations of the TEC and BEC." AR, Tab 8, p. 246.

**ii. Solicitation Specifically Identified the Factors to Be Reviewed By the TEC and the BEC in Performing Their Respective Evaluations and by the SSA in Performing Its Price/Technical Tradeoff (Best Value Analysis).**

The Solicitation identifies three factors to be used in evaluation of offers, listing them in descending order of priority, as follows:

1. technical capability,
2. past performance, and
3. price.

AR, Tab 5, p. 166.

The subfactors of the Technical Capability factor are explicitly identified as "1) Facilities Equipment and Personnel," "2) Corporate Experience," "3) Program Management Plans," "4) Key Personnel Qualifications," and "5) Understanding of the Work," again listed in descending order of importance. The Solicitation identifies additional specific considerations applicable to each of the subfactors. But the Solicitation's discussion of these considerations makes no reference to the use of "staffing calculations" in connection with the evaluation. Nor does the Solicitation identify or refer to a "call center industry standard", "industry best practices," from

which such a "staffing calculation" can be derived in connection with evaluation of proposals. AR, Tab 5, pp. 166-172. USCIS necessarily identified all the technical evaluation factors to be "considered in awarding the contract" – and factors not so identified may not be considered. FAR 15.204-5. ("The contracting officer shall . . . [i]dentify all significant factors and subfactors that will be considered in awarding the contract").

**f. Factors for the Evaluation of Price**

The Solicitation also set out specific subfactors for use by the BEC in assessing the price proposal, including "breakdown of labor classification and all other costs", pricing Tables and explanatory narrative. The BEC was to evaluate proposals for price reasonableness and was to "conduct its pricing analysis using one or more FAR techniques in 15.404-1(b)." AR, Tab 5, p. 172. None of the enumerated techniques entail application of a staffing calculation, an industry standard, or best practices in connection with establishment of price reasonableness through conduct of the required price analysis. For the reasons discussed in connection with the evaluation of Technical Capabilities, the BEC was precluded from using any factor to evaluate proposals other than the criteria identified in the Solicitation.

**g. Factors for the Best Value/Tradeoff Analyses**

The Solicitation provided that "[t]he SSA will review the findings [of the TEC and BEC] and make the final source selection decision." AR, Tab 5, p. 165. It follows that the SSA's selection decision will be based on the its review of the conclusions reached by those committees based on application of the factors and subfactors called out in the Solicitation. The Source Selection Plan is consistent with and explicitly confirms that the SSA's analysis will use the factors specified in the Solicitations:

> The Best Value Analysis is performed by the SSA and will be made by comparing the differences . . . in the value of the <u>non-price factors</u> with the differences in the price proposal . . . Price

> may become the ultimate determining factor . . . as offers become more equal based on *other factors*."

AR Tab 8, p. 246 (emphasis added).

**h. February – April 2006. The SSO Initially Followed the "Structured Process" Contemplated by the Solicitation, but then Abandoned the Process and Used the So-Called Industry Standard to Make a Second Price Reasonableness Determination that Enabled the Desired Award to Datatrac.**

**i. February 27, 2006: The TEC Submits Its Technical Evaluation Report**

On February 27, 2006, the TEC submitted its evaluation report to the SSA. The report included recommendations based solely on the factors and subfactors called out in the Solicitation and, in accordance with the requirements of FAR 15.305(a)(3) "[a] . . . matrix, or quantitative ranking, along with appropriate supporting narrative, of each technical proposal *using the evaluation factors*." AR Tab 20, p. 616 (emphasis added). The technical report makes no mention of performance of any analysis of staffing using a "call center industry staffing standard" as a criterion for award.

**ii. February 24, 2006: The TEC Submits Its Technical Evaluation Report to the SSA.**

On February 24, 2006, the BEC submitted its initial evaluation report on the various proposals "in accordance with the requirements of the Source Selection Plan and the FAR." AR, Tab 15, p. 556. The report made no mention of evaluation criteria other than those identified in the Solicitation, explicitly noting that "[t]he SSP and RFP stated that the price analysis be conducted using one more of the techniques specified in FAR 15.404-1(b)." AR, Tab 15, p. 556. The BEC's price analysis revealed that [redacted]. The report concluded that "[redacted]

[redacted]." AR, Tab 15, pp. 559-560, 567. The BEC consensus report, submitted February 28, 2006, contained substantially the same information and, again, made no mention of evaluation factors other than those called out by the Solicitation. AR, Tab 26, pp. 871-895.

**iii. April 3, 2006 - The First Source Selection Decision Document.**

On April 3, the SSA issued the Source Selection Decision, noting that [redacted]," and that [redacted]" AR, Tab 26, pp. 920, 975. This Source Selection Decision identified Datatrac as an awardee despite its high price, relying in significant part on Datatrac's prior experience with the NCSC program. AR, Tab 26, pp. 921, 976.

**iv. April 3 –April 25: [redacted]**

By April 18, USCIS became aware that, for reasons as yet unexplained, DHS was holding up award of the contracts. AR, Tab 26, pp 943, 996-997. On April 19, DHS Procurement Analyst Toi Johnson advised Contracting Officer Ross that [redacted] AR, Tab 26, p. 943.

On April 25, DHS' reasons for delaying award became clear when Toi Johnson advised Contracting Officer Ross [redacted]

[redacted]

AR, Tab 26, p. 984 (emphasis added).

v. **April 26-27, 2006: USCIS Makes Clear That, Like DHS, It [redacted] And, To That End, Seeks And Obtains A New Evaluation Factor Aimed At Producing The Desired Outcome.**

On April 26, Contracting Officer Ross responded to DHS observation regarding the absence of "clear discriminators" by arguing that, in addition to the HubZone and early transition features, the. SSDD [redacted]." AR, Tab 26, p. 985 Then, at 8:13 AM on April 27, USCIS' Deborah Parot reached out in an e-mail identified as of "high" importance, to [redacted] of the UISCIS Call Center Program Office:

[redacted]

[redacted]

AR, Tab 26, p. 999 (emphasis added). [redacted] responded to Ms. Parot three hours later at 11:05 AM, advising that he [redacted]

AR, Tab 26, p. 1015 (emphasis added). [redacted] did not and, as far as the record shows, never has positively concluded [redacted]. AR, Tab 26, p. 1015.[1] But this absence did not prevent [redacted] from describing the evils arising from the Pandora's box that L-3/MOI apparently opened when it—again apparently--- used a [redacted] Occupancy Rate. According to [redacted] And this condition "[redacted]" which runs the risk of "[redacted] your Knowledgebase" so that you consistently have [redacted], which means, in turn, that you "[redacted]" Moreover, "[redacted]

[1] The record remains barren of meaningful support for the validity of [redacted] calculation, although he did state that he was "[redacted] AR, Tab 26, p. 1018.

[redacted] AR, Tab 26, p. 1015.

Ms. Parot found [redacted] analysis to be [redacted] and asked him to [redacted] and advise her whether it was [redacted] [redacted] responded that it was [redacted]" AR, Tab 26, p. 1018.

**vi. April 27, 2006: The SSA Adopts And Uses [redacted] Alleged Industry Standard Calculation To Conduct a Second "Price Realism Analysis" Justifying Award To Datatrac.**

At 1:04 PM on April 27, 2006, Laura B. Zuchowski, DHS Procurement Specialist, advised Soraya Correa, Director, Office of Procurement Operations at DHS, that [redacted] Ms Zuchowski noted that [redacted] AR, Tab 26, pp. 1017-1019. DHS' Ms. Zuchowski had now assumed the role of the SSA and undertaken to prepare the SSDD, which was issued on April 27. AR, Tab 13, pp. 529-537. Ms. Zuchowski stated in the SSDD that [redacted] AR Tab 13, pp 529, 535. Ms. Zuchowski did not explain how the price realism analysis was conducted but did reiterate [redacted] litany of problems that USCIS would encounter if award were made to L-3/MOI due to its apparent use of "[redacted]" and concluded that "[redacted]

[redacted]" AR, Tab 13, p. 536. *Cf:* AR, Tab 26, p. 1015. The SSDD repeats [redacted] opinion that L-3/MOI "[redacted]" but makes no mention of any attempt on the part of the SSA or any other member of the SSO to ask L-3/MOI whether this appearance was fact.

**vii. The Record Contains No Support For The Validity of the Second "Price Reasonableness Analysis" And Provides No Meaningful Explanation As To Its Operation.**

In connection with its adoption by the SSA as a "price reasonableness analysis," the USCIS BEC purportedly reviewed and reported on the "[redacted]" AR, Tab 13, p. 568-571. Like the SSDD, the BEC's report contains no reference to expert opinion or documentation that would support the validity of the calculation as an accurate means of determining occupancy rate in the circumstances of this procurement and there is nothing in its report or elsewhere in the record that the BEC made any inquiry in this regard. Nor did the BEC undertake to provide either its own rationale for the accuracy of the calculation or a coherent and complete explanation of its operation. Yet the BEC clearly accepts [redacted] conclusion based on the calculation that L-3/MOI "[redacted]" AR, Tab 13, pp. 568-571.

**viii. The "Price Reasonableness Analysis" Is Based on Assumptions Whose Reasonableness Is Not Supported And Is Inaccurate on Its Face.**

The absence of an explanation from [redacted], USCIS or DHS as to how the price reasonableness analysis works to yield a [redacted] occupancy rate for L-3/MOI has prompted

counsel for Plaintiff to inquire into the mechanics of the calculation underlying the analysis. [2] The calculation utilizes data points from the RFP, including 4.58 minutes average handling time per call or "AHT", the number of CSRs proposed by, respectively, Aspen, Datatrac and L-3/MOI and the number of monthly calls at the 400,000 level. AR, Tab 26, pp. 1016, 1018. And, as will be discussed further below, the calculation also relies on five assumptions whose reasonableness [redacted] is implicitly asserting but for which neither he nor anyone else at USCIS has provided support: (i) the validity of the [redacted] productivity rate as an " industry standard" applicable to L-3/MOI; (ii) the supposed inclusion by L-3/MOI of [redacted] in its price proposed to the government ; (iii) the supposed inclusion by L-3/MOI of [redacted] per month in its proposed price (iv) the notion that L-3/MOI's occupancy rate can be accurately calculated only by first applying the [redacted] productivity rate to the 450 minutes supposedly available in the work day after [redacted] removes [redacted] for lunch and, finally, (v) the notion that it is acceptable to inflate the occupancy rate by applying an [redacted] productivity factor to available hours without making any inquiry of either the offerors or objective outside experts as to the appropriateness of such a calculation.

In any event, Plaintiff's counsel utilized all the above data points and assumptions in the effort to understand the operation of the calculation underlying the price reasonableness analysis and now submits that [redacted] appears to have performed it substantially --though perhaps not entirely-- as discussed below. AR, Tab 16, p. 570, AR, Tab 26, p. 1016[3]

---

[2] The calculation appears in the record both as an attachment to the above BEC report, AR, Tab 16, pp. 568-570, and to [redacted] April 26 e-mail to Ms. Parot, AR, Tab 26, pp. 1015-1016.

[3] This discussion is best understood while referring to the calculation, a copy of which is in the AR at page 570.

First, [redacted] divided the 400,000 calls per month, as identified in the Solicitation, by the assumed [redacted] workdays in the month to yield a dividend for "Daily Calls Offered" of 18605 calls per day. He then divided the number representing Daily Calls Offered by the number of CSRs proposed by the offerors---[redacted] in the case of L-3/MOI---for a dividend of some [redacted] "Daily Calls Per CSR" for L-3/MOI. Laying this number aside for the moment, [redacted] next turned to the calculation of available minutes using the assumed [redacted] productivity rate. Utilizing the assumption of [redacted] for lunch, [redacted] found available 450 of the 480 total minutes in a day.(480 -30 = 450) He then applied the [redacted] productivity rate to those minutes, yielding a factor he calls "Available Minutes—Productivity" of 382.5 minutes. (.85 x 450 = 382.5)

The next step, obviously, is to apply the data so far developed to arrive at the occupancy rate, which in the case of L-3/MOI is [redacted]. The calculation does not give us any indication of how the [redacted] is derived. But it appears that, in the case of L-3/MOI, [redacted] derived it by dividing the [redacted] Daily Calls Per CSR attributed to L-3/MOI by a number that does not appear in the calculation. That number can perhaps reasonably be called the "theoretical Daily Calls Per CSR" because it is derived by dividing the [redacted] "Available Minutes-Productivity" by the AHT of 4.58 to yield a dividend of some [redacted] theoretical Daily Calls Per CSR. [redacted] then divided L-3/MOI's [redacted] daily calls by the [redacted] theoretical daily calls to determine the [redacted] occupancy rate for L-3/MOI. [redacted] Application of this rate to the available hours as reduced by the application of the productivity rate enables one to obtain the disastrous results that [redacted] graphically described to Ms. Parot and which the SSA used to make award to Datatrac.

The above approach appears to be a reasonably accurate if not complete replication of [redacted] effort vis-à-vis L-3/MOI in that it produces [redacted] results when applied to

Datatrac and Aspen. But it also appears to have resulted in the identification of at least two apparent discrepancies in [redacted] calculations. The first is that, when [redacted] is divided into the Daily Calls Offered figure of 18605, the correct dividend is some [redacted] calls per day rather than the [redacted] cited by [redacted]. This discrepancy is minor. But the other discrepancy is not minor. Thus, [redacted] derived the "Daily Calls Per CSR" for the offerors in two ways, the first being as described above. The second is, as can be seen from the calculation, derived by dividing the AHT of 4.58 into the number of CSRs proposed by the offeror in question for the 400,000 level.[4] In the case of both Datatrac and Aspen, this calculation yields a number identical with the number obtained by dividing the CSRs offered into the 18605 "Daily Calls Offered." But there is no equivalent outcome in L-3/MOI's case because, first, [redacted] uses the number [redacted] as L-3/MOI's proposed number of CSRs when the correct number is [redacted] and, second -- and probably more importantly -- [redacted]. And when that figure is used to calculate L-3/MOI's occupancy rate, we find that it yields an occupancy rate of some [redacted] -- a rate very close to that of both Datatrac and Aspen. This last computation may or may not yield a result that [redacted] would consider accurate. But we have no way of assessing the accuracy because USCIS has provided us no explanatory data or information that would enable us to do so.

It appears that the calculation underlying the "price reasonableness analysis" is flawed in five ways. First, USCIS has adduced no support for its accuracy or status as a standard used in the industry. Second, USCIS has provided neither a rationale to support its accuracy nor—and

---

[4] As no data was available for Datatrac at the 400,000 level, [redacted] prorated the number of CSRs from Datatrac's proposal at a call level of 420,000 to the 400,000 call level where data was available for both Aspen and L-3/MOI.

perhaps more importantly---any meaningful explanation of how the calculation operates to arrive at the [redacted] occupancy rate that deprived L-3/MOI of its substantial chance of award of a contract. Third, the calculation as it presently stands in the record contains apparent inaccuracies that are not explained by anything in the record, thereby raising the possibility that the calculation is inaccurate in its entirety, even on its own terms. Fourth, USCIS has provided no support for the validity of the five assumptions made to enable the use of the calculation, as outlined above And, fifth, while we can identify and at least partially perform the arithmetic process by which [redacted] arrived at L-3/MOI's apparent use of a [redacted] occupancy rate, neither the arithmetic nor the limited number of documents in the record that discuss it provide any insight as to the meaning or validity of that process. AR Tab 26.

**i. L-3/MOI Was Clearly Prejudiced By USCIS' Use Of A Calculation Characterized As An Industry Standard To Evaluate Its Proposal.**

Plaintiff has already established that it was potentially prejudiced by USCIS' approach to the process of making award to Datatrac because it "had a substantial chance of receiving the award" (Opinion of Judge Hodges, p. 8.) But a reasonably close examination of the Administrative Record reveals a disturbing pattern of behavior on the part of USCIS and its parent agency DHS that caused Plaintiff to suffer a degree of prejudice far beyond mere potentiality. The pattern commenced with an admitted predisposition to make award to Datatrac first manifested in writing by the Contracting Officer in mid-March and explicitly incorporated into the first SSDD in early April followed by concerted action on the part of USCIS and its parent agency DHS against L-3/MOI when the predisposition failed to materialize into an actual award. AR Tab 13, pp 529, 535, AR, Tab 26, pp 999, 1011-1018. This pattern is illustrated by the conversation between USCIS and DHS that took place during March and April, 2006.

On April 26, DHS' Toi Johnson addressed the SSDD of April 3 making award to Datatrac, stating in part: [redacted] AR, Tab 26, p. 984. This memorandum is followed by (a) USCIS Debra Parot's query to [redacted] as to [redacted], (b) [redacted] (c) Ms. Zuchowski's assumption of the role of the SSA and her adoption of [redacted] undisclosed "industry standard calculation" to re-evaluate the proposals by conducting a "price reasonableness analysis" the results of which establish that "[redacted] AR, Tab 13 at 535-536, Tab 26 at 999, 1011-1018

The evidence of DHS and USCIS deliberate use of a factor not specified in the Solicitation so as to achieve the desired outcome of award to Datatrac is more than substantial and establishes beyond doubt that L-3/MOI suffered great prejudice due to the actions of these two agencies.

**2. USCIS Impermissibly Tailored the Procurement Inconsistent with Customary Commercial Practice, as Required by FAR § 12.302(c).**

This procurement was a commercial-item acquisition subject to FAR Part 12. FAR § 12.301(a) provides that "contracts for the acquisition of commercial items shall...include only

those clauses...determined to be consistent with customary practice." The Solicitation stated that "[c]onsiderations shall include...the impact on recruiting and retaining the call center's minimum and maximum personnel." AR, Tab 5, p. 88. The Solicitation made further demands regarding the minimum number of CSRs required and apportionment of those CSRs between the two required call centers. Id.

Most importantly, under Section V, Proposal Evaluation, each offeror was evaluated on its Technical Capability, namely under Facilities, Equipment and Personnel, the offeror was required to present a schedule outlining the number of CSRs to be hired and trained. AR, Tab 5, p. 167. Additionally, the Solicitation evaluated each offeror based on information it provided regarding CSR scheduling. AR, Tab 5, p. 168.

If a Contracting Officer chooses to tailor any clause for conditions inconsistent with customary commercial practice, the Contracting Officer must obtain a waiver as described in FAR § 12.302(c). FAR § 12.302(c) provides that

> [t]he contracting officer shall not tailor any clause or otherwise include any additional terms or conditions in a solicitation or contract for commercial items in a manner that is inconsistent with customary commercial practice for the item being acquired unless a waiver is approved in accordance with agency procedures.

In a bid protest, the Comptroller General[5] sustained the protest where there were certain disclosure requirements regarding profit that were not customary commercial practice. Matter of: Smelkinson Sysco Food Svcs., B-281631, March 15, 1999, 99-1 CPD P 57. The Comptroller General, relying on FAR Part 12, found that since there was no meaningful market research showing the Solicitation requirement was consistent with customary commercial practice, that the agency's failure to obtain a waiver was improper. Id.

---

[5] While not binding on this Court, Comptroller General opinions "may be of persuasive value." Riggs v. United States, 21 Cl. Ct. 664, 675 (1990).

Nowhere does the Solicitation disclose how the bidder is supposed to arrive at its staffing levels for CSRs. In conformance with FAR Part 12, the offerors were supposed to use customary commercial practice in any calculations geared toward arriving at appropriate staffing levels. There appears to have been no market research conducted into what the customary commercial practice was in calculating CSR staffing requirements in call centers. The United States stated that <u>www.gsa.gov</u> was viewed but no pages were printed out and that further discussion of market research is listed at pp. 68-69 of the Administrative Record. <u>See</u> <u>Itemized List of Documents Identified In and Not Produced as Part of the Administrative Record</u>, Government Response at #1. Indeed, the only reference to the calculations of staffing levels comes, not from the RFP, but in emails attempting to explain the staffing levels. [redacted] used "a standard of [redacted] for Productivity which is generally used within the call center industry. The only variable is the Occupancy standard which is usually between [redacted] AR, Tab 26, p. 1015. There is passing reference to a Dr. Anton, and the wholly unsupported fact that [redacted] has "[redacted]" AR, Tab 26, p.1018.

The fact is that [redacted] use of the "standards" for occupancy and productivity rates are anything but. Through information and expert testimony that L-3/MOI will show once granted its motion for leave to supplement the Administrative Record, the Court will learn the erroneous nature of USCIS' claim that its staffing calculation is consistent with industry standards or commercial best practices.

Had [redacted] conducted the market research for a waiver, as required by FAR Part 12, he would have learned that the percentages for occupancy and productivity rates are not

Agreed-Upon Redacted Copy
May Be Made Public

standards. FAR Part 10 provides guidance to agencies regarding the scope and proper methods for conducting required market research.[6]

No meaningful market research was conducted regarding the calculation of staffing levels. But what USCIS did was tailor the procurement in a manner inconsistent with customary commercial practice, in clear violation of FAR § 12.203(c). And if USCIS had determined that it needed to use the calculation of staffing levels used by [redacted], then FAR § 12.302(c) requires such a change be accomplished through a waiver in accordance with USCIS procedures, and then modifying the solicitation through an addenda in accordance with FAR § 12.302(d).

USCIS' clear violation of federal procurement law, as set forth in FAR § 12.302, severely prejudiced L-3/MOI. Had L-3/MOI known that its CSR staffing levels would be evaluated using the productivity and occupancy rates (which were not the customary commercial practice) which [redacted] applied, L-3/MOI would have submitted a different proposal using those rates. Instead, L-3/MOI submitted a proposal based on the customary commercial practice of [redacted] and received a lower technical score with erroneous accompanying conclusions that it would [redacted]. [redacted] price of Datatrac. Had L-3/MOI been properly reviewed using customary commercial practices, L-3/MOI would have received the contract award because Datatrac's higher price would have been wholly unjustifiable.

---

[6] FAR § 10.002(b)(2) provides a list of techniques for such market research, which includes, (i) contacting knowledgeable individuals in Government and industry regarding market capabilities to meet requirements, (ii) publishing formal requests for information in appropriate technical or scientific journals or business publications, (iii) querying the Government-wide database of contracts and other procurement instruments intended for use by multiple agencies, and other Government and commercial databases that provide information relevant to agency acquisitions, (iv) participating in interactive, on-line communication among industry, acquisition personnel, and customers, and (v) conducting interchange meetings or holding presolicitation conferences to involve potential offerors early in the acquisition process.

USCIS' belief that the staffing levels proposed by L-3/MOI were less realistic and more risky than Datatrac's proposed staffing levels reflects USCIS' underlying belief that L-3/MOI was ignorant of industry standards. That underlying belief is unreasonable because, as publicly available information and expert testimony will show, it is USCIS that was ignorant of industry standards.

As Cibinic and Nash have explained, an agency's ignorance of industry standards can lead to award decisions that are inherently erroneous even if the alleged industry standards they were included in the Solicitation documents. To illustrate this point, Cibinic and Nash offer Dynalantic v. United States, 945 F.2d 416 (Fed. Cir. 1991) as instructive.[7] John Cibinic, Jr. and Ralph C. Nash, Jr., Formation of Government Contracts, Ch. V. p. 829 (3rd Ed. 1998). The facts of this procurement are very similar to those of Dynalantic Corp. v. United States, 945 F.2d 416 (Fed. Cir. 1991). In Dynalantic, the Source Selection Authority used a productivity standards, not disclosed in the Solicitation, of 3 lines of code per person per day to measure the adequacy of the staffing proposed for an Air Force software development contract. Dynalantic's based its bid on the assumption that is programmers could produce 10 lines of code per program per day. Id. at 1.

The evaluators advised the Source Selection Authority in Dynalantic that Dynalantic did not understand the contract because its bid proposed completing the programming work more efficiently than the evaluators thought possible. Id. at 2.

At trial before the General Services Board of Contract Appeals, Dynalantic produced expert witnesses who proved that the reasonable and the acceptable range for the development

[7] Plaintiff acknowledges that the Federal Circuit has designated Dynalantic an unpublished opinion and accordingly does not include reference to it here for precedential value.

and production of computer software was between 3.8 and 15 lines of code per programmer per day, and that 3 lines of code was unreasonable and 10 lines of code was reasonable. The Federal Circuit looked to these experts as the definitive source for reliable information on what the industry standard and commercial best practices were for the rate of software code programming. The Federal Circuit also noted that the productivity standard of 3 lines of code per programmer per day was established and applied by the Source Selection Authority who was not a computer expert and who blindly relied on another non-expert, who in turn blindly relied on another person who stated that the 3 line standard of code was standard because it was used on another Air Force contract. Id. at 2. Neither the Source Selection Authority nor the person he relied on could tell how or where the 3 line standard came from or how he reached the conclusion that its application was appropriate to that procurement. Id. at 2. The Federal Circuit reversed the GSBA's decision that had denied Dynalantic's protest finding the 3 line standard faulty, arbitrary, and unreasonable and the Air Force in error for using it as a selection standard. Id. at 3.

In the instant case, the Administrative Record provides similarly inadequate support for the application of a productivity rate in addition to an occupancy rate as a method for measuring the adequacy of staffing levels. USCIS points to [redacted] as the Air Force pointed to the Source Selection Authority in Dynalantic as an authoritative source, without producing anything more than a cursory reference to some industry standard as the supporting source for his methodology. As in Dynalantic, this Court should not accept USCIS' bold assertion that its methodology is reasonable but rather the expert opinion testimony that L-3/MOI will produce at the hearing on this motion when the Court grants L-3/MOI's Motion to Supplement the Administrative Record to provide such testimony.