**B. USCIS Misread Or Misunderstood L-3/MOI's Proposed Staffing Solution And Improperly Downgraded L-3/MOI's Proposal**

L-3/MOI submitted a proposal that met and exceeded the Solicitation's staffing requirement that an offeror maintain a minimum of [redacted] CSRs within the offeror's proposed HUBZone location. L-3/MOI's proposal clearly fulfilled the following staffing requirement element:

> The Contractor shall locate one of its call centers in a HUBZone area. The Contractor shall have a minimum of 250 CSRs at its location within the HUBZone.

AR, Tab 5, p. 88. L-3/MOI explicitly committed that, "[[redacted]" AR, Tab 12, p. 400. L-3/MOI also provided a schedule showing when L-3/MOI would have those CSRs hired, trained, and through the clearance process to begin work. Id. at 399-400.

But USCIS misread or ignored L-3/MOI's clear statements in full compliance with the Solicitation's staffing requirement of having 250 CSRs at its HUBZone location. The BEC stated in its Business Evaluation Analysis of December 5, 2005 that, [redacted] AR, Tab 14, p. 547. The BEC read the Solicitation to require the offerors to staff their HUBZone call center with 250 CSRs regardless of minutes in call volume. The BEC looked at Attachment 8 to L-3/MOI's proposal, counted [redacted] CSRs and wrongly questioned the adequacy of L-3/MOI's staffing levels. The BEC expressed its mistaken reading of the Solicitation's requirements in that same December 5th Business Evaluation Analysis when discussing Call Center Management Services' ("CCMS") Price Proposal, "[redacted]" AR, Tab 14, p. 548.

This quotation shows that the BEC used the wrong information and misread L-3/MOI's proposal when assessing L-3/MOI's proposal that unequivocally satisfied the requirement of having 250 CSRs at its HUBZone call center location. This December 5th Business Evaluation Analysis improperly raises a question about the sufficiency of L-3/MOI's proposal and tainted the Source Selection Authority's perception of the merits of L-3/MOI's proposal.

The BEC misunderstood L-3/MOI's proposed staffing levels. The BEC believed that because L-3/MOI proposed a total of [redacted] CSRs for the 400,000 call per month volume that L-3/MOI was providing sufficient CSRs to satisfy the 250 CSR requirement. The BEC erred in its understanding of L-3/MOI's proposed staffing and the solicitation requirements. BEC's error was forwarded up the decision chain at USCIS and tainted USCIS' perception of the adequacy of L-3/MOI's staffing.

It is this kind of rating-without-understanding problem that led the General Services Board of Contract Appeals to sustain the protest in Computer Systems & Resources, Inc., GSBCA No. 9176-P; 1987 WL 46022 (G.S.B.C.A.), 88-1 BCA ¶ 20331. In that procurement, the chief of an evaluation factor team admitted that she evaluated a portion of a proposal related to her teams area of evaluative responsibility eventhough she did not understand the proposal. Id. at 10. Accordingly, the GSBCA deemed the procuring agency's determination that the misunderstood proposal met the minimum mandatory requirements to be "utterly without foundation." Id. Similarly, in this case, USCIS' BEC question that L-3/MOI's staffing presented a performance risk is utterly without foundation because it is grounded in the BEC's fundamental misunderstanding of L-3/MOI's proposal as well as the Solicitation requirements.

### C. Intervenors' Proposals Failed to Meet the Solicitation's Staffing Requirements and Improperly Received High Ratings from USCIS.

As mentioned above, the Solicitation clearly states that there is a minimum requirement of 50 CSRs at all call centers at all times to meet USCIS' technology requirements set forth later in the Solicitation in Section 6. AR, Tab 5, pp. 88, 95-96. Intervenors' proposals fail to address the minimum CSR requirement per call center, and by so doing, offer staffing models that do not comply with the Solicitation requirements. Intervenors' propose to have [redacted] of their total CSRs in one HUBZone without regard to the number of CSRs in the second call center.

USCIS cannot apply one element of the staffing requirements and disregard others. All of these elements of the CSR staffing requirement must have meaning. A court must consider a Solicitation as a whole and interpret it in a manner that harmonizes and gives reasonable meaning to all of its provisions. Rotech Healthcare Inc. v. United States, 2006 WL 2055882 (Fed. Cl.) (page numbers unavailable); Banknote Corp. of America. v. United States, 365 F.3d 1345, 1353 (Fed. Cir. 2004). Of the three proposals found by USCIS to merit consideration for award, only L-3/MOI satisfied the 50 CSR requirement. The Intervenors do not propose to maintain [redacted] CSRs per call center at all call volumes as called for by the Solicitation. More specifically, and as demonstrated below, the proposals of Datatrac and Aspen do not comply with the 50 CSR requirement because they failed to maintain at least two call centers with no fewer than [redacted] CSRs.

The staffing levels of both Datatrac and Aspen fail to maintain the 50 CSR per call center minimum. At the 200,000 call per month level, Aspen proposed [redacted]. [redacted] AR, Tab 79, p. 1789. Likewise, Datatrac's staffing called for [redacted]. AR, Tab 16, pp. 568-570. Applying

Intervenors' [redacted] Id. Despite Aspen's insistence that this Court look at only the 80% rule, Aspen's own proposal explicitly abandoned the 80% requirement for its peak staffing summary. AR, Tab 79, p. 1789. Aspen's proposed staffing called for a total of [redacted] based at its HUBZone Albuquerque Call Center. [redacted]. Yet, USCIS did not downgrade either Datatrac or Aspen for their failure to comport with these staffing requirements.

In addition, USCIS identified other deficiencies in Aspen's proposal. The TEC found "[redacted]". AR, Tab 99, Page 1959. Aspen, however, despite this conclusion made by an evaluator in connection with her review of Aspen's proposal in terms of compliance with the technical evaluation factor for "Facilities, Equipment and Personnel," rather than downgrading the proposal or even noting a risk factor, Aspen received the [redacted]" on this sub-factor. AR, Tab 13, p. 530. According to the Solicitation, "[redacted]" means "[redacted] AR, Tab 5, p. 170.

Similarly, in evaluating Datatrac's proposal, the BEC was not clear if Datatrac's proposal met "[redacted]." AR, Tab 14, p. 542. Again, just as with Aspen this was not noted as a reason to downgrade Datatrac's proposal or even note a risk factor. AR, Tab 15, p. 564.

Another mistake made by USCIS was that its decision to award a contract to Aspen and not to L-3/MOI was based upon an incorrect conclusion that both contractors were proposing

[redacted] as part of their technical proposals and that it was too risky to have two contractors utilizing this protocol. AR, Tab 13, p. 534.

According to Aspen's VP and Program Manager, [redacted] was not going to be used at either of their two main call centers. AR, Tab 25, p. 719. Had USCIS not incorrectly read Aspen's proposal to include a [redacted] solution at their two main call centers the fact that L-3/MOI had proposed [redacted] would not have been a risk factor and an impediment to awarding the contract to L-3/MOI. AR, Tab 13, p. 533.

USCIS also erroneously indicated that another reason that Aspen's and Datatrac's proposals were stronger technically than L-3/MOI's was based upon Aspen's and Datatrac's [redacted] AR, Tab 13, p.533 and Tab 20, p. 622. On November 10, 2005, the Technical Evaluation Team, however, recognized that "[redacted]" AR Tab 99, p. 1941. As a result, the benefit of the 45 day start up period was not relevant and did not warrant attributing credit to Aspen and Datatrac, as USCIS did, and penalizing L-3/MOI.

By not downgrading their proposals or charging Datatrac or Aspen with risk factors as USCIS did with L-3/MOI's proposal, USCIS demonstrated impermissible favoritism for the awardees. Accordingly, USCIS' decision to rate the Datatrac and Aspen's proposals as highly as they did without any recognition of the actual deficiencies in their proposals, was arbitrary and capricious and in violation of procurement law.

Agreed-Upon Redacted Copy
May Be Made Public

**D. The Solicitation's CSR Staffing Requirements Contained Latent Ambiguities Which Improperly Prejudiced L-3/MOI And Which Warrant A Full Re-Procurement Of The Contracts.**

The express terms of the Solicitation required that offerors staff each call center with 50 CSRs. AR, Tab 5, p. 88. L-3/MOI reasonably understood the Solicitation's 50 CSR per call center minimum as a controlling precondition to the subsequent staffing related requirements. Nothing in the solicitation or in the Questions and Answer contradicted that reasonable interpretation. In fact, when inquiries were made of USCIS regarding the staffing requirement, USCIS' answers reinforced L-3/MOI's interpretation. After the offerors submitted their proposals, however, USCIS applied a different interpretation of the staffing requirements that resulted in L-3/MOI's staffing levels being questioned, and improperly downgraded, by USCIS. USCIS' divergent interpretation highlights a subtle but critical ambiguity in the Solicitation's staffing requirements. Importantly, this ambiguity is entirely latent in nature because it only arose once USCIS evaluated the proposals and was therefore undetectable by L-3/MOI (or any of the other offerors) beforehand. Since USCIS drafted the Solicitation's staffing requirements in a way that rendered them susceptible to differing interpretations, and since L-3/MOI's proposal was based on its reasonable interpretation of the staffing requirements, the well-established doctrine of *contra proferentem* applies. As such, the Solicitation's latent ambiguities and the risk for said ambiguities must fall upon USCIS, as the drafter, not L-3/MOI. Further, consistent with this Court's prior holdings in cases where ambiguities are construed against a government drafter, the appropriate remedy for the staffing requirements' latent ambiguities is a complete reprocurement of the contracts.

**1. The Presence of a Latent Ambiguity in the Solicitation Requires Procurement.**

Whether a solicitation contains an ambiguity is a question of contract interpretation for the Court. Metcalf Construction Co., Inc. v. United States, 53 Fed. Cl. 617, 628 (2002); see also Metric Constructors, Inc. v. National Aeronautics And Space Administration, 169 F.3d 747, 751 (Fed. Cir. 1999). Ambiguity arises when a portion of a solicitation is susceptible of two different and reasonable interpretations, each of which is found to be consistent with the contract language. Metcalf Construction Co., Inc., 53 Fed. Cl. at 628-629; see also Metric Constructors, Inc., 169 F.3d at 751 (A contract contains an ambiguity when it is susceptible to more than one reasonable interpretation.) (citing Hills Materials Co. v. Rice, 982 F.2d 514, 416 (Fed. Cir. 1992)).

As this Court has held, "an ambiguity is latent where it is subtle, or otherwise undetectable, until such time as the parties ascribe two different meanings." Metcalf Construction Co., Inc., 53 Fed. Cl. at 629 (2002) (citing Triax Pac, Inc. v. West, 130 F.3d 1649, 1475 (Fed. Cir. 1997) and Community Heating & Plumbing Co. v. Kelso, 987 F.2d 1575, 1579 (Fed. Cir. 1993)). When a latent ambiguity exists in a contract solicitation, this Court, under the rule of *contra proferentem*, puts the risk of ambiguity, lack of clarity, and absence of proper warning on the drafting party, who could have avoided the controversy. Metcalf Construction Co., Inc., 53 Fed. Cl. at 629 In so doing, this Court protects offerors "from hidden traps not of their own making." Metcalf Construction Co., Inc., 53 Fed. Cl. at 629 (citing Sturm v. United States, 190 Ct. Cl. 697, 697, 421 F.2d 723, 727 (Ct. Cl. 1970).

Therefore, when a solicitation "is ambiguous and the contractor follows an interpretation that is reasonable, this interpretation will prevail over one advanced by the Government." Metcalf Construction Company, Inc., 53 Fed. Cl. at 629 (citing United Pac. Ins. Co. v. United

States, 497 F.2d 1402, 1407 (Ct. Cl. 1974); see also Hills Materials Co. v. Rice, 982 F.2d 514, 516-517 (Fed. Cir. 1992) (when a non-drafting party's interpretation is a reasonable one, that interpretation is the dispositive interpretation of the clause.)

"Before a court may enforce the general rule of *contra proferentem* against the drafter of an ambiguity, the contractor's interpretation of that ambiguity must be reasonable." HPI/GSA-3C, LLC v. Perry, 364 F.3d 1327, 1334 (Fed. Cir. 2004). As the Federal Circuit has noted, the contractor availing himself of *contra proferentem* must show that: (1) the contract specifications were drawn by the Government; (2) the language used therein is susceptible of more than one interpretation; (3) the intention of the parties does not otherwise appears; and (4) the contractor actually and reasonably construed the specifications in accordance with one of the interpretations to which the language was susceptible. Id. In this case, L-3/MOI satisfies each of the criteria required to activate the mechanism of *contra proferentem* and, since the Solicitation is ambiguous, the staffing requirements must be construed against USCIS, meaning that L-3/MOI is entitled to the declaratory and injunctive relief it seeks.

Each of the four criteria necessary for *contra proferentem* to apply are present in this case. Two of those criteria cannot be disputed: 1) USCIS drafted the Solicitation and 2) L-3/MOI relied on its interpretation of the staffing requirements when preparing its proposal. To determine if *contra proferentem* applies the Court's inquiry is limited to two issues; first, are the staffing requirements susceptible of more than one reasonable interpretation; and second, was L-3/MOI's interpretation reasonable? Those questions are answered easily in the affirmative. The staffing requirements were interpreted differently by L-3/MOI, and the Intervenors, all of whom were in line for award. As demonstrated below, L-3/MOI's interpretation was reasonable because it accounts for the reasons given by USCIS for the 50 CSR minimum requirement.

In holding that an ambiguity was latent and should be construed against the government, this Court noted that "it appears from the record that the government did not explicitly raise its competing interpretation of the contract until the briefing" stage and thus could not have been noticed earlier by the contractor. Record Steel And Construction, Inc., 62 Fed. Cl. at 518; see also Metcalf Construction Co., Inc., 53 Fed. Cl. at 629 (holding that an ambiguity, while not latent, nonetheless should be construed against the Navy and ordering that the disappointed bidder be reinstated in the competitive range under the subject solicitation); see also Metric Constructors, Inc., 169 F.3d at 751 (reversing agency determination on the basis that the subject contract contained latent ambiguities which were to be construed against NASA as the drafter).

In the past, when holding that a solicitation's ambiguities must be construed against the government, this Court has ordered a reprocurement of the subject contract. See Metcalf Construction Co. Inc., 53 Fed. Cl. at 646 (ordering the Navy to reinstate the plaintiff disappointed bidder in the competitive range under the subject solicitation and to have all offerors re-submit proposals for evaluation consistent with the Court's findings). In this case, L-3/MOI satisfies each of the criteria required under *contra proferentem* and, since the Solicitation's ambiguous staffing requirements must be construed against USICS, L-3/MOI is entitled to a reprocurement of the contracts.

**2. L-3/MOI Reasonably Interpreted The Solicitation's Staffing Requirements To Require A Minimum Of 50 CSRs.**

L-3/MOI's interpretation of the CSR staffing requirements is both reasonable and correct. The Solicitation clearly states that "each call center is required to have a minimum complement of 50 CSRs." AR, Tab 5, p. 88. The other pertinent sections of the Solicitation confirm that L-3/MOI's interpretation of the staffing requirements—that there was a 50 CSR minimum per call

center—is perfectly reasonable. In Section 4 of the Performance Work Statement ("PWS") portion of the Solicitation states as follows:

- The network of NCSC Tier 1 call centers shall be located geographically in such a way as to minimize the impact of weather or other localized or regionalized events that may otherwise affect collective operational performance.

- The Contractor shall locate one of its call centers in a HUBZone area. The Contractor shall have a minimum of 250 CSR's at its location with the HUBZone.

- If through contract performance and diminished call volume during the term of this Contract the Contractor's total CSR staffing falls below 300 CSR's, it shall maintain a minimum of 80% of its total CSR complement at that location.

- The Contractor shall maintain a minimum of 2 call centers. No one site may have more than 80% of the Contractor total CSR staffing. AR, Tab 5, p. 88.

L-3/MOI reasonably interpreted the staffing requirements to mean that it had to maintain 50 CSRs, as a minimum operating crew, at any of its locations. This is a reasonable interpretation not only because of the plain language set forth above, but also because the 50 CSR minimum is tied to the "Government provided telecommunication services described in Section 6." AR, Tab 5, p. 88.

Section 6 of the PWS describes, in detail, the technical support that the Contractor must provide. L-3/MOI reasonably understood USCIS' requirement of the 50 CSR minimum complement as a floor that normally could not be breached without substantially compromising the operability of that call center. Moreover, because the staffing requirement set forth above explicitly contemplates that call volumes could fall to a level requiring fewer than 300 CSRs, a decrease in call volume alone would not justify breaching the 50 CSR minimum because such a decrease in call volume could occur as part of the normal expected flow of work under the contract.

At the pre-proposal conference, the offerors questioned USCIS specifically about the total number of CSRs required, as follows:

Question: What is the government's estimate of he total CSR requirement? What is the current number of CSR's utilized?

Answer: The number of CSR's is a business decision for each offeror to make current contractor staffing information is irrelevant. AR, Tab 7, p. 225.

Based on its interpretation of a 50 CSR minimum, L-3/MOI submitted a proposal that unequivocally satisfied all of the Solicitation's staffing requirements. L-3/MOI's proposal committed to employ [redacted] CSRs in its call center in Corpus Christi, Texas. AR, Tab 12, p. 400. With 250 CSRs in Corpus Christi, a HUBZone, L-3/MOI's proposal exceeded the 50 CSR minimum and complied with the 250 CSR minimum requirements. Id. L-3/MOI met the requirement of a second call center by locating another call center in Pittsfield, Maine, another HUBZone.

**3. USCIS Interpreted The Staffing Requirements Differently Than L-3/MOI, Giving Rise To Latent Ambiguities In The Solicitation.**

Despite L-3/MOI's clear proposal to meet and exceed the staffing requirements laid out in Section 4 of the Solicitation, including the manner and time by which it would hire and train the necessary CSRs, USCIS used a different interpretation of Section 4, which not only undercut L-3/MOI's chances for award, but also created latent ambiguities in the Solicitation. USCIS' interpretation reflects that the CSR requirement was susceptible to more than one interpretation.

Mr. Kevin Acotto, a member of the BEC, demonstrated his belief that the Solicitation required "[redacted]." AR, Tab 14, p.548. His comments analyzing the proposal of CCMS reflect the BEC's understanding of the CSR requirement as [redacted] full time equivalent customer service representatives in a HUBZone regardless of call volume. Further, to prove that the offeror met that requirement, the BEC required the offeror's Attachment 8, which reflects staffing costs for only the 400,000 calls per month level, to show that the offeror had hired the 250 CSR minimum. AR, Tab 14, p. 547. In addition to being directly controverted by L-

3/MOI's technical proposal, this interpretation of the Section 4 requirement is different from the reasonable interpretation that L-3/MOI used.

Further, the SSDD, which awarded the contracts to Datatrac and Aspen, contains erroneous information and reflects USCIS' divergent interpretation of the staffing requirements. The SSA prepared the SSDD with input and suggestions from the Contracting Officer, Mr. Ned Ross, and numerous others at USCIS and DHS. Mr. Aytes' award decision was supported by erroneous facts supplied to him by the BEC. On page 10 of the BEC's Business Evaluation Analysis dated December 5, 2005, Mr. Kevin Acotto, a BEC member, notes "[redacted]." Id. While Mr. Acotto does not explain this comment, it is clear he took the information not from L-3/MOI's technical proposal, but rather from a costing worksheet showing L-3's proposal costs for staffing to service 400,000 calls per month. Accordingly, USCIS' interpretation of Section 4 proves that a latent ambiguity is present in the Solicitation.

The BEC's differing interpretation of the Section 4 requirements was magnified by Mr. Ross in his Interoffice Memorandum to Mr. Aytes regarding the Business Evaluation Report for NCSC Support Servicer HSSCCG-05-R-00012 dated February 24, 2006. AR, Tab 15, pp. 555-567. Mr. Ross borrows from Mr. Acotto's analysis and determines that L-3/MOI "specifies [redacted]" AR, Tab 15, p. 565. Again, L-3/MOI's Attachment 8 was used in lieu of its technical proposal. But Mr. Ross did not stop there. He further noted that "[redacted]

[redacted]" Id.

By recasting the Section 4 requirement in this light and by using costing information from Attachment 8 rather than the staffing commitment in its technical proposal, Mr. Ross provided Mr. Aytes a prejudicial picture of L-3/MOI's proposal based on a very different interpretation of that requirement than L-3/MOI reasonably understood. Again, Mr. Ross' interpretation does not take account of the two call centers or the 50 CSR minimum per call center requirements. Rather he interpreted the 250 CSR and the 80% requirements differently from and to the detriment of L-3/MOI.

**4. Given The Solicitation's Latent Ambiguities, This Court Should Order a Reprocurement of the Contract**

In its Response, Intervenors may attempt to persuade this Court that any ambiguity in the staffing requirements was patent, not latent, and that L-3/MOI failed to satisfy its duty to clarify the ambiguity. For several reasons, however, any such argument by Intervenors fails. As a threshold matter, the staffing requirements' ambiguity does not meet the definition of a patent ambiguity. A "patent ambiguity is one that is 'obvious,' 'gross,' 'glaring,' or 'substantial.'" Metcalf Construction Company, Inc. v. United States, 53 Fed. Cl. 617, 629 (2002); see also Metric Constructors, Inc., 169 F.3d at 751 ("An ambiguity is patent only if it so glaring as to raise a duty to inquire.") quoting Newsom v. United States, 676 F.2d 647, 649-50 (Ct. Cl. 1982). The doctrine of patent ambiguity is an exception to the general rule of *contra proferentum* which construes an ambiguity against the drafter. Metric Constructors, Inc., 169 F.3d at 751 citing Sturm v. United States, 421 F.2d 723 (Ct. Cl. 1970)). In this case, as in Record Steel And Construction, Inc. v. United States, the ambiguity is latent, not only because it is subtle and not at all obvious, but also because it did not arise until long after the proposals were submitted.

Record Steel And Construction, Inc, 62 Fed. Cl. at 518 (holding that contractual ambiguity was latent, in part, because "it appears from the record that the government did not explicitly raise its competing interpretation of the contract until the briefing" stage).

Further, even if the Solicitation's ambiguities were patent (which they are not), they should still be construed against USCIS because of its response to inquiries about the staffing requirements. At the pre-proposal conference, the staffing requirements were the subject of several questions from the offerors.

L-3/MOI reasonably relied on USCIS' answers and, simply put, the best practices of the commercial call center industry dictated that it commit 190 CSRs to the HUBZone, no more and no less. While one may conceivably conclude that the staffing requirements dictate that 192 CSRs are required for a HUBZone, to entertain such an inference is to accept that USCIS, contrary to its stated position, did in fact have a preconceived minimum number of overall CSRs. Therefore, even if this Court is inclined to consider the staffing requirements as patently ambiguous, USCIS, at the least, erred by not properly stating the overall CSR minimum when asked and, as this Court has ordered in the past, must be held accountable for its' insufficient response.

USCIS' inaction with regard to the expressed uncertainty as to the staffing requirements is quite similar to the inaction of the Government in Metcalf Construction Co., Inc.. In that case, this Court construed a patent ambiguity against the government because the government was informed of potential uncertainty by the offerors but failed to clarify the ambiguity and as a result, bore the risk of the ambiguity. Metcalf Construction Co., Inc., 53 Fed. Cl. at 632. This Court's reasoning is as applicable now as it was then. USCIS was questioned about the staffing requirements but made no serious effort to cure the offerors' uncertainty when it should have.

Ultimately, regardless of how Intervenors respond, they cannot offer anything to rebut the fact that L-3/MOI reasonably interpreted the staffing requirements to mean that it had to maintain 50 CSRs, as a minimum operating crew, at any of its locations. USCIS' own interpretation differed from L-3/MOI's, which reflects latent ambiguities in the staffing requirements that only arose once USCIS applied and interpreted the staffing requirements, after L-3/MOI submitted its proposal. L-3/MOI's interpretation is clearly reasonable, however, and satisfies all of the criteria of the doctrine of *contra inferentum*, such that the staffing requirements' latent ambiguities must be construed against USCIS, not L-3/MOI. Further, as this Court has ordered in similar circumstances in which a solicitation's ambiguities must be construed against a contracting agency, the proper remedy is a full reprocurement of the subject contracts.

**E. USCIS' Violated Its Duty To Seek Clarifications Regarding Staffing and Wage Rates With A View To A Possible Award to L-3/MOI.**

Federal procurement regulations require agencies conducting procurements without discussion to seek clarification when presented with proposals that contain apparent mistakes. Examples of the kinds of issues that "must be explored" are: "[a]mbiguities in the proposal or other concerns (e.g., perceived deficiencies, weaknesses, errors, omissions, or mistakes. (See 14.407))." FAR 15.306(b)(3)(i). While FAR section 15.3206(b)(3)(i) references the establishment of a competitive range, which USCIS did not technically use for this procurement, the Armed Services Board of Contract Appeals has recently applied this FAR section to a procurement that was conducted as a commercial service procurement not employing a competitive range. See In re Orion Technology, Inc., 2006 WL 1064133, (A.S.B.C.A.), 06-1 BCA ¶ 33266, ASBCA No. 54608 (A.S.B.C.A., Mar. 28, 2006).

USCIS identified the need for clarifications on the proposals of all three of the vendors it had determined represented the best value to the government, namely L-3, Datatrac and Aspen. The BEC noted that L-3/MOI's proposed staffing and wage rates "[redacted]" AR, Tab 15, p. 566. As for Datatrac, the BEC identified the need to seek clarifications as to Datatrac's proposal, as follows[redacted] AR, Tab 15, p. 566. As for Aspen, the BEC similarly called for clarifications to Aspen's proposal finding that [redacted]" AR, Tab 13, p. 561.

The fact that USCIS identified the need for clarifications from all three vendors in line for award is clear evidence of its recognition of its responsibility and intention to seek clarifications as part of the regular course of the procurement.

On April 19, 2006, Datatrac and Aspen sent their clarifications in response to USCIS' letter request "dated April 18, 2006". AR, Tab 26, pp. 928 and 931. USCIS made no such request for clarifications of L-3 and conveniently omitted from the Administrative Record its letters to Datatrac and Aspen seeking their response to its clarifications.

Had USCIS sought clarifications from L-3/MOI, its concerns about L-3/MOI's proposed wage rate would have immediately been resolved. L-3/MOI proposed to pay its CSRs in both Maine and Texas [redacted] per hour, a rate well in excess of the SCA wage rate. AR, Tab 12, p. 508. Through clarification, USCIS would have discovered that it made a mistake in interpreting L-3/MOI's wage and never would have noted this as a deficiency its evaluation of the proposal.

Had USCIS sought clarifications with L-3/MOI on the staffing issues it identified, the staffing issue would have been resolved in short order, also in favor of L-3/MOI. USCIS would have learned that L-3/MOI's properly applied the 50 CSR minimum as a condition precedent to the 80/20 rule based upon a fair reading of the proposal. "Given the Government provided telecommunications service described in Section 6, call centers shall have a normal minimum complement of 50 CSR's." AR, Tab 5, pp. 88, 95-96. By including this requirement in the Solicitation, USCIS itself required a minimum of 50 CSRs at all times in any NCSC call center to support the technology requirements set out in Section 6 of the Solicitation. Thus, rather than a deficiency in its staffing model, L-3/MOI was actually in compliance with the Solicitation requirements as a whole. At the very least, USCIS would have discovered a latent ambiguity in its requirements and could have resolved it at that time once and for all.

Had USCIS properly sought clarifications, L-3/MOI would have had an opportunity to explain the commercial best practice of [redacted] that renders [redacted] staffing model obsolete in the commercial call center industry and should not be acceptable in government call centers particularly in an acquisition seeking commercial best practices.

Had USCIS properly performed its duty to seek clarifications from L-3/MOI and not just Datatrac and Aspen, USCIS would have discovered that it had misread portions of L-3/MOI's proposal, and what it perceived as "deficiencies" in L-3/MOI's proposal were not in fact "deficiencies" at all. USCIS' failure to actually seek clarifications from L-3/MOI cost them the contract and is evidence of favoritism toward Datatrac and Aspen. Moreover, USCIS' failure to seek clarifications rendered its decision to not award a contract to L-3/MOI arbitrary and capricious and a violation of procurement law generally under the FAR. USCIS' conduct constitutes a disregard for procurement law.

### F. USCIS Failed To Conduct Discussions

The Solicitation clearly stated that USCIS' intent was to award without discussions. AR, Tab 5, p. 159. And while a contracting agency has discretion in determining whether or not to conduct discussions, that discretion is not "unfettered." See Day & Zimmerman Svcs. v. United States, 38 Fed. Cl. 591, 604 (1997). The court in Day & Zimmerman, relying heavily on the GAO's decision in The Jonathan Corp., B-251689, May 17, 1993, 93-2 CPD ¶ 174, recognized that "peculiar circumstances may arise which warrant an *exception* to the general rule that courts should respect the acts of procuring officials when said officials exercise their discretionary functions." Id. (emphasis in original).

In Day & Zimmerman, the plaintiff to the bid protest was not awarded a contract, in large part, because of assumptions made to the estimate of "man years" required to complete the work contemplated in the solicitation. Id. at 605. The Technical Committee in Day & Zimmerman identified several "deficiencies" regarding the plaintiff's technical staffing proposal. Id. at 606. Based on indications from the evaluation records, the court concluded that the plaintiff's technical staffing score suffered due to the agency's belief that plaintiff proposed insufficient staffing levels in its proposal. Id. at 606 – 607. The court noted that given the totality of the circumstances, there was no reasonable justification for the failure to conduct discussions. Id. at 608.

What is especially interesting about Day & Zimmerman, is that the agency relied on a cost adjustment arrived at after a cost realism analysis. Id. at 605. And while the agency in Day & Zimmerman failed to disclose that analysis (Id.), USCIS has arrived at a similar result in this case through reliance on the so-called "standards" that [redacted] pulled out of his head. Similar to the plaintiff in Day & Zimmerman, L-3/MOI was downgraded based on an analysis, which resulted in the conclusion that L-3/MOI was understaffing its call centers. Under the

authority of Day & Zimmerman, the situation presented before this Court is one of the "peculiar circumstances," that require USCIS to conduct discussions to clarify the large disparity in cost between Datatrac, and L-3/MOI based on staffing of call centers.

This very Court has addressed this exact same issue in Rig Masters. In Rig Masters, however, this Court properly declined to extend Day & Zimmerman to the facts in Rig Masters because the plaintiff failed to identify any undisclosed criteria or vague evaluation criteria the agency used to evaluate the proposals. See Rig Masters, 70 Fed. Cl. at 422. Here, L-3/MOI has clearly shown that the productivity and occupancy rates used by [redacted] to evaluate L-3/MOI's proposal were clearly undisclosed. Those rates do not show up anywhere in the solicitation. Additionally, the rates are vague because, contrary to [redacted] bare assertions, the rates he used to evaluate L-3/MOI are not the only evaluation criteria in the marketplace, much less commercial industry standards.

L-3/MOI suffered prejudice when USCIS failed to conduct proper discussions. Had USCIS conducted discussions, L-3/MOI would have explained the methods by which L-3/MOI arrived at its staffing levels, and USCIS would have learned that L-3/MOI's staffing levels were perfectly compliant with the solicitation and designed to offer USCIS the best value. But USCIS used its flawed, vague, and undisclosed rating criteria when it evaluated L-3/MOI's staffing levels. This resulted in a downgrade of L-3/MOI's proposal that was significant enough to justify paying Datatrac far more for the same services. If USCIS had conducted discussions, USCIS would have learned that L-3/MOI's staffing proposal was perfectly in line with commercial best practices, and that any worry over staffing levels and burnout were wholly unjustified.

### G. USCIS Breached Its Duty To Conduct A Fair Procurement And The Implied Covenant Of Good Faith, Fair Dealing, And Honest Consideration

In the course of this procurement, USCIS demonstrated clear favoritism toward the proposals of Apparent Awardees. USCIS did not conduct a fair, open, competitive procurement. What USCIS in fact did was determine that it wanted Apparent Awardees to win the contract before the fact and then attempt to rationalize that decision based on pretexts created wholly outside the BEC and TEC review processes. Awarding a contract in such a manner is not only irrational and an abuse of discretion, it violates USCIS' duty to conduct a fair procurement and give each bid honest consideration, which cannot stand and justifies the intervention of this Court to halt the solicitation, direct resolicitation or award, and compensate L-3/MOI.

#### 1. Predetermining an Awardee and Justifying It Post-Hoc on a Pretextual Basis is a Violation of the Duty to Conduct a Fair Procurement and a Breach of the Covenant of Good Faith, Fair Dealing, and Honest Consideration.

Every RFP includes with it a promise to conduct a fair procurement and give honest consideration to each responsive bid. As this Court said in Prineville Sawmill Co. v. United States, 859 F.2d 905, 909 (1988),

> An invitation for bids issued by the government carries, as a matter of course, an implied contractual obligation to fairly and honestly consider all responsive bids. And if this duty is breached, a bidder may rely upon the explicit grant of remedial power to the Claims Court in bid protest actions against the government...

(*internal citations omitted*). In the leading case on the duty to conduct a fair procurement, Heyer Products Co. v. United States, 135 Ct. Cl. 63 (1956), the predecessor to this Court ruled that when an agency engages in favoritism and predetermines who will receive the award or awards on a pretext, the promise to conduct a fair procurement and honestly consider all bids is "broken, shamefully broken," rendering "the advertisement for bids... a sham, done only to appear to comply with the law, to clothe [the agency's] apparently dishonest purpose with the habiliments

of legality.... They induced them to spend their money to prepare their bids on the false representation that their bids would be honestly considered." Id. at 69. This is true because, as this Heyer court explained, "No person would have bid at all if he had known that the cards were stacked against him.... It would not have put in a bid unless it thought it was to be honestly considered. It had a right to think it would be." Id.

Predetermining an award or engaging in favoritism, in and of itself, is arbitrary and capricious. "[I]t is enough for recovery if an adequate showing is made that the government acted in bad faith, e.g., by predetermining the awardee or by harboring a prejudice against the plaintiff." Keco Industries v. United States, 203 Ct. Cl. at 574(emphasis added). However, a violation of the duty to conduct a fair procurement and honestly consider all bids is also a separate inquiry from that into whether the Government's actions were arbitrary and capricious. Prineville Sawmill Co., 859 F.2d at 909 (finding that bid protests are reviewed for both whether the implied duty to fairly and honestly consider all bids and whether its decision was arbitrary and capricious).

Proof that the officials in question intentionally acted to benefit themselves or others is not necessary, it is enough to demonstrate a preference, "The law of procurement does not tolerate actions reflecting personal predilections of administrative officials, whether ascribable to whim, misplaced zeal, or impermissible influence." Parcel 49C Ltd. Partnership v. United States, 31 F.3d 1147, 1153 (1994). Regardless of the reasons for USCIS' preference for Apparent Awardees over L-3/MOI, like the GSA, awarding this contract based on that preference and then justifying it with a post-hoc pretext was an abuse of discretion.

**2. USCIS Determined Awardees Prior to Conducting a Proper Evaluation, Then Engaged in Pretextual Evaluation to Justify Its Determination After the Fact.**

USCIS contravened the very purpose of this procurement – to achieve better value for a more reasonable price – by deciding to award it to one of the most costly of the offerors prior to making a proper price/technical tradeoff analysis. The RFP explicitly sought a solution that utilized commercial best practices. AR, Tab 5, p. 128. To emphasize this fact, the RFP specifically stated that "the Government will not issue an award to an Offeror who offers a significantly higher overall price to achieve only slightly superior performance capabilities." AR, Tab 8 p. 246. And yet, USCIS ultimately completely abandoned these admirable goals in analyzing the offers before it in order to award to those it had already chosen. USCIS began with the best of intentions, but quickly went awry, and the end result was precisely what it stated it would avoid – it issued awards to offerors it inexplicably preferred who offered unreasonably higher overall prices for "superior" performance capabilities so negligible that USCIS itself could not identify them for more than three weeks. AR, Tab 26 pp. 943-1082.

USCIS subversion of the process in favor of its pre-selected awardees began early in the process – before, in fact, the solicitation was even issued:

- [redacted] AR, Tab 26, p. 976.
- [redacted].

- [redacted].

- [redacted].

During the evaluation process itself, USCIS' impermissible favoritism continued. USCIS rated the same aspects of proposals differently, finding [redacted] a drawback to the L-3/MOI proposal but not to the Aspen proposal (AR, Tab 26, p. 943) and giving Apparent Awardees, but not L-3/MOI, credit for proposing [redacted] (AR, Tab 12, p. 413; Tab 20, pp. 619, 623). In fact, Toi Johnson pointed to the differing treatment of [redacted] specifically as analysis that "[redacted]." AR, Tab 26, p. 943. Additionally, USCIS improperly downgraded the L-3/MOI proposal after misreading it for failing to meet the 80% requirement, AR, Tab 15, p. 565, but did not even comment on the fact that Apparent Awardees were not responsive because they failed to meet the 50 CSR minimum. AR, Tab 68, p. 1693; AR, Tab 49, pp. 1382-1389.

At some point between February 27, 2006, when the TEC issued its report, and before April 3, 2006, when the SSDD was first sent forward for approval, USCIS' decision to award the contracts to Apparent Awardees became official. Although there are some indicators that USCIS had made up its mind much earlier, AR, Tab 2, p. 26, we will assume that the SSA made his decision on April 3, the latest and therefore the most favorable date to Defendant. At no point

prior to the April 3 award decision did USCIS seek clarifications regarding the deficiencies in the three proposals or to conduct discussions – it did not need to, because it already knew that Apparent Awardees would win. *More than two weeks after the award decision* on April 3, however, USCIS did seek clarifications – asking Apparent Awardees to clarify their proposals because otherwise the could not receive their awards. AR, Tab 26, pp. 928, 931-942. L-3/MOI, despite the startling similarity between its need for clarification and those of Apparent Awardees, was never given any such opportunity, because there was never an intention to award to them. Instead of conducting discussions prior to its April 3 decision to clarify all the proposals, USCIS ultimately used an undisclosed and fundamentally flawed benchmark in order to justify its decision, as discussed in section II.A. above.

Mr. Ross freely acknowledged that he had no objective reason to [redacted] AR, Tab 26, p. 943. Scrambling to find a pretext to justify its decision, USCIS ran through a series of failed attempts to satisfy DHS using the criteria within the RFP:

- [redacted]. (AR, Tab 26, p. 970.) This strength had to be removed because it was unsupported. Id.
- [redacted]. Id.
- [redacted] AR, Tab 26, p. 943.
- [redacted] AR, Tab 13, p. 531.
- [redacted]

[redacted].

- [redacted]. AR, Tab 26, pp. 914, 943-44, 968, 969, 979, 980, 984, 999.

As this process wore on, in an effort to avoid producing the non-existent justification DHS required, USCIS stepped up the pressure, clamoring for an immediate approval of the SSDD and threatening high-level calls from the Department, in part because it had sent out notification of the awards to Congress on April 18, 2006 and Congress wanted to know what was going on. AR, Tab 26, pp. 979, 980, 996. DHS did not cave and stood its ground. Having failed to produce a justification for its decision using the RFP criteria and unable to pressure DHS into approval, USCIS finally turned outside the solicitation to identify a methodology that it could use as a pretext for the award to Apparent Awardees – [redacted] purported "call center industry staffing standard." This supposed standard did not in fact represent the industry standard, but appears [redacted] – thus, [redacted] took his pretext from one of the very offerors USCIS intended receive the contract all along. Stunningly, this analysis neatly took care not only of a part of the price difference, but nearly the whole thing – 90%. AR, Tab 26, p. 1017. The ultimate impact of [redacted] reasoning is that if Datatrac and L-3 had used the same staffing analysis, the price would have been virtually the same on the two proposals.

Thus, given the choice between the two types of staffing analysis – L-3/MOI's, which was based on the most up-to-date and efficient "[redacted]" analysis or Datatrac's, which was based on an [redacted] – [redacted] chose the one of USCIS' favored offeror, his former employer, despite the fact that such a choice directly contradicted the

purposes of the solicitation. He then pounded the point home by claiming that the results –the result of faulty math – made the L-3/MOI model "[redacted]," despite the widespread industry practice to the contrary. Even assuming [redacted] math was correct, in stark contrast to the efficiency standard that USCIS so desperately needed to overcome the criticisms of Congress and the GAO, this selection favored a company whose employees would spend only [redacted] hours of the day doing their job. At no point was this decision to favor the methodology of one company over another discussed with the TEC or the BEC, as required. In fact, it appears that the TEC and BEC were completely unaware of it and it was never analyzed in depth by anyone at all – the decision to use Datatrac's outdated methodology was incorporated directly into the SSDD and sent off to DHS for blessing mere hours after [redacted] applied it to L-3/MOI. AR, Tab 26, p. 1020. DHS gave its concurrence and the awards USCIS had wanted all along were issued the very next day. AR, Tab 2, p. 26.

**3. Prior Findings of This Court Support the Determination that USCIS' Actions in This Procurement Violated the Duty to Conduct a Fair Procurement and Breached the Covenant of Good Faith, Fair Dealing, and Honest Consideration.**

An award to a substantially higher priced bidder in and of itself is enough to raise suspicions of favoritism in a procurement. In Heyer, 135 Cl. Ct. at 65, the predecessor to this court found, that the award of a contract to a bidder whose price was several hundred thousand dollars higher than the low bid in and of itself "makes one strongly suspect discrimination and favoritism and a failure to accept that bid which was most advantageous to the Government." Datatrac's substantially higher total evaluated price – [redacted] (AR Tab 15 p. 557) – is very similar to the circumstances of Heyer and a similar suspicion of discrimination and favoritism based on that fact alone is appropriate in this case, particularly in light of the fact that one of the primary purposes of this solicitation was to remedy the fact that

USCIS had been paying too much under the prior contract, and the sheer amount of money involved in the overpayment in this award.

As its predecessor, INS, did in 126 Northpoint Plaza Ltd. Partnership v. United States, 34 Fed. Cl. 105 (1995), USCIS made a decision as to what it wanted and then attempted, post-hoc, to make the evaluation fit that determination by creating a pretextual justification for that decision. In 126 Northpoint, the GAO officer responsible for approving the award reacted to INS' poor justification by explaining that INS had to have a better reason. "[INS was] admonished and, fearing a bid protest, GSA directed INS to revise their subjective objections." Id. at 111. "Anticipating a legal conflict, [the GAO officer] informed the agency that he could not cancel a solicitation in order to avoid contracting with a particular qualified offeror, therefore, the agency *had to formulate objective reasons for cancellation....* " Id. at 110 (emphasis added). INS then "formulated its objective needs with an intent to disqualify a particular bidder. The alleged 'operational changes' were merely excuses for an alternative agenda." Id. The Court in 126 Northpoint found these actions sufficient to demonstrate bias against the offeror and pointed out that "GSA officials' discretionary power does not include yielding to pressures such as those exerted by INS" and found that "Defendant's action in this case violated its duty to conduct a fair procurement and was an abuse of discretion." Id. at 112.

Almost precisely as occurred in 126 Northpoint, DHS pointed out that USCIS had insufficiently justified its decision to award to Apparent Awardees and had to formulate sufficient reasons for its decision. USCIS, like INS, was "admonished" and "directed to revise" its subjective justification for award (see generally AR, Tab 26 pp. 943-1082) ("... [redacted]

[redacted] USCIS tried repeatedly to come up with a reason that would satisfy DHS and was unable to do so until the very end. USCIS tried repeatedly to come up with a clear discriminator between L-3/MOI and Datatrac that would satisfy DHS and for three weeks was unable to do so. INS finally came up with "operational changes" to justify its desires, USCIS came up with "industry staffing standards." USCIS' "industry staffing standards" – precisely like INS' "operational changes" – came post-hoc, were not in the RFP, and "were merely excuses for an alternative agenda."

In Parcel 49C Ltd. Partnership, 31 F.3d 1147, this Court, affirmed by the Federal Circuit, found that the primary reason for the contracting officer's actions was merely a pretext for accommodating the preferences of the FCC – a "backdoor" into achieving the ends that they sought. Id. at 1151. The FCC in that case had launched a "campaign to scuttle" award to a particular bidder by applying its criteria – particularly space requirements – differently in different contexts. Id. In doing so, the Government violated its duty to conduct a fair procurement.

Like the FCC, USCIS launched a "campaign to scuttle" an award to L-3/MOI. In a blatant display of favoritism, it applied its criteria, such as the analysis of the impact of [redacted], differently to Aspen than to L-3/MOI and allowed only Apparent Awardees, not L-3/MOI, to clarify their proposals to cure real and apparent deficiencies in their proposals. In fact, *more than two weeks after USCIS had made the decision to award to Aspen and Datatrac,* [redacted], which Aspen did. (AR, Tab 26 pp. 931-942.) Such unequal treatment of offerors is not permitted and is a basis for this Court to enjoin the procurement, even without bad faith, because they create an "unlevel playing field." Dubinsky v. United States, 43 Fed. Cl. 243, 269-270 (1999). In

Agreed-Upon Redacted Copy
May Be Made Public

Dubinsky, this Court found the combination of undisclosed subfactors and differential treatment of offerors, as happened here, grounds to require resolicitation and award costs to the Plaintiff. Id. at 274-276.

USCIS finally came up with the pretext of the industry staffing standards to "backdoor" its way into an award that eliminated L-3/MOI. The Federal Circuit clearly stated that, "The law of procurement does not tolerate actions reflecting personal predilections of administrative officials, whether ascribable to whim, misplaced zeal, or impermissible influence. Certainly GSA officials wield no discretionary power to succumb to pressure such as those exerted by FCC." Parcel 49C, 31 F.3d at 1153. Regardless of the reasons for USCIS' preference for Apparent Awardees over L-3/MOI, like the GSA, awarding this contract based on a pretext was an abuse of discretion. It thus violated the Government's duty to conduct a fair procurement under Parcel 49C and Heyer.

In United International Investigative Services, Inc. v. United States, 41 Fed. Cl. 312 (1998), subsequent to evaluation by the Technical Evaluation Board ("TEB"), the contract specialist found the first report inadequate to justify the conclusions. The agency then had two members of the TEB reevaluate the offerors and they changed the protestor's score, circumventing the established procedure. The Court found that the changes could have benefited from group discussion by the TEB and might have come out differently. These violations were found to have "deprived plaintiff of the opportunity to have its proposal considered fairly and honestly." Id. at 322. The Court stated that "the decision to have two evaluators circumvent the consensus and discussion requirements of the [TEB] merits judicial intrusion." Id.

In this case, the circumstances are even worse than those in United International – first, in this case it was the justification of the *award itself* that was inadequate; second, the reevaluation

on behalf of the BEC was conducted by an individual who was not even a *member* of the BEC, in violation of the BEC procedures; and third, the evaluation was based on a criterion that was not even listed in the RFP. In fact, USCIS failed to follow even its own Source Selection Plan. In the Technical Evaluation Guide (AR, Tab 103, p. 1978), evaluators were told that they "[redacted]" USCIS failed to do so, and just as it predicted, its deviation from the SSP demonstrated its lack of impartiality.

Like in United International, [redacted] analysis of the "industry staffing standard" could have benefited from discussion with the entire BEC – to determine, in the first instance, whether it was even an appropriate method of evaluation. By stepping outside the BEC procedures, in conformity with the decision in United International, this process violated USCIS' obligation to "fairly and honestly" consider L-3/MOI's bid.

#### 4. USCIS' Violations Prejudiced L-3/MOI and Subverted the Fundamental Purposes of This Procurement,

As has been discussed in detail above, these actions, in clear violation of the duty to conduct a fair procurement and the covenant of good faith, fair dealing, and honest consideration prejudiced L-3/MOI, which was third in line for award and, but for these violations, would have stood a significant chance of receiving the award. See Opinion of Judge Hodges, August 8 2006 at 1, 8.

## III. RELIEF REQUESTED

This Court has the authority under 28 U.S.C. 1491(b)(1) and (2) to award "any relief that the court considers proper[.]" See Naplesyacht.com, Inc. v. United States, 60 Fed. Cl. 459, 480 (2004). Such relief includes the exercise of the Court's equitable powers. See Parcel 49C Ltd.

P'ship v. United States, 31 F.3d 1147, 1153 (Fed. Cir. 1994). Wherefore, L-3/MOI prays this Court to provide the following declaratory and injunctive relief, as well as recovery of costs:

**A. Declaratory Relief**

This Court has the power to grant declaratory judgments in bid protest cases under the Tucker Act, 28 U.S.C. § 1491(b). Placeway Constr. Corp. v. United States, 920 F.2d 903. 906 (1990). Declaratory relief is not available when it would have no practical effect on the parties. Labat-Anderson, Inc. v. United States, 65 Fed. Cl. 570, 576 (2005).

L-3/MOI requests that this Court declare the following:

1. USCIS' determination to not award L-3/MOI an NCSC contract was irrational, arbitrary, capricious, unreasonable, and/or contrary to law, and therefore is of no force and effect;

2. By using pretext in order to reach a predetermined conclusion, USCIS violated its duty to conduct a fair procurement and breached the covenant of good faith, fair dealing, and honest consideration;

3. USCIS' unlawfully applied undisclosed and faulty criteria regarding productivity and occupancy rates during its source selection process, rendering its decision null and void and of no force and effect;

4. USCIS' failure to justify the payments of price premiums to the Apparent Awardees is irrational, unreasonable, arbitrary, and/or capricious and therefore is of no force and effect;

5. USCIS' price/technical trade-off determination in favor of the Apparent Awardees against L-3/MOI was irrational, arbitrary, capricious, unreasonable, and/or contrary to law, and therefore is of no force and effect;

6. The Solicitation contained latent ambiguities which cannot be remedied short of directed award to L-3/MOI or reprocurement;

7. L-3/MOI construed the latent ambiguities in the solicitation reasonably, and therefore those ambiguities are construed in favor of L-3/MOI and against USCIS;

8. USCIS' Source Selection process was irrational, arbitrary, capricious, unreasonable, and/or contrary to law, and therefore is of no force and effect; and

9. Each and all of these actions prejudiced L-3/MOI, which was third in line for award and would have received the award but for each and all of these actions.

In the instant case, these declarations would have a practical effect on the parties, as it is an essential portion of the resolution of this bid protest to determine that USCIS' actions were in violation of procurement law, were arbitrary and capricious, and were a breach of the duty to conduct a fair procurement and the covenant of good faith, fair dealing, and honest consideration. In addition, such declaratory relief will ensure that any resolicitation of the contract avoids these fatal flaws. In such circumstances, declaratory relief is appropriate. See e.g. Hunt Bldg. Co. v. United States, 61 Fed. Cl. 243, 269 (Ct. Cl. 2004).

**B. Injunctive Relief**

L-3/MOI has requested two forms of injunctive relief: (1) a permanent injunction setting aside the NCSC Contract Award to Datatrac and Aspen and (2) a permanent injunction enjoining USCIS' contracting officer from awarding the NCSC Program Contract to anyone other than L-3/MOI and one other awardee or, in the alternative, directing the USCIS Contracting Officer to conduct a re-competition of the procurement in keeping with the findings and declaratory judgments of this Court.

In deciding a motion for a permanent injunction, the Court must consider four factors: (1) the public interest; (2) the movant's likelihood of success on the merits; (3) immediate and irreparable injury to the movant; and (4) the balance of hardship on all the parties. Asia Pac. Airlines v. United States, 68 Fed. Cl. 8, 25 (2005) (citing PGBA, LLC v. United States, 389 F.3d

1219, 1228-29 (Fed. Cir. 2004)). No single factor – aside from success on the merits – is dispositive and weakness on one factor can be overborne by strength of others. Arch Chems., Inc. v. United States, 64 Fed. Cl. 380, 389 (2005) (citing FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993) and Gentex Corp. v. United States, 58 Fed. Cl. at 634, 654 (2003)).

For success on the merits, a protestor must demonstrate that but for the alleged error there is a substantial chance that it would have won the award. Transatlantic Lines LLC v. United States, 68 Fed. Cl. 48, 56 (2005). As discussed above, this Court has found that L-3/MOI was [redacted]" for award (Op. p. 2) and that "Plaintiff had a substantial chance of receiving the award…" (Op. p. 8). Therefore, with success on the merits above, L-3/MOI is entitled to injunctive relief as the remaining three factors all weigh in its favor.

**1. Public Interest**

The public has a strong interest in preserving the equity and integrity of the federal procurement system and in ensuring that public officials treat contractors fairly. "[I]t is beyond peradventure that the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid." Impresa Construzioni Geon. Domenico Garufi v. United States, 52 Fed. Cl 826, 828-29 (2002) (quoting Seattle Security Servs., Inc. v. United States, 45 Fed. Cl. 560, 572 (2000); *see also* Magellan Corp. v. United States, 27 Fed. Cl. 446, 448 (1993) (finding that public interest lies in honest, open, and fair competition in public procurement) and Alfa Laval, 40 Fed. Cl. at 235 (finding that "the public has a strong interest in assuring that the integrity of the procurement laws are preserved – both in letter and in spirit.").

L-3/MOI's protest challenges the awards made to Apparent Awardees on fundamental principles that are the bedrock of a procurement system built on integrity – that contracts are awarded through a fair and just process, in conformity with the law, and without favoritism.

Allowing USCIS to proceed with an award based on such pretexts and post-hoc justifications as were present here, despite the violations of federal law and regulation present in this bidding process, would frustrate the policies permitting disappointed bidders to challenge illegally awarded procurements and potentially chill future disappointed bidders from exercising their rights. Cf. Ulstein Maritime, Ltd. v. United States of America, 833 F.2d 1052, 1055 (1st Cir. 1987). Issuance of injunctive relief will protect the integrity of the procurement process, implementing the purposes of the Competition in Contracting Act, 10 U.S.C. § 2301 et. seq, and the Federal Acquisition Regulations intended, in the public interest, to ensure fair decision making in the procurement process.

In addition, the injunctions requested above will save the public millions of dollars, which is definitively in their interest. Such savings should be taken into consideration in determining the public interest:

> The public interest is served by ensuring a procurement process conforms to applicable procurement regulations. The combined contract savings to the Government of $ 1,732,287.00 if both contracts are awarded to plaintiff also should be taken into account.

Hawaiian Dredging Constr. Co. v. United States, 59 Fed. Cl. 305, 317-318 (Ct. Cl. 2004) (internal citations omitted). The potential savings to the public in this case are even greater than those in Hawaiian Dredging – totaling potentially more than $103,000,000. See also Informatics Corp. v. United States, 40 Fed. Cl. 508, 519 (1998) (finding public interest weighed in favor of an injunction where the protestor would have saved the public $4 million). In light in particular of Congress' inquiry into the problems with USCIS' existing call center system and GAO's

finding that USCIS had been paying too much for this contract,[8] the public interest here clearly weighs in favor of injunctive relief to ensure that USCIS does not repeat the mistakes of the past.

### 2. Irreparable Harm to Plaintiff

In evaluating the irreparable injury factor, courts have considered "whether plaintiff has an adequate remedy in the absence of an injunction." Impresa Construzioni Geon. Domenico Garufi, 52 Fed. Cl at 828 (2002) (quoting Seattle Security Servs., Inc., 45 Fed. C1. at 571 (2000)). Loss of an opportunity to compete fairly for a valuable business opportunity is sufficient to prove irreparable harm. Transatlantic Lines, 68 Fed. Cl. at 57 (citing Overstreet Elec. Co. V. United States, 47 Fed. Cl. 728, 744 (2000) and Red River Serv. Corp. v. United States, 60 Fed. Cl. 532, 549 (2004)).

In addition to the loss of an opportunity to compete fairly, this Court has specifically found loss of profit itself constitutes irreparable harm:

> If lost profits do not constitute irreparable harm, then protesters who are seeking to displace a putative awardee automatically fail to meet one of the four requirements for injunctive relief. The usual rule is that mere loss of money does not qualify as irreparable harm if the party can be made whole through money damages when the claim, which does not itself seek an injunction, is resolved on the merits. In those bid protests, involving contract awards - not resolicitation or cancellation or another form of relief - a protester is limited to recovery of bid preparation costs if it fails to obtain injunctive relief. Loss of anticipated profits thus can be remedied solely by injunctive relief. The protester's interests cannot be met with a suitable monetary award in these circumstances unless a permanent injunction is granted.

Norfolk Dredging Co. v. United States, 58 Fed. Cl. 167, 184-185 (Ct. Cl. 2003). Moreover, irreparable harm from lost profit is particularly present where the anticipated contract carries a high dollar value, as this contract in this case does. TRW Environmental Safety Systems, Inc. v. United States, 18 Ct. Cl. 33, 73 (1989).

---

[8] GAO-05-526, June 2005, *Better Contracting Practices Needed at Call Centers*, available at www.gao.gov.

In the instant case, without injunctive relief, Apparent Awardees would be permitted to perform the contract and L-3/MOI would be limited to recovery only of its bid preparation and litigation costs. Should injunctive relief not issue, L-3/MOI has lost the opportunity to compete fairly for a substantial procurement and will not be able to recover that opportunity through either correction of the error by this Court or in a reprocurement process. In addition, should injunctive relief not be granted, significant lost profits would result.

**3. Balance of Harms**

Balancing the harms requires consideration of both the harm to the plaintiff that will result if injunctive relief does not issue and the harm to the Government if it does. See e.g. Overstreet, 47 Fed. Cl. at 744. The irreparable injury that L-3/MOI faces if injunctive relief does not issue far outweighs any potential harm to the Federal Government in this case. In fact, the Federal Government too would be harmed by a failure to issue injunctive relief.

The harm to L-3/MOI is plain in this case because the firm offered a significantly lower price than its competitor but did not receive fair consideration for award of the contract by USCIS. The Apparent Awardees in this case will charge USCIS a price substantially higher than the price proposed by L-3/MOI. Thus, the award gives rise to significant financial detriment and harm to the Federal Government and the public at large.

The hardship to USCIS is minimal, if any exists at all, as the incumbent contractor has been extended and can continue to perform until such time as L-3/MOI can take over the contract or a resolicitation process occurs. Any inconvenience to USCIS due to the need to briefly extend the incumbent contract is far outweighed by the harm that L-3/MOI is and will continue to sustain without injunctive relief. Delay alone does not warrant denial of injunctive relief, and delay is even less meaningful in the context of sizable procurements. As this Court ruled in Cardinal Maint. Serv. v. United States, 63 Fed. Cl. 98, 111-112 (2004):

> Although requiring the government to re-compete [a contract] will cost the government some money and effort, it will not completely disrupt the procurement process.... To the contrary, in light of the large size of the contract, and the fact that the plaintiff will be prohibited from bidding on the contract in the absence of an injunction, the court finds that the plaintiff will suffer more harm if the court fails to grant an injunction than the government will suffer if the court does grant an injunction.

See also Magnavox Elec. Sys. Co. v. United States, 26 Cl. Ct. 1373, 1384 (1992). ("The harm caused by... minimal delay in the procurement is outweighed by the harm plaintiff will suffer if it is illegally and unreasonably denied fair and honest consideration for the contract award."). Because the incumbent can continue performance can continue during any minimal delay and no national security claims are implicated, the balance of hardships favors L-3/MOI. See e.g. Transatlantic Lines, 68 Fed. Cl. at 57.

**C. Recovery of Costs**

When a plaintiff is successful in a bid protest case, it is entitled to recover the costs associated with the bid and the protest. "Legally, the award of bid protest costs as damages is justifiable on either foreseeability grounds, or under the long held notion that the breaching party ought not to profit from the breach at the expense of the nonbreaching party." Concept Automation v. United States, 41 Fed. Cl. 361, 370 (Ct. Cl. 1998). Such fees can include attorneys' fees pursuant to the Equal Access to Justice Act. If L-3/MOI is successful on the merits, it is entitled to enumerate the costs incurred in bidding on this contract and in pursing its remedy through this Court and be compensated for them.

**1. Bid Preparation Costs**

Pursuant to 28 U.S.C. 1491(b)(2) and this Court and the United States Court of Appeals for the Federal Circuit has held that "a losing competitor may recover the costs of preparing its unsuccessful proposal if it can establish that the Government's consideration of the proposals submitted was arbitrary or capricious." CSE Constr. Co. v. United States, 58 Fed. Cl. 230, 263

(Ct. Cl. 2003) (citing E.W. Bliss Co. v. United States, 77 F.3d 445, 447 (1996)). A request for such relief must appear in the complaint. See Alfa Laval Separation, Inc. v. United States, 47 Fed. Cl. 305, 311 (2000). In this case, L-3/MOI requested bid proposal and preparation costs in paragraph F of the Amended Complaint's prayer for relief. Having demonstrated above that USCIS' consideration of the proposals submitted was arbitrary and capricious, L-3/MOI is entitled to receive its bid proposal preparation costs.

### 2. Costs and Expenses of Litigation, including Attorneys' Fees

Pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(a) and (b) and 28 U.S.C. § 1920, L-3/MOI should be entitled to file a motion subsequent to ruling on this motion, if it is successful, to receive reimbursement of all costs and expenses associated with this litigation, including attorneys' fees. See Naplesyacht.com, Inc. v. United States, 60 Fed. Cl. 459 (2004) (allowing a post-judgment motion for recovery of attorneys fees and costs where procuring agency had abused its discretion) and Blue Dot Energy Company, Inc. v. United States, 2004 U.S. Claims LEXIS 330 (2004) (allowing a motion for recovery of attorneys' fees and expenses where procuring agency had acted in violation of law and procurement regulations) (reversed on other grounds, Blue Dot Energy Co. v. United States, 2006 U.S. App. LEXIS 11018 (2006)). Because USCIS abused its discretion and violated law and procurement regulations in this case, thus prejudicing L-3/MOI, L-3/MOI is entitled to recover expenses it incurred in pursuing the litigation before this Court.

## IV. CONCLUSION

DHS and USCIS awarded a contract to Datatrac rather than L-3/MOI even though the latter's proposal was one of the three "most likely to offer the government the best value", Datatrac's proposal was substantially higher at all evaluated call levels and there was "[redacted]" at the total evaluated price. AR, Tab 13, at 535. "[redacted]

[redacted]. AR, Tab 5, Tab 13, at 535, 568. This agencies action was contrary to the requirements of applicable statute, regulation and agency guidance that preclude use of factors or subfactors to evaluate proposals different from the criteria specified in the solicitation and was "not in accordance with the law". Bannum Inc. v. U.S., 404 F.3d 1346, 1351, citing 5 U.S.C. § 706(2)(A) (2000). The use of a new criterion to evaluate proposals without amending the RFP to notify offerors is contrary to the requirements of FAR 15-206 and USCIS internal guidance and is likewise not in accordance with the law. 40 Fed. Cl. 665. The use of the so-called industry standard to evaluate proposals resulted in unequal treatment of offerors, specifically Datatrac and L-3/MOI, "and is therefore arbitrary." 44 Fed. Cl. 161. Finally, the use of the results of an unvalidated and internally inconsistent staffing calculation to justify award to Datatrac was irrational on its face, as was the agencies' willingness to conclude based on that calculation that L-3/MOI "appears" to have used a [redacted] occupancy rate in its proposal without making further inquiry of L-3/MOI as to whether the company did in fact use that rate.

This 11th day of August, 2006.

s/ John Horne
John H. Horne
POWELL GOLDSTEIN LLP
One Atlantic Center
Fourteenth Floor
1201 West Peachtree Street, NW
Atlanta, GA 30309-3488
Telephone Number: (404) 572-6600
Facsimile Number: (404) 572-4527

Of Counsel:

Carl A. Gebo

Diane Festin LaRoss
Mark B. Carter
Christopher R. Jordan
POWELL GOLDSTEIN LLP
One Atlantic Center
Fourteenth Floor
1201 West Peachtree Street, NW
Atlanta, GA 30309-3488
Telephone Number: (404) 572-6600
Facsimile Number: (404) 572-4527

W. Bruce Shirk
Kathleen M Hamann
POWELL GOLDSTEIN LLP
901 New York Avenue, NW
Washington, DC 20001
Telephone Number: (202) 347-0066
Facsimile Number: (202) 624-7222

::ODMA\PCDOCS\ATL\1068092\3