Agreed-Upon Redacted Copy
May Be Made Public

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | |
|---|---|
| **MICRODYNE OUTSOURCING, INC., a subsidiary of L-3 COMMUNICATIONS CORPORATION,** | |
| **Plaintiff,** | **FILED UNDER SEAL** |
| v. | **Case Number: 06-498C** |
| **THE UNITED STATES of AMERICA,** | **Judge Robert H. Hodges, Jr.** |
| **Defendant, and** | |
| **DATATRAC INFORMATION SERVICES, INC.,** | |
| **Defendant-Intervenor, and** | |
| **LOCKHEED MARTIN ASPEN SYSTEMS CORP.,** | |
| **Defendant-Intervenor.** | |

**PLAINTIFF'S RESPONSE TO THE CROSS**
**MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Attorney of Record

John H. Horne
POWELL GOLDSTEIN LLP
One Atlantic Center
Fourteenth Floor
1201 West Peachtree Street, NW
Atlanta, GA 30309-3488
Telephone Number: (404) 572-6600
Facsimile Number: (404) 572-4527

Of Counsel:

Carl A. Gebo
Diane Festin LaRoss
Mark B. Carter
Christopher R. Jordan

POWELL GOLDSTEIN LLP
One Atlantic Center
Fourteenth Floor
1201 West Peachtree Street, NW
Atlanta, GA 30309-3488
Telephone Number: (404) 572-6600
Facsimile Number: (404) 572-4527

Agreed-Upon Redacted Copy
May Be Made Public

W. Bruce Shirk
Kathleen M Hamann

POWELL GOLDSTEIN LLP
901 New York Avenue, N.W.
3rd Floor
Washington, DC 20001
Telephone Number: (202) 347-0066
Facsimile Number: (202) 624-7222

Agreed-Upon Redacted Copy
May Be Made Public

# TABLE OF CONTENTS

Page(s)

I. INTRODUCTION ..... 1

A. USCIS Abused Its Discretion and Through Its Irrational and Arbitrary Decisions, As Well as its Actions in Violation of Procurement Law, Subverted the Core Purpose of This Procurement By Awarding Contracts That Waste Millions of Taxpayer Dollars ..... 1

B. Disputed Facts ..... 5

C. Standard of Review ..... 6

II. ARGUMENT ..... 7

A. Undisclosed Evaluation Criteria and the Improper Second Price Reasonableness Determination ..... 7

1. The [redacted] Staffing Analysis was Not "Intrinsic" To The Stated Evaluation Factors ..... 7

2. The TEC Did Not Consider [redacted] Staffing Analysis To Be Intrinsic To the TEC When Evaluating L-3/MOI In Accordance With the Source Selection Plan ..... 8

3. The Cases Cited By Defendant and Intervenor Datatrac Do Not Support the Proposition That [redacted] Staffing Analysis is Intrinsic to the Evaluation Criteria ..... 9

4. L-3/MOI's Objection To the Award To Datatrac Reflects Much More Than "A Mere Disagreement With the Agency's Evaluation Process" Because the Source Selection Plan Decision Was Based On a Factor Not Contemplated By the SSP and Was Made Outside The Source Slection Process ..... 11

B. USCIS Knew or Should Have Known that L-3/MOI's Staffing Proposal As Submitted Incorporated the CSR Availability Elements of [redacted] and That Applying [redacted] to L-3/MOI's Proposal Would Necessarily Yield an Artificially Inflated Occupancy Rate to the Detriment of L-3/MOI ..... 12

C. Price Technical Tradeoff ..... 15

D. Improper Evaluation ..... 17

1. L-3/MOI's Proposal Was Improperly Downgraded ..... 17

2. **USCIS' Failure To Consider The Fact That Intervenors' Proposals Do Not Comply With The 50 CSR Minimum Resulted In An Irrational And Unreasonable Evaluation.** ................. 19

3. **The Solicitation Included Latent Ambiguities That Prejudiced L-3/MOI And Which Warrant A Complete Re-Procurement.** .......... 19

4. **Failure to Seek Clarifications.** .......... 22

5. **Failure to Conduct Discussions** .......... 22

E. **USCIS′ Decision to Award to Intervenors Was Pretextual, Violating the Duty to Conduct a Fair Procurement and the Covenant of Honest Consideration.** .......... 23

1. **A Showing of a Violation of the Duty to Conduct a Fair Procurement and Breach of the Covenant of Honest Consideration Does Not Require that Plaintiff Prove Malice or Specific Intent.** .......... 23

2. **Cross-Movants Confuse the Cause of Bias with the Existence of Bias.** .......... 24

3. **Cross-Movants' Attacks on Evidence of USCIS' Failure to Conduct a Fair Procurement and Breach of the Covenant of Good Faith Fail.** .......... 26

III. **CONCLUSION** .......... 28

Agreed-Upon Redacted Copy
May Be Made Public

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

126 Northpoint Plaza Ltd. v. United States, 34 Fed. Cl. 105 (1995) ............................... 23, 24, 25

Alfa Laval Separation Inc. v. United States, 175 F.3d 1365 (Fed. Cir. 1999) ............................... 7

Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345 (Fed. Cir. 2004) ........................... 6

Bannum, Inc. v. United States, 404 F.3d 1346 (Fed. Cir. 2005) ............................................ 7, 25

Beta Analytics Int'l v. United States, 44 Fed. Cl. 131 (1999) ...................................................... 7

Beta-Analytics v. United States, 67 Fed. Cl. 384 (2005) ........................................................... 12

Computer Sciences Corporation v. United States, 51 Fed. C1. 297 (2002) ................................ 10

Delbert Wheeler Construction, Inc. v. United States, 39 Fed. Cl. 239 (1997) ............................ 23

Dubinsky v. United States, 43 Fed. Cl. 243 (1999) ............................................................ 25, 30

Galen Medical Associates, Inc. v. United States, 369 F.3d 1324 (Fed. Cir. 2004) ...................... 27

Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324 (Fed. Cir. 2001) ..................................................................................................................................7

Keco Industries v. United States, 203 Cl. Ct. 566 (1974) ..................................................... 24, 29

Maintenance Engineers v. United States, 50 Fed. Cl. 399 415 (2001) ....................................... 10

Metcalf Construction Co., Inc. v. United States, 53 Fed. Cl. 617 (2002) .................................... 21

Overstreet Elec. Co. v. United States, 59 Fed. Cl. 99 (2003) ....................................................... 7

Parcel 49C Ltd. Partnership v. United States, 31 F.3d 1147 (Fed. Cir. 1994) ................. 23, 24, 25

PGBA, LLC v. United States, 60 Fed. Cl. 196 (2004) .......................................................... 17

Prineville Sawmill Co. v. United States, 859 F.2d 905 (Fed. Cir. 1988) ............................... 23, 24

Rig Masters, Inc. v. United States, 70 Fed. Cl. 413 (2006) ....................................................... 23

United International Investigative Services, Inc. v. United States, 41 Fed. Cl. 312, (1998) ........ 15, 23, 24, 26

**Regulations**

FAR § 12.302(c) ........ 30

FAR § 15.101-1 ........ 30

FAR § 15.306 ........ 30

FAR 15.306(a)(2) ........ 22

Agreed-Upon Redacted Copy
May Be Made Public

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | |
|---|---|
| **MICRODYNE OUTSOURCING, INC., a subsidiary of L-3 COMMUNICATIONS CORPORATION,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**THE UNITED STATES of AMERICA,**<br><br>**Defendant, and**<br><br>**DATATRAC INFORMATION SERVICES, INC.,**<br><br>**Defendant-Intervenor, and**<br><br>**LOCKHEED MARTIN ASPEN SYSTEMS CORP.,**<br><br>**Defendant-Intervenor.** | **FILED UNDER SEAL**<br><br>**Case Number: 06-498C**<br><br>**Judge Robert H. Hodges, Jr.** |

**PLAINTIFF'S RESPONSE TO THE CROSS MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

COMES NOW, Plaintiff Microdyne Outsourcing, Inc., a subsidiary of L-3 Communications Corporation ("L-3/MOI"), and hereby files its Response to the Cross Motions for Judgment on the Administrative Record.[1]

## I. INTRODUCTION

### A. USCIS Abused Its Discretion and Through Its Irrational and Arbitrary Decisions, As Well as its Actions in Violation of Procurement Law, Subverted the Core Purpose of This Procurement By Awarding Contracts That Waste Millions of Taxpayer Dollars.

[1] For ease of reference, the Cross-Movants' briefs will be referred to as follows: Defendant - Def. Br.; Datatrac - Data. Br.; Aspen - Asp. Br.

The purpose of this procurement, and USCIS' intent, was to remedy the broken call center system and control the runaway costs identified by the GAO, Congress and USCIS itself by securing the benefits of the best practices of the call center industry. See GAO-05-526, June 2005, Better Contracting Services Needed at Call Centers, available at www.gao.gov and AR, Tab 14, p. 533. L-3/MOI, not Aspen or Datatrac (collectively, "Intervenors"), offered the best commercial practices at the lowest reasonable price, but USCIS did not award L-3/MOI a contract. Rather, USCIS, disregarded its duty to serve the public interest by abusing its discretion through the conduct of a flawed and illegal procurement and an award that will cost the taxpayer as much as $100 million, but no less than $20 million, more than it should. AR, Tab 13, p. 531. As late as April 25, 2006 (*after* USCIS made the decision to whom it would award the contract) Toi Johnson, a Procurement Specialist with the Department of Homeland Security ("DHS") Office of Procurement Operations, stated: [redacted] AR, Tab 26, p. 984.

The Source Selection Authority, Michael Aytes ("SSA"), decided to award the contracts to the Intervenors in March 2006. He based that decision on input from the Technical Evaluation Committee ("TEC") and the Business Evaluation Committee ("BEC") that emanated from a flawed process. USCIS demonstrated its blind determination to award the contract to Datatrac, no matter what the cost by ignoring the facts that [redacted] both the incumbent contract price and the independent government cost estimate ("IGCE"), which USCIS acknowledged were too high. A comparison between the prices per call offered reveals the degree to which [redacted] is out of line with industry standards and best practices and never should have been found reasonable. USCIS' irrational and unwarranted preference for

Intervenors, particularly Datatrac, undermined the procurement's main purpose of finding the best value for the taxpayers.

The [redacted], but misread L-3/MOI's technical and price proposals and the Solicitation's staffing requirement and ignored current industry standards and commercial best practices. [redacted]. The latent ambiguity is such that USCIS' interpretation renders the Intervenors' non-compliant proposals responsive and hid the risk inherent in their staffing allocations. These staffing requirement issues would have been clarified had USCIS made a simple inquiry to L-3/MOI through which USCIS would have learned that L-3/MOI's proposal was perfectly compliant with the Solicitation and offered USCIS the best value. USCIS also would have avoided its disparate treatment allowing Intervenors to remedy problems in their submissions after the award decision had already been made, while not even allowing L-3/MOI to address the BEC's questions. AR, Tab 26, pp. 928, 931-942.

DHS recognized that USCIS' award decision lacked rational support. DHS' first review of the USCIS Source Selection Decision Document ("SSDD") properly noted that [redacted]. AR, Tab 26, pp. 943, 985. USCIS was undeterred by DHS' serious concerns with the justification offered by USCIS and, incredibly, notified Congress that the award had been made on April 18, 2006, ten days before approval of the final SSDD. AR, Tab 26, pp. 979, 980, 996.

From April 3, 2006 to April 27, 2006, USCIS scrambled to find a way around the Solicitation's unequivocal statement that, "the Government will not issue an award to an Offeror who offers a significantly higher overall price to achieve only slightly superior performance

capabilities." AR, Tab 8, p. 246. Even as late as April 25, 2006, [redacted]

Unable to convince DHS that its award decision was justifiable through an application of the Solicitation's evaluation criteria, USCIS turned at the last minute to [redacted], a Senior NCSC Program Executive, to introduce a previously unidentified calculation methodology to the proposed staffing levels offered by L-3/MOI and the Intervenors based on a so-called "industry standard" staffing calculation. That evaluation criterion did not exist in the Solicitation, [redacted] to any proposals before the SSA's decision to award, and did not conform to the procurement's primary purpose of procuring a solution that embodied the best practices in the commercial call center industry.

There are two problems with [redacted] calculation. First, it was not disclosed in the Solicitation. In fact, it did not even appear in the Administrative Record until well after USCIS had made its award decision. Second, despite Defendant's unexamined assumptions that the staffing calculation is an industry standard and is suitable to justify award to Datatrac, there is no evidence in the Administrative Record that the staffing calculation is either a commercial best practice or an industry standard. The only evidence for this new evaluation criterion being an industry standard is contained in an email exchange between USCIS employees. L-3/MOI has not been allowed to supplement the Administrative Record or submit any evidence challenging this bare assertion made by USCIS employees with absolutely no evidentiary support.

USCIS set out to correct the problems of its past, but has ended up simply compounding them. After drafting the Solicitation that called for lower costs and better practices, it made awards that have resulted in the same bad practices, for an unconscionably higher price to be

born by the U.S. taxpayer. USCIS engaged in all of these efforts and errors, irrationally and in violation of law, to reach an end it had predetermined, justified on pretext. USCIS ultimately awarded to offerors likely to leave USCIS in precisely the same mess it was in under the contract that had drawn so much criticism – overpaying for poor performance.

### B. Disputed Facts.

Defendant states that it described the overflow contract at the pre-proposal conference. Def. Br. p. 3. While USCIS did mention the overflow contract at the pre-proposal conference, USCIS did not disclose that GWA-Datatrac Fast, LLC was awarded that contract. AR, Tab 9, p. 258 and AR, Tab 10, pp. 280-81. Even though USCIS' evaluators touted Datatrac's experience on the overflow contract, the Administrative Record is actually silent as to whether Datatrac was the prime contractor on the overflow contract.

The Defendant claimed that there were no deficiencies noted in Aspen or Datatrac's proposals. Def. Br. p. 7. However, the [redacted]. AR, Tab 14, p. 542; Tab 15, p. 566. The [redacted]. AR, Tab 20, p. 626. [redacted]. AR, Tab 99, pp. 1951, 1959.

The Defendant, Aspen and Datatrac all mischaracterized the fact that [redacted]. Since the SSA erroneously believed that [redacted]. AR, Tab 13, p. 536.

Defendant, Aspen and Datatrac all mischaracterize L-3/MOI's staffing model. Def. Br. pp. 27, 30-33; Asp. Br. pp. 27-30; Data. Bf. pp. 29-37. Contrary to their assertions, [redacted] This analysis is consistent with Dr. Anton's analysis that CSRs can work 6.5 hours of every 8 hour day, which is precisely what L-3/MOI proposed. Debra S. Perkins and Jon Anton, "Best practices for customer service call centers - an exclusive statistical study," Telemarketing and Call Center Solutions, No. 10, Vol. 15, p. 80 (April 1997). Datatrac is silent as to the risks associated with overstaffing and inefficiency and USCIS was either ignorant of or indifferent to more risks.[2]

**C. Standard of Review.**

The standard of review in this matter is undisputed. For L-3/MOI to prevail in this bid protest, this Court must find *either* that the agency decision L-3/MOI is challenging was "irrational" *or* that the decision involved a "clear violation of applicable procurement law."

---

[2] Under a proper application of the Erlang methodology, it is clear that L-3/MOI's CSR staffing proposal is based on a 6.5 hour day, consistent with Dr. Anton's conclusion that telephone service representative availability is estimated at 6.5 hours per 8 hour shift.

Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (emphasis added); Def. Br. pp. 16-17; Data. Br. p. 7; Asp. Br. p. 10.

To prevail under the "clear violation of applicable procurement law" ground, this Court must also find that an error by USCIS significantly prejudiced L-3/MOI. Bannum, Inc. v. United States, 404 F.3d 1346, 1353 (Fed. Cir. 2005); see also Alfa Laval Separation Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999); Def. Br. p. 18; Data. Br. p. 7; Asp. Br. p. 11. To establish prejudice, this Court must find that L-3/MOI had a "substantial chance" of receiving the contract award, absent USCIS' error. Id.; Def. Br. p. 18; Data. Br. p. 7.

To prevail under the "irrational" ground, this Court must determine whether USCIS provided a "coherent and reasonable explanation" of its exercise of discretion. Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1333 (Fed. Cir. 2001); Def. Br. p. 16 - 17; Data. Br. p. 7; Asp. Br. p. 10. L-3/MOI must also show prejudice. See Alfa Laval Separation, Inc. v. United States, 175 F.3d at 1367; Data Br. p. 7; Asp. Br. p. 11.

The evidentiary standard required by this Court to award injunctive relief is by a showing of a preponderance of the evidence. See Beta Analytics Int'l v. United States, 44 Fed. Cl. 131, 137 (1999). While recognizing the discretion the procuring agency has, the evidentiary standard for a determination of "irrationality" is a preponderance of the evidence. See Overstreet Elec. Co. v. United States, 59 Fed. Cl. 99, 117 (2003); Asp. Br. p. 11.

## II. ARGUMENT

### A. Undisclosed Evaluation Criteria and the Improper Second Price Reasonableness Determination.

#### 1. The [redacted] Staffing Analysis was Not "Intrinsic" To The Stated Evaluation Factors.

Defendant and Intervenor Datatrac argue that [redacted] staffing analysis, resulting in a supposed 93% occupancy rate for L-3/MOI, was an "evaluation discriminator" that is

"intrinsic" to the Solicitation's evaluation criteria. Def. Br. pp 19, 27; Data. Br. p. 31. Citing L-3/MOI's Brief in Support of its Motion for a Temporary Restraining Order and Preliminary Injunction ("TRO Brief"), Datatrac further argues that L-3/MOI's proposal used the [redacted], and, therefore, "L-3/MOI [cannot] object to the absence of the terms 'occupancy rate' and 'productivity rate' from the RFP." Data. Br. p. 30.

Datatrac's comments are misleading. First, L-3/MOI has consistently objected to the agency's use of [redacted] staffing analysis to arrive at the inaccurate 93% Occupancy Rate for L-3/MOI, stating in its TRO Brief that "…the methodology that [redacted] used…was not plainly discernible from the Solicitation…even a close reading of the Solicitation does not reveal that staffing cost models would be measured against such a formula." TRO Br. p. 23. L-3/MOI objects to the sudden and unannounced appearance of [redacted] staffing analysis because it was neither intrinsic to the evaluation criteria nor the industry standard that could be used to make an accurate assessment of L-3/MOI's staffing proposal.

**2. The TEC Did Not Consider [redacted] Staffing Analysis To Be Intrinsic To the TEC When Evaluating L-3/MOI In Accordance With the Source Selection Plan.**

The TEC Report dated February 27, 2006, concluded that [redacted] AR, Tab 20, p. 624. Significantly, the Report notes with regard to workload and staffing:

[redacted]

[redacted]

AR, Tab 20, pp. 624-626 (emphasis added). The TEC Report also noted that L-3/MOI [redacted]

AR, Tab 20, p. 625.

The TEC arrived at the above consensus conclusions by applying the criteria set out in the Solicitation, none of which included any "industry staffing standard." AR, Tab 20, pp. 614-626. If the TEC considered [redacted] staffing analysis to be intrinsic to the evaluation criteria, then it reasonably would have used it to measure the staffing and workload models in L-3/MOI's proposal.[3] AR, Tab 12, pp. 400-403, 420-421, 430-431, 508-509. It did not do so. AR, Tab 20, pp 614-626. The TEC simply did not perceive [redacted] staffing analysis based on an alleged "industry standard" as intrinsic to the technical evaluation criteria and doing so would have required a significant departure from the SSP.

**3. The Cases Cited By Defendant and Intervenor Datatrac Do Not Support the Proposition That [redacted] Staffing Analysis is Intrinsic to the Evaluation Criteria.**

Defendant cites Maintenance Engineers v. United States, 50 Fed. Cl. 399, 415 (2001) for the proposition that "a Solicitation need not identify each element to be considered by the agency during the course of the evaluation where such element is intrinsic to the stated factors." (internal citations omitted). Def. Br. p. 19.

---

[3] L-3/MOI's proposal explicitly references "continuous efficiencies" using "historic models" which, in turn, use "industry standard staffing variables assumptions such as average handle time, shrinkage (unplanned absences) and service level definitions." AR, Tab 12, p. 403.

Maintenance Engineering is distinguishable from this case in that, first, the "former contract prices" that the Maintenance Engineering plaintiff alleged as the undisclosed evaluation factor "were specifically requested in the Solicitation and the provisions of the Solicitation stated that the information could be considered in the evaluation and comparison of the proposals," so that "the bidders were on notice that the former contracts amount/price would be evaluated as part of the past performance evaluation." Id. at 416. In our case, neither Defendant nor Intervenors have asserted that the USCIS Solicitation specifically provides that [redacted] staffing analysis would be an evaluation factor. Second, in Maintenance Engineering, the agency Technical Evaluation Board ("TEB") evaluated the proposals "in accordance with the Source Selection Plan," while in our case the agency did not conduct the second price reasonableness determination "in accordance with the Source Selection Plan," because that plan contained no provision for a second effort to establish price reasonableness. Id. at 403; AR, Tab 8, pp. 231-255.

Defendants and Intervenors also rely on Computer Sciences Corporation v. United States, 51 Fed. Cl. 297 (2002), which differs from our case in that the Computer Sciences plaintiff made no claim that the subfactor alleged to be the "discriminator" in the award determination was not called out in the Solicitation, relying instead on the argument that a single statement in the SSP established that "greater weight" was given to a factor than was proper. Id. at 308. In this case, the law requires that no weight be given to a factor that has been shown to be absent from the Solicitation and the SSP.

### 4. L-3/MOI's Objection To the Award To Datatrac Reflects Much More Than "A Mere Disagreement With the Agency's Evaluation Process" Because the Source Selection Plan Decision Was Based On a Factor Not Contemplated By the SSP and Was Made Outside The Source Selection Process.

Datatrac argues inaccurately that L-3/MOI's criticism of the award of a contract to Datatrac reflects a "mere disagreement with the agency's evaluation process." Def. Br. p.15. L-3/MOI is not "disagreeing" with the agency's "structured process" of evaluation as established by the SSP, but rather states that DHS' and USCIS' conduct of the second price reasonableness analysis was outside that structured process. Thus, neither [redacted] staffing analysis methodology nor any other CSR staffing standard or model was called out by the SSP. The April 27, 2006 Source Selection Decision was written only *after* DHS concluded that the USCIS evaluation process, culminating in the April 3 draft SSDD, had not sufficiently justified the price differential between Datatrac and L-3/MOI and that the "industry standard calculations" supplied by [redacted] would enable preparation of [redacted] AR, Tab 26, p. 984; AR, Tab 26, pp. 1017-1019. Moreover, no one from DHS or USCIS inquired of L-3/MOI how [redacted] staffing analysis might compare with the results of the "historical models" discussed in L-3/MOI's proposal and L-3/MOI's prior experience in decreasing price per minute for Microsoft and Dell. AR, Tab 20, p. 625; AR, Tab 12, p. 403; AR, Tab 20, pp. 614-626. USCIS' failure even to make inquiry of L-3/MOI in these circumstances is not excusable. Cf. Day & Zimmerman Svcs. v. United States, 38 Fed. Cl. 591, 604 (1997).

USCIS departed from the SSP when it conducted the second price reasonableness analysis using an undisclosed evaluation factor. Such a departure from the SSP is, at a minimum, very strong evidence of the agencies' unequal treatment of L-3/MOI vis-à-vis the

other offerors. Beta-Analytics v. United States, 67 Fed. Cl. 384, 407 (2005) (". . .a departure from the SSP shows unequal treatment of offerors, and is therefore arbitrary.")

**B. USCIS Knew or Should Have Known that L-3/MOI's Staffing Proposal As Submitted Incorporated the CSR Availability Elements of [redacted] and That Applying [redacted] to L-3/MOI's Proposal Would Necessarily Yield an Artificially Inflated Occupancy Rate to the Detriment of L-3/MOI.**

[redacted] methodology used a [redacted] defined in the SSDD as [redacted] to determine that L-3/MOI's proposal [redacted] AR, Tab 13, p. 535. The SSDD is partially correct – L-3/MOI did formulate its proposal by taking into account the same basic factor that defines [redacted] "productivity rate," namely, [redacted] AR, Tab 15, p. 535. That being the case, [redacted] application of the [redacted] factor to the L-3/MOI proposal meant that he was applying that factor to hours L-3/MOI had *already discounted* for the amount of time CSRs are available to take calls. [redacted] thus compounded the effect of the "productivity rate" on the L-3/MOI Occupancy Rate so as to artificially inflate it to [redacted]

The Solicitation requests offerors to ensure their staffing proposals are sufficiently flexible to address not only routine, day to day operations but to "offer scalable resources to manage call volume patterns that fluctuate and have cyclical patterns related to customer behaviors, and respond to 'spikes'...." AR, Tab 5, p.87. L-3/MOI's staffing proposal explicitly addressed these matters and, in so doing, specifically advised USCIS that the process it has developed "to meet and exceed service level requirements" explicitly incorporated inefficiencies or CSR availability into its staffing plans:

[redacted]

AR, Tab 12, p. 403 (emphasis added). The proposal notes that these practices enabled L-3/MOI to [redacted]. AR, Tab 12, p. 404. L-3/MOI's use of terms such as "industry-standard staffing variable assumptions" and "shrinkage" served to put USCIS evaluators on explicit notice that L-3/MOI's proposed staffing plan, and necessarily the prices flowing from that plan, incorporated the same factors that make up the [redacted] "productivity rate" [redacted] applied to L-3/MOI's proposal. AR, Tab 13, p 535.

As used in the call center industry, the term "shrinkage" means "... the amount of paid time that an employee is not available to be on the phones." Penny Reynolds, Call Center Staffing, The Complete, Practical Guide to Workforce Management 66 (The Call Center School, 2003)[4]; see also Peter L. DeHaan, "Call Center Shrinkage," Connections Magazine, July/August 2004 ("Shrinkage in a call center...is agents who are "on the clock" but who aren't processing calls.").[5] Categories of employee "down time" that make up shrinkage may include: breaks, lunch time (if paid),[6] meetings, training and development, off-phone work, vacation, holidays,

---

[4] L/3-MOI requests the Court to take judicial notice of the meaning of the term "shrinkage" as used in the call center industry as a "fact...not subject to reasonable dispute in that it is...capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." FRE 201(b)(2).

[5] In this regard, shrinkage is the reciprocal of "productivity" in call center terminology, so that, for example, a 15% shrinkage rate or factor is the reciprocal of an 85% productivity rate. Reynolds at 69.

[6] L-3/MOI's proposal contemplated 15-minute paid lunches as a management option in the event of spikes.

sick time/tardiness and, of course, unexplained absence. Call Center Staffing at 67. These categories of employee time are, of course, coextensive in type with the categories enumerated in the SSDD as elements of [redacted] productivity rate, i.e., out on break, in training, coaching or handling administrative tasks. AR, Tab 13, p. 535.

The USCIS evaluators were necessarily explicitly aware that L-3/MOI's proposal incorporated shrinkage – along with other industry-standard staffing variables – into its proposed staffing plan and, by extension, its proposed price. The SSP charged USCIS' technical evaluators with assessing all "non-price" aspects of staffing proposed, including "the number of CSRs," adequacy of "staffing plans," staffing requirements for "[m]anagement of cyclical call volume and unforeseen spikes," "workload forecasting" and "CSR scheduling." AR, Tab 21, pp. 247-251. These evaluators recognized that L-3/MOI's proposal sets out a [redacted] AR, Tab 21, p. 629, 631, 653. It is clear that under these circumstances, USCIS' technical evaluators and hence USCIS itself knew or should have known that the L-3/MOI proposal already incorporated the element of "the amount of time CSRs are available to take calls." AR, Tab 13, p. 535. Moreover, those same evaluators had actual knowledge that, using shrinkage and other factors to assess its operations, L-3/MOI had significantly decreased prices [redacted] during the course of performance of their call center contracts with those companies.

Had USCIS made inquiry of its own technical evaluators, it would have learned not only that the [redacted] methodology was yielding an inaccurate occupancy rate, but that historical

evidence tended to show that L-3/MOI's price was in fact more reasonable than Datatrac's. The evaluators understood that L-3/MOI had already accounted for shrinkage and identified *not one* of the parade of horribles [redacted] trotted out when he applied his "industry staffing standard." To the contrary, they found L-3/MOI's proposal embodied a [redacted] AR, Tab 21, p. 629. Had [redacted] analysis been appropriate, surely the evaluators would not have so praised L-3/MOI.

The Administrative Record does not show that any technical evaluator was consulted regarding the application of the [redacted] methodology to L-3/MOI's staffing proposal, which is curious in light of their charge to evaluate staffing. Had they been so consulted, it seems likely they would have pointed out the duplicative nature and inflationary effect [redacted] productivity rate would have on L-3/MOI's occupancy rate and, as well, the potential for L-3/MOI to decrease USCIS costs over time, thereby enabling USCIS to conclude that its second price reasonableness determination was in error and refrain from awarding a contract to Datatrac.[7] It is precisely for these reasons that this Court has found that a failure to consult with evaluators in applying such an analysis "deprived plaintiff of the opportunity to have its proposal considered fairly and honestly…" and "merits judicial intrusion." United International Investigative Services, Inc. v. United States, 41 Fed. Cl. 312, 322 (1998).

## C. Price Technical Tradeoff

Cross-Movants ignore the story of the price technical tradeoff in its entirety. All three briefs point this Court to Tab 13 of the Administrative Record as the core justification for

---

[7] Assuming for purposes of discussion that, after assessing the amount of time reasonably allocable to each category of shrinkage, L-3/MOI arrived at an overall shrinkage factor of 15% to arrive at its staffing plan and, by extension, its proposed prices, since the 15% shrinkage factor is the reciprocal of an 85% productivity rate, the application of [redacted] methodology to the L-3/MOI proposal would mean multiplying 0.85 by itself, resulting in a dramatic reduction in "productivity minutes" and a concomitant increase in the occupancy rate.

USCIS' price technical tradeoff decision. Def. Br. p. 25; Asp. Br. p. 32; Data. Br. p. 25. But the Source Selection Decision at Tab 13 is only part of the story, as shown by the following summary of relevant facts and circumstances surrounding the price technical tradeoff decision:

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

- [redacted]

USCIS must apply a consistent standard for evaluating each proposal. See e.g., PGBA, LLC v. United States, 60 Fed. Cl. 196, 207 (2004), *aff'd* 389 F.3d 1219 (Fed. Cir. 2004). As

clearly set forth in the chronology above, USCIS' price technical determination was wholly irrational and an abuse of its discretion because USCIS had already made the decision to award the contract to the Intervenors when it began drafting the SSDD. Instead of applying a consistent standard to all offerors, USCIS chose to whom it wanted to award the contract, and then used the SSDD as a tool to rationalize that decision after the fact, not to explain an existing justification for choosing the Intervenors.

For the SSDD to have any meaning at all, it must reflect the deliberative process and conclusion reached *before* the decision to award was made. The price technical tradeoff in the SSDD does not and cannot do so because the SSA made the decision to award in March without any mention of what later became the apparent critical factor supporting award to Datatrac - staffing adequacy measured by an alleged industry standard, which did not appear until April 27, 2006. As such, the price technical tradeoff was irrational and an abuse of discretion.

**D. Improper Evaluation.**

**1. L-3/MOI's Proposal Was Improperly Downgraded.**

The Government and Intervenors assert that the BEC's comments that L-3/MOI's proposal did not pay an appropriate wage and did not satisfy the [redacted] staffing rule for CSRs in a HUBZone at the 400,000 call level did not constitute a downgrade of their proposal, because USCIS considered L-3/MOI's proposal [redacted] Def. Br. p. 31; Asp. Br. 27; and Data. Br. p. 24. First, given this Court's Order on the motions to dismiss, the issue is no longer whether L-3/MOI's proposal was compliant, but rather, whether the Government's review of L-3/MOI's proposal was actually based upon the merits of the proposal or based upon wrong conclusions drawn by the Government.

Contrary to the other movants' assertions, L-3/MOI's proposal was downgraded based upon USCIS' erroneous statement that its wage rates did not meet the wage determination for Texas. AR, Tab 15, p. 565. In fact, it is undisputed that L-3/MOI's wage rate of [redacted] rate that Intervenors contend by the Service Contract Act mandates. AR, Tab 12, p. 508. Yet, the SSA relied on the BEC report containing this falsehood in making his award decision. According to the SSP, "[t]he SSA will perform a comparative, best value analysis of the findings of the TEC and the BEC and make a formal award decision" and "will reach a decision using the oral and written reports and recommendations of the TEC and the BEC." AR, Tab 8, pp. 239 and 246. The BEC's incorrect analysis did not reflect what L-3/MOI proposed and tainted the SSA's consideration of L-3/MOI's proposal on its merits.

The Government's assertion that the 50 CSR minimum is "not supported by the record" is simply wrong. Def. Br. p. 32. The Government identifies the very section of the Solicitation that supports L-3/MOI's position. In footnote 15 of its brief, the 50 CSR requirement is a condition precedent to the 80% rule. The 50 CSR condition precedent reads specifically that "[g]*iven the Government provided telecommunications service described in Section 6[], call centers shall have a normal minimum complement of 50 CSRs.*" Def. Br. p. 32 (emphasis added). Aspen and Datatrac completely ignore this condition precedent and the fact the Government's telecommunications service at the call centers requires a minimum of 50 CSRs for operation in their motions. Asp. Br. p. 5 and Data. Br. p. 3.

There can simply be no doubt that the cumulative effect of the numerous errors made by the Government in reading L-3/MOI's proposal was negative. Given the fact that award

decisions are subjective, the Government cannot claim that its incorrect reading of L-3/MOI's proposal had no impact whatsoever on the SSA.

**2. USCIS' Failure To Consider The Fact That Intervenors' Proposals Do Not Comply With The 50 CSR Minimum Resulted In An Irrational And Unreasonable Evaluation.**

It is undisputed that neither Datatrac nor Aspen's proposals complied with the 50 CSR minimum staffing requirement. It is undisputed that USCIS utterly failed to consider these critical deficiencies in its consideration of Intervenors' proposals. The ramifications of these undisputed facts are critical.

A fair, rational and reasonable analysis of the Intervenors' proposal would have revealed the risks those proposals presented by not complying with the 50 CSR minimum at lower volume call levels. Having fewer than 50 CSRs staffing a call center is more than just a technical deficiency, it affects the very operational viability of that call center. Proper analysis would have factored the Intervenors' deficiency into the scoring and assessment of risk presented by those proposals. USCIS should have downgraded the Intervenors' proposals and adjusted price reasonableness analysis to reflect the increased risk. USCIS' evaluation, therefore, is unreasonable and irrational and should not be allowed to stand.

**3. The Solicitation Included Latent Ambiguities That Prejudiced L-3/MOI And Which Warrant A Complete Re-Procurement.**

The Solicitation's staffing requirements included latent ambiguities that prejudiced L-3/MOI and nothing argued by either the Intervenors or the Government merits a different conclusion by the Court. Facially inconsistent or mutually exclusive provisions constitute a patent ambiguity. However, nothing in the CSR staffing requirements is either facially inconsistent or mutually exclusive, therefore they are latent, not patent, ambiguities. The staffing requirements fall into two categories: 1) how many CSRs are needed and 2) where the CSRs are

physically located. Under the first category, the Solicitation requires a minimum of 250 CSRs in a HUBZone area and at least 50 CSRs at each call center. L-3/MOI met the 250 CSR requirement as stated in its technical proposal and followed the 50 CSR per call center requirements for each call volume level. USCIS left the overall number of CSRs used to service any given call volume level to the offerors as "a business decision for each offeror to make," and set no other numeric minimum. AR, Tab 7, p. 225. The 50 CSR requirement is operability-related, and establishes the minimum number of personnel needed to maintain a functional call center system. The 80% rule requirement is socio-economic and requires that if the overall number of CSRs falls below 300, at least 80% of the total CSRs must be located in a HUBZone. This requirement refers specifically to where the CSRs are located and does not bear upon operability of a call center. Clearly, these terms are not facially inconsistent or mutually exclusive *per se*. Rather, the conflict only arises when the overall number of CRSs dips below 300. In that event, it is possible, as was the case with L-3/MOI's proposal, that the 50 CSR minimum requirement would trump the 80% HUBZone requirement.

The Government and Intervenors cannot reconcile this tension and do not even attempt to do so in their Motions. Instead, they cavalierly assert that the fault lies with L-3/MOI for not including more CSRs in its staffing proposal. This argument fails for two reasons. First, USCIS stated that there was no overall minimum CSR requirement and, at the time it submitted its staffing proposal, L-3/MOI could not have known that USCIS would subsequently renege on its stated position. Therefore, the ambiguity created by USCIS' changing interpretation is inherently latent in nature.[8] Second, L-3/MOI arrived at its overall number of CSRs based on its

---

[8] Even if this Court considers the Solicitation's ambiguities to be patent, it should construe them against USCIS, as it did in Metcalf Construction Co., Inc. v. United States, 53

sound business judgment and the best practices of the call center industry, as contemplated by the Solicitation. AR, Tab 7, p. 225. On that basis, L-3/MOI determined that the best commercial practice required 240 CSR to service 400,000 calls per month. Following the 50 CSR requirement, L-3/MOI seated [redacted]. To add more CSRs would have deviated from best practices and best value, and not complied with the interests of the procurement.

The prejudice to L-3/MOI arising from the Solicitation's ambiguities was both cumulative and undeniable. The unwarranted concerns as to L-3/MOI's staffing levels fed into the SSA's determination that Datatrac offered a greater overall value because L-3/MOI's proposal was riskier. AR, Tab, 13, p. 535-536. Despite the fact that its proposal was responsive, the BEC and TEC's misguided concerns as to the adequacy of L-3/MOI's proposal lingered throughout the remainder of the procurement. AR, Tab 15, p. 565, Tab 25, pp. 720-724. And on the broader context of USCIS' pretextual analysis of Datatrac and L-3/MOI's proposals, the contrived notion that L-3/MOI's proposal suffered from inadequate staffing merely made it easier to support the conclusion USCIS had already reached: Datatrac was the offeror to whom USCIS wanted to award the contract.

---

Fed. Cl. 617 (2002) (holding that the bid protestor's duty to inquire concerning a patent ambiguity was negated by the Government's failure to clarify the ambiguity after it was put on notice by a pre-proposal inquiry and that while bid protestor was also at fault for failing to make an inquiry, the Government bore the risk of a failure to clarify, once it was made aware of the defect). To the extent a duty to inquire exists in this case, it must fall on USCIS, not L-3/MOI. USCIS stated that there was no overall CSR minimum yet, by the time it began evaluating proposals, it had clearly changed its position and it was obligated to alert the offerors accordingly. In the alternative, assuming USCIS' interpretation of the staffing requirements remained consistent, USCIS should have told the offerors during the Q & A that the 80% requirement functioned as an overall CSR minimum requirement. USCIS did neither, however, and, therefore, even if L-3/MOI had a duty to inquire as to the staffing requirements, it cannot be punished for it now because USCIS' total inaction supersedes any duty L-3/MOI had.

4. **Failure to Seek Clarifications.**

The Defendant and Intervenors all mischaracterize L-3/MOI's claim concerning the Government's failure to seek clarifications and again, entirely miss the point. All three movants assert in their briefs that what L-3/MOI means by clarifications is to "change" (Def. Br. p. 33) "modify" (Asp. Br. p. 29) or "revise" (Data. Br. p. 23) their proposal, which is not at all what L-3/MOI is claiming. Rather, the subject clarifications would have afforded the Government an opportunity to use the correct wage rate already in L-3/MOI's proposal and to make an accurate and informal assessment of L-3/MOI's staffing model. Such a clarification would not have required L-3/MOI to alter its proposal in any way. The very purpose of clarifications under FAR 15.306(a)(2) is to give offerors an opportunity to "clarify certain aspects of proposals" or "resolve minor or clerical errors" and to give the Government an opportunity to better understand the proposals, which is precisely L-3/MOI's position.

5. **Failure to Conduct Discussions.**

Where an agency applies undisclosed or vague criteria in an evaluation process of a procurement, this Court has scrutinized the agency's failure to conduct discussions. See Day & Zimmerman, 38 Fed. Cl. at 604. USCIS' failure to conduct discussions is inherent in Counts V and IX of the Amended Complaint because of USCIS' use of undisclosed criteria (industry staffing standard) and vague evaluation criteria (minimum CSR requirements) to evaluate the proposals. Aspen relies on Rig Masters, Inc. v. United States, 70 Fed. Cl. 413, 420-21 (2006) and Delbert Wheeler Const., Inc. v. United States, 39 Fed. Cl. 239, 249 (1997) for support of USCIS' broad discretion in deciding not to hold discussions. Asp. Br. p. 29. But that discretion is not "unfettered." Day & Zimmerman, 38 Fed. Cl. at 604. L-3/MOI has already distinguished Rig Masters in its brief. L-3 Br. p. 56. Delbert Wheeler merits the same distinction as Rig Masters. In Delbert Wheeler, as in Rig Masters, the plaintiff failed to identify or argue that there

was any undisclosed criteria or vague evaluation criteria the agency used to evaluate the proposals. Delbert Wheeler, 39 Fed. Cl. 239. Therefore, the plaintiff in Delbert Wheeler did not fall under the Day & Zimmerman analysis and the court properly held that discussions were not warranted.

USCIS' failure to conduct discussions was irrational because USCIS used vague and undisclosed rating criteria. Under Day & Zimmerman, USCIS should have conducted discussions to remedy the use of vague and undisclosed rating criteria that resulted in flawed evaluation process and an irrational award decision. The inherently flawed results prejudiced L-3/MOI, because if USCIS had conducted discussions, USCIS would have learned that L-3/MOI's staffing proposal was perfectly in line with the commercial best practices required of the solicitation, and that any worry over staffing levels and burnout were unreasonable.

### E. USCIS' Decision to Award to Intervenors Was Pretextual, Violating the Duty to Conduct a Fair Procurement and the Covenant of Honest Consideration.

#### 1. A Showing of a Violation of the Duty to Conduct a Fair Procurement and Breach of the Covenant of Honest Consideration Does Not Require that Plaintiff Prove Malice or Specific Intent.

This Court has held that failure to conduct a fair procurement or a breach of the covenant of honest consideration, due to bias or because the award was predetermined or its reasoning pretextual, merits judicial intervention. 126 Northpoint Plaza Ltd. v. United States, 34 Fed. Cl. 105, 111-112 (1995), and it and the Federal Circuit have described such actions as an "abuse of discretion," Id.; Prineville Sawmill Co. v. United States, 859 F.2d 905, 914 (1988); Parcel 49C Ltd. Partnership v. United States, 31 F.3d 1147, 1151 (1994); "illegal," Parcel 49C, 31 F.3d at 1151; and "arbitrary and capricious," United International Investigative Services, Inc. v. United States, 41 Fed. Cl. 312, 322-323 (1998). As such, the burden of proof is a preponderance of the

evidence as discussed above.[9] Cross-Movant's claims notwithstanding, even to demonstrate bad faith, L-3/MOI *need not* show that USCIS had a "specific intent to injure," Data. Br. p. 29, nor is L-3/MOI obliged to prove "malice," "specific intent," or "animus," Asp. Br. pp. 40, 46 in order to demonstrate that USCIS' actions violated its duties to conduct a fair procurement and to give its proposal honest consideration.

In Bannum, Inc v. United States, 56 Fed. Cl. 453 (2003), this Court provided a non-exclusive list of illustrative circumstances where bias has been found, not a list of elements that must be present in order to find a breach of the duties of good faith and honest consideration. This Court, and its predecessor, have found consistently since 1956 that predetermination of a contract award is sufficient to merit judicial intervention without requiring evidence of specific intent to injure the plaintiff or malice. See, e.g., Heyer Products Co. v. United States, 135 Cl. Ct. 63 (1956); Keco Industries v. United States, 203 Cl. Ct. 566, 492 F.2d 1200 (1974); Prineville Sawmill, 859 F.2d 905; Parcel 49C, 31 F.3d 1147; United International, 41 Fed. Cl. 312; and Dubinsky v. United States, 43 Fed. Cl. 243 (1999). In fact, this Court has specifically found that USCIS' predecessor organization, INS, engaged in such behavior to a degree that warranted judicial intervention. 126 Northpoint Plaza Ltd. Partnership, 34 Fed. Cl. 105.

**2. Cross-Movants Confuse the Cause of Bias with the Existence of Bias.**

By arguing that prior employment is not *per se* evidence of bias and therefore neither [redacted] nor USCIS were biased, Defendant confuses the issue of proof of the *cause* of bias with proof of the *existence* of bias. To satisfy its burden, L-3/MOI need only show that bias,

---

[9] This Court has also found that such predeterminations can be bad faith. Keco Industries v. United States, 203 Cl. Ct. 566, 574 (1974). As was discussed by Cross-Movants, the standard for proving bad faith is proof that is "almost irrefragable." This Court has held that "almost irrefragable proof" equates to "clear and convincing evidence." See Def. Br. pp. 37-38; Asp. Br. pp. 38-39; Data. Br. pp. 38-39.

Agreed-Upon Redacted Copy
May Be Made Public

favoritism, or predetermination existed, not why it existed. There is clear and convincing evidence in this record that USCIS did in fact predetermine the outcome of this procurement, which the law does not permit. L-3 Br. pp. 63-67. Twice USCIS acknowledged its favoritism and subjective preferences - first, when Mr. Ross admitted he was using "subjective" analysis to get to the end he wanted, AR, Tab 26, p. 943, and second, when USCIS attempted to justify paying [redacted] more because they had unsubstantiated "extra confidence" in Datatrac. AR, Tab 26, p. 985. This Court expressly rejected such subjective rationales in 126 Northpoint and Parcel 49C – "The law of procurement does not tolerate actions reflecting personal predilections of administrative officials...." Parcel 49C, 31 F.3d at 1153.

In the face of DHS' repeated doubts about the rationalizations offered in defense of its decision to award to the Intervenors, USCIS did not reconsider its award. Rather, the SSA revised the SSDD to incorporate an analysis of the adequacy of L-3/MOI's proposed staffing levels that was based on nothing contained in the Solicitation, nothing used by the TEC or the BEC previously, and nothing considered a best commercial practice. When applied, this analysis resulted in nothing more than an erroneous and meaningless figure that [redacted] interpreted, without support, as L-3/MOI's staffing *appearing* to have used the unacceptable rate he calculated - even [redacted] could not call this analysis conclusive. AR, Tab 26, p. 1015. USCIS justified its award decision on this interpretation. USCIS rushed from [redacted] analysis through the award announcement in the course of 24 hours. AR, Tab 26, p. 1015 and Tab 2, p. 26. To use the analysis in this way, outside the TEC and BEC process, is in and of

itself a violation of the duty to conduct a fair procurement. United International, 41 Fed. Cl. at 322.[10]

The Federal Circuit's ruling in Galen Medical Associates, Inc. v. United States, 369 F.3d 1324 (Fed. Cir. 2004), provides no support for Intervenors' argument. In Galen, the protestor claimed bias based on the fact that two evaluators were references for the awardee and that the awardee submitted additional material after the submission of best and final offers. The facts of the instant case differ significantly from Galen. Here, USCIS *asked* Intervenors to correct fatal flaws in their proposals *after the award decision had been made*, AR, Tab 26, pp. 928, 931-942, but never allowed L-3/MOI to clarify its proposal to remove the misinterpretations of its proposal that tainted USCIS' consideration of L-3/MOI's proposal. As discussed extensively in L-3/MOI's brief, USCIS' conduct is in line with previous cases where this Court has determined the agency's conduct constituted impermissible favoritism. L-3 Br. pp. 63-67.[11]

**3. Cross-Movants' Attacks on Evidence of USCIS' Failure to Conduct a Fair Procurement and Breach of the Covenant of Good Faith Fail.**

Defendant claims that the email at AR, Tab 26, p. 943 "neither admits *nor implies* favoritism." Def. Br. p. 39 (emphasis added). The immediately preceding sentence in the email clearly implies favoritism - [redacted] In fact, USCIS never justified its subjective decision to treat L-3/MOI and Aspen disparately and had to drop the

[10] Defendant and Intervenors note that [redacted] "out of an abundance of caution," despite his incorrect conflict of interest form, which stated he was a member of the TEC. There still has not been any explanation as to why the same "abundance of caution" was not applied to the other roles he played in this procurement.

[11] The remainder of Intervenor Aspen's argument is that the bias claim does not run against Aspen, only Datatrac. Asp. Br. pp. 40-46. To the contrary, Aspen benefited from the flawed and tainted process and USCIS' predetermination and post hoc rationalization, as described elsewhere in L-3/MOI's briefs. The award to Aspen, like the award to Datatrac, was predetermined by the agency and justified later by pretext.

differentiation from the SSDD, because the only explanation for the disparate treatment was the one mentioned by Toi Johnson - favoritism.[12]

Intervenors claim that the changing of the weighting of corporate experience cannot demonstrate bias, because it occurred before the issuance of the Solicitation and before the issuance of the sole-source contract. Asp. Br. pp. 42-43, Data. Br. p. 39. Both these claims are wrong.[13] Clearly, [redacted] had a very good idea who would bid on the Solicitation - he had worked for three of the bidders. He knew that Datatrac would benefit because he knew that Datatrac was going to win the sole source contract. In June, [redacted] changed the weighting *and* dropped the number of live assistance calls, both indicative of the fact that he wanted the experience of holding the sole source contract to weigh heavily in favor of its winner. The issuance of the Solicitation and the award of the overflow contract were part of the same "acquisition strategy," and proceeded together. AR, Tab 2, p. 22. [redacted], as NCSC Program Director, was fully aware of both the Solicitation and the overflow contract in June.

Datatrac argues that the SSA's rationale for awarding a contract to Datatrac *never changed*. Data. Br. pp. 37-28. Of course the SSA's rationale never changed - because the rationale was USCIS' irrational and predetermined preference to award Datatrac the contract. As

---

[12] That Aspen apparently did not actually [redacted] in its proposal is beside the point. All those involved believed that Aspen had in fact [redacted] in its proposal and nonetheless demonstrated favoritism by only holding it against L-3/MOI.

[13] Aspen cites CACI, Inc.-Federal v. United States, 719 F.2d 1567 (1983), in favor of this proposition, but CACI is inapposite here. In CACI, the Court said that the setting of particular weights for different factors was not evidence of favoritism, because the Department could not know that the awardee would need such a weighting in order to win the contract. In this case, the individual setting the weighting had intimate knowledge of the bidder, including its prices, how it built staffing models, and that it would win the sole-source contract, which was not the case in CACI. Aspen also cites CACI in support of its argument that the creation of the IGCE did not demonstrate bias. This argument also fails - [redacted] knew how Datatrac's pricing was formulated. Regardless of what [redacted] knew, nothing explains the irrational decision to set an IGCE *higher* than an existing contract price that was already too high.

Datatrac states in its brief, the only significant changes to the SSDD throughout the drafting process were those that DHS forced it to make – the changes to justify the expenditure of tens of millions of taxpayer dollars when it was not necessary. None of the permutations or implications of DHS' criticism of USCIS' price technical tradeoff ever affected the SSA's opinion, because the SSA never made a price technical tradeoff. The decision had been made, and everything that followed was a post-hoc attempt to find a justification.

**III. CONCLUSION**

USCIS' use of the undisclosed evaluation criteria to arrive at their perceived best staffing level was irrational because USCIS has not provided a coherent explanation for the use of the percentages cited by [redacted]. The only explanation contained in the administrative record is that [redacted] has simply always used the calculation. His bare assertion that it is a standard does not make it so. The so-called price technical tradeoff decision was also irrational because USCIS made the decision to whom it would award the contracts before actually engaging in the analysis. The price technical tradeoff was a *post hoc* tool used to rationalize USCIS decision to award the contracts to Datatrac and Aspen, not a justification reflecting the deliberative process which led USCIS to the decision to make a proper contract award.

Any rating based on the CSR requirement was irrational because the requirement was ambiguous due to USCIS' assertion that there was no minimum CSR requirement, while the Solicitation required a minimum number of CSRs in a HUBZone location. USCIS' failure to seek clarifications and/or conduct discussions was also irrational because there were glaring aspects of the proposals that would have been cleared up through the clarification or discussion process. When the email from [redacted] showing that he used a calculation to evaluate staffing models first surfaced, USCIS should have recognized that the calculation was not

contained in the Solicitation and brought the procurement to a screeching halt as USCIS conducted discussions to clarify the staffing levels. Staffing is such a key, integral part of call centers that to not fully explore anything dealing with staffing is wholly irrational.

All of the aforementioned irrational acts prejudiced L-3/MOI because, had USCIS conducted the procurement in accordance with the Solicitation, any and all of USCIS' concerns about L-3/MOI's ability to provide the best value would have been quashed and L-3/MOI would have stood a substantial chance of receiving award of the contract.

This Court can set aside an award on the separate, independent grounds that the procuring agency violated procurement law. Dubinsky, 43 Fed. Cl. at 243. The actions described in L-3/MOI's Brief in Support of its Motion for Judgment on the Administrative Record and in this response establish that USCIS violated procurement law when it, at a minimum: awarded a contract on the basis of an evaluation criterion not specified in the Solicitation, in violation of 10 U.S.C. § 2305(a)(2)(A)(i), 41 U.S.C. § 235a(b)(1)(A), and multiple sections of the FAR, L-3 Br. pp. 13-32; impermissibly tailored the procurement, in violation of FAR § 12.302(c); failed to conduct a meaningful price technical tradeoff, in violation of 10 U.S.C. § 2305(a)(3)(A)(i), 41 U.S.C. § 235b(c)(1)(A) and FAR § 15.101-1 and failed to seek clarifications, in violation of FAR § 15.306.

Pursuant to Keco Industries, 203 Cl. Ct. at 574 (1974) and its progeny, this Court can also set aside an award on the separate, independent grounds that the procuring agency (1) predetermined the awardee or (2) abused its discretion. By violating the duty to conduct a fair procurement and breaching the covenant of honest consideration, USCIS' actions in this case demonstrate both that it predetermined the awardee and abused its discretion. The actions described in L-3/MOI's Brief in Support of its Motion for Judgment on the Administrative

Record and here amply demonstrate that USCIS failed to give honest consideration to L-3/MOI's proposal and otherwise conducted an unfair procurement process. USCIS preferred Datatrac and Aspen from the beginning and manufactured a way to give them this contract. USCIS' process was "a sham, done only to appear to comply with the law, to clothe their apparently dishonest purpose with the habiliments of legality." See Heyer Products, 135 Cl. Ct. at 69-70 (1956). While USCIS may have had the very best of intentions, and even may have had its idea of the public interest at heart, the public interest is never served by violating the strictures of the procurement process – it is adherence to those rules, not USCIS' subjective preferences, that best protect the public interest.

This 18th day of August, 2006.

s/ John Horne
John H. Horne
POWELL GOLDSTEIN LLP
One Atlantic Center
Fourteenth Floor
1201 West Peachtree Street, NW
Atlanta, GA 30309-3488
Telephone Number: (404) 572-6600
Facsimile Number: (404) 572-4527

Of Counsel:

Carl A. Gebo
Diane Festin LaRoss
Mark B. Carter
Christopher R. Jordan
POWELL GOLDSTEIN LLP
One Atlantic Center
Fourteenth Floor
1201 West Peachtree Street, NW
Atlanta, GA 30309-3488
Telephone Number: (404) 572-6600
Facsimile Number: (404) 572-4527

W. Bruce Shirk
Kathleen M Hamann
POWELL GOLDSTEIN LLP
901 New York Avenue, NW
Washington, DC 20001
Telephone Number: (202) 347-0066
Facsimile Number: (202) 624-7222

::ODMA\PCDOCS\ATL\1068083\2