Joint Approved Redacted Copy
May Be Made Public

# In the United States Court of Federal Claims

No. 06-498C
Filed Under Seal: September 8, 2006

| | |
|---|---|
| * * * * * * * * | |
| MICRODYNE OUTSOURCING, INC., a subsidiary of L-3 COMMUNICATIONS CORPORATION, | Post-Award Bid Protest; Negotiated Procurement; |
| Plaintiff, | Best Value Determination; 10 U.S.C. § 2305(b)(1); |
| v. | 41 U.S.C. § 253b(a); FAR 15.304(d); |
| UNITED STATES OF AMERICA, | Cost/Technical Tradeoff; Undisclosed Evaluation |
| Defendant, and | Criterion; Revising Source |
| DATATRAC INFORMATION SERVICES, INC., | Selection Document Does Not Prove Pretextual |
| Defendant- Intervenor, and | Award; Duty to Conduct Fair Procurement; |
| LOCKHEED MARTIN ASPEN SYSTEMS CORP., | No Prejudicial Error in Procurement; Cross-motions |
| | For Judgment on Administrative |
| Defendant-Intervenor. | Record (Rule 52.1). |
| * * * * * * * * | |

John H. Horne, Powell Goldstein LLP, Atlanta, GA, for plaintiff. Carl A. Gebo, Diane Festin LaRoss, Mark B. Carter, Christopher R. Jordan, W. Bruce Shirk, Kate Hamann, of counsel.

John J. Todor, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.

Rand L. Allen, Wiley Rein & Fielding LLP, Washington, D.C., for defendant-intervenor Datatrac Information Services, Inc. Daniel P. Graham, Kevin J. Plummer, of counsel.

Thomas L. McGovern III, Hogan & Hartson LLP, Washington, D.C., for defendant-intervenor Lockheed Martin Aspen Systems Corp. Michael D. McGill, of counsel.

## OPINION AND ORDER

**HODGES**, Judge.

This is a post-award bid protest. Plaintiff Microdyne/L-3 submitted a bid in response to a Request for Proposals issued by the United States Citizenship and Immigration Services (USCIS) to staff its National Customer Service Center. The USCIS is a division of the Department of Homeland Security and operates the Center, which employs Customer Service Representatives (CSRs) to answer callers' questions about immigration benefits and policies.

The RFP explained that the award would be made to one or more offerors representing the best value to the Government. The USCIS awarded contracts to Aspen Systems and Datatrac Information Services following a trade-off among eligible bidders. Plaintiff L-3 was next in line to receive the award. Plaintiff appealed to the Government Accountability Office, which dismissed its protest. It then filed a Complaint in this court, alleging that the awards to Aspen and Datatrac were arbitrary and capricious and that the USCIS clearly and prejudicially violated applicable procurement law and regulations. The awardees intervened.

Plaintiff, defendant, and intervenors filed cross-motions for judgment on the Administrative Record. The essence of this bid protest involves the parties' differing interpretations of events that transpired before, during, and after the USCIS made its final award decisions. Plaintiff suspects that the Agency had predetermined the result and "attempt[ed] to rationalize that decision based on pretexts created wholly outside" the evaluations process. The Government and the intervenors maintain that the Record fully supports the awards to Aspen and Datatrac and does not demonstrate bad faith, prejudice, or favoritism by the Agency but diligence that courts should "encourage, not disparage." Our role in this protest is to review the USCIS's award based on the information available to it when selections were made. Agencies have great latitude in choosing with whom to contract. We interfere only when the Administrative Record does not provide a rational basis for their decisions, or the protestor has proven a prejudicial violation of procurement laws or regulations, or bad faith. We found that none of those applied to this procurement. Many of plaintiff's arguments involve what the law considers the "minutiae" of the process. The court issued a ruling from the bench granting defendant's and intervenors' motions for judgment on the Administrative Record and denying plaintiff's cross-motion for judgment and its request for a permanent injunction. This Opinion supplements the rationales the court expressed orally to the parties on August 22.

## BACKGROUND

The USCIS supports the Department of Homeland Security by administering citizenship and immigration laws governing services and benefits. The USCIS also performs

a "customer service" function by providing general information through its Customer Service Representatives (CSRs) to persons who call the National Customer Service Center with questions about immigration policies. Callers first access general case information through a network Interactive Voice Response. Callers who want specific information are routed to live representatives, who, using pre-scripted material, respond to information requests, process service requests, and provide case status information. Operations employing these CSRs are referred to as Tier One. Tier One Centers administer to ninety percent of those callers needing live assistance. Calls are routed to a Tier Two Center staffed with USCIS employees if they require support beyond Tier One capability.

The USCIS issued a Request for Proposals in September 2005 for offers to provide Tier One services. The goal was "to optimize customer telephone interaction by providing a proactive, unified, and integrated approach to the delivery of citizenship and immigration services benefits modeled on industry best practices . . . ." The Solicitation sought call services for a period of one base year, plus four option years and stated that the Government intended to award "one or more contracts" for those services. The RFP had three evaluation criteria: Technical Capability, Past Performance, and Price. Technical Capability was more important than Past Performance and Price, and Technical Capability and Past Performance together were "significantly more important than Price." The Government's objective was "obtaining performance capability superiority rather than the lowest overall price."

This "best value" procurement would involve the weighing of "the differences (strengths, weaknesses, and risks) in the value of the non-price factors with the differences in the prices proposed." A Technical Evaluation Committee (TEC) would evaluate the offerors' technical proposals and past performance. The Technical Capability component measured the "ability of the Contractor to demonstrate the knowledge, understanding and technical ability to meet USCIS call center service requirements in the [Performance Work Statement]." Past Performance was scored "on the degree of relevance to the requirements of the RFP on the basis of similarity in size, scope, complexity, and technical difficulty." A Business Evaluation Committee (BEC) would assess pricing. Offerors were to propose pricing for the base year and the four option years. The number of estimated calls per month was set forth in various Contract Line Item Numbers (CLINs), which were "derived from historical data." The USCIS guaranteed awardees a "minimum of 200,000 calls per month per contract." The CLINS ranged from the 200,000 minimum to 1.2 million calls per month. The historical average monthly call volume was around 800,000 calls.

Members of the Technical and Business Evaluation Committees first would examine each offer individually. The Committees would arrive at a consensus rating for each offeror, and the Committee Chairpersons would author reports that contained specific reasons for those scores for the Source Selection Authority. The SSA would engage in tradeoffs in accordance with the RFP criteria and would make the final award decisions. Advisors would assist by providing specific information in their area of expertise as requested. They were

categorized as "technical, program, procurement, and legal." The Contracting Officer would oversee the entire source selection process. The USCIS intended to evaluate offers and make awards without discussions.

The Source Selection Authority was Michael Aytes. He explained that the RFP made clear "technical capability and past performance were significantly more important than price" and found that

> [t]hree proposal [we]re considered viable for award - Aspen Systems, Datatrac and L-3. Evaluating the prices at the minimum 200,000 calls per month, Aspen Systems proposed the lowest price, followed by L-3 Communications, and Datatrac Information Services. At the 400,000 and 800,000 call levels, L-3 was lowest followed very closely by Aspen Systems. Of the three top rated technical proposals, Datatrac [wa]s the highest price in all three call levels, but it[] [was] also the highest technically rated of all proposals.

Mr. Aytes noted that Aspen's technical rating was significantly superior to the L-3 proposal rating and only slightly behind the Datatrac technical rating. Plus, Aspen's price was lower than the Datatrac price in every call tier and very competitive with the L-3 price in every call tier. The SSA thus reasoned that "Aspen Systems offer[ed] the best mix of technical capability and price" and therefore merited "the first award of the two awards contemplated under the solicitation."

Between Datatrac and L-3, the SSA found "Datatrac's very strong technical proposal along with its past performance rating ranked first amongst all proposals submitted contrasted with L3's adequate technical proposal and outstanding past performance." Datatrac's and L-3's offers contained a difference in price: "at the 200,000 call level, Datatrac's pricing [wa]s approximately [redacted]% higher than the L3 pricing. At the 400,000 call level, Datatrac's pricing [wa]s approximately [redacted]% higher and at the 800,000 call level, Datatrac's pricing [wa]s approximately [redacted]% higher." The Source Selection Authority, however, highlighted "[s]everal important factors" that "clearly distinguish[ed]" the strengths of Datatrac as compared to L-3. Datatrac's offer placed its call center at a HubZone in Kentucky, and the Source Selection Plan stated clearly that extra consideration would be given to offerors proposing as much. The same was true as to Datatrac's stated ability to assume 20% of the call volume within 45 days. Both had "outstanding" past performance ratings, however Datatrac had past experience specifically with the National Customer Service Center call program. "Datatrac was the predecessor contractor several years ago and performed in an exemplary manner. . . . This positive experience with this offer[or] provide[d] additional confidence in Datatrac's ability to perform the requirements and provide the necessary services." The Source Selection Authority decided that such considerations "significantly decrease[d]" the overall performance risk in Datatrac's proposal. This decrease in risk, according to the SSA, "more than offset the cost savings that might be gained" by contracting

with L-3 who submitted a "much lower rated" proposal. The SSA awarded the second contract to Datatrac.

Mr. Aytes articulated his conclusions in his April 3 Source Selection Decision Document. The selections reflected the USCIS's belief that Aspen's and Datatrac's proposals represented the best value to the Government. The Department of Homeland Security's Office of Procurement Operations (OPO) reviewed Mr. Aytes' decision document and suggested revisions. The USCIS complied with many of OPO's recommendations, however, the Contracting Officer told the Procurement Office that "[w]hat it boiled down to is that there is a price difference between Datatrac and L-3." An OPO official responded, "[i]n general, I still do not feel that the Gov[ernment] has justified paying the price difference of $[redacted]m (400k calls) and $[redacted]m (800k calls) between the No. 1 and No. 3 ranked proposals. <u>It is important that the document state what we are getting from Datatrac that is worth the price differences</u>." (emphasis added).

The Procurement Office contacted [redacted], a procurement advisor, and inquired whether there was "a standard for staffing relative to a number of calls handled? Is the staffing level proposed by the offerors adequate?" [redacted] was a former employee of Aspen, Datatrac, and two other bidders in this procurement, who the USCIS retained as an advisor for this procurement. He was the Director of the National Customer Service Center. [redacted] analyzed Aspen's, Datatrac's, and L-3's proposals. He compared the staffing proposals at the 400,000 call level in light of his historical experience in the industry, his knowledge of industry best practices, and the writings of an industry expert, Dr. Jon Anton.[1] [redacted] assumed an 85% Productivity Rate, "which is generally used within the call center industry," and is the amount of minutes each Customer Service Representative would have available each day to take calls. The only variable in his analysis was the Occupancy Rate, which is the amount of time CSRs actually would spend on the telephone assisting callers. [redacted] noted that the Occupancy standard is usually between 75-85% and that it "appear[ed] L-3 used a [redacted]% Occupancy Rate to determine [its] staffing levels." He then identified six risks accompanying L-3's apparent rate. Among them were a fast-paced "call after call" environment, which could lead to employee burnout, increased turnover rates, and a decrease in the knowledge base of its Representatives. The same analysis yielded a [redacted]% Occupancy Rate for Datatrac, which [redacted] considered typical for the industry.

The Business Evaluation Committee Chairman used [redacted] staffing analysis to prepare an Addendum to the BEC Report. The Addendum was a means to "account for the significant dollar difference between the #2 [Datatrac] and #3 [L-3] offerors considered for

---

[1] The 400,000 call level presumed one contractor would discharge fifty percent of the call volume. The USCIS expected 800,000 calls per month based on historical data, and the Agency intended to issue two contracts.

award." The Addendum described [redacted]'s calculations and attributed certain risks to plaintiff's proposal based on [redacted]'s results. The Source Selection Authority authored a second decision document incorporating the TEC and BEC Reports, and the BEC Addendum. The outcome did not change. He concluded that Aspen offered "the best mix of technical capability and price and therefore . . . the best value to the Government." His second tradeoff noted that "Datatrac's very strong technical proposal along with the past performance rating ranked first amongst all proposals submitted." He described in detail five "important factors . . . which clearly distinguish[ed] the strengths of Datatrac as compared to the L3 proposal." The SSA then incorporated the BEC Addendum in his discussion of L-3's and Datatrac's cost proposals. As he illustrated:

> [T]he contracting office in conjunction with the program office, conducted a price realism analysis. . . . At the [400,000 call] level, Datatrac's CSR staffing equates to [redacted] CSRs compared to L3's [redacted] CSRs. According to the program office, the call center industry staffing standards consider call volume, average handling time (AHT), productivity rate, which is the amount of time CSRs are available to take calls [not on break, in training, coaching or handling administrative tasks], and occupancy rate which is the amount of time CSRs are actually on the phone.

L-3 seemed to propose "an unusually high occupancy rate of [redacted]% - far above the industry standard" of 75-85%. The SSA explained the risks perceived from Datatrac's elevated rate. It "means CSR[s] are taking more calls daily in a call after call environment without pauses in between . . . result[ing] in a more hectic pace, which leads to employee burn out and increased turnover rates." The rapid turnover causes the "immediate ripple effect" of decreasing the knowledge base of the CSRs. Mr. Aytes understood that "the majority of the price differences between Datatrac and L3 [wa]s directly attributable to the large difference in staffing proposed" and that contracting with the lower cost L-3 entailed greater risk that this bidder would not perform the contract to the Agency's satisfaction. He reasoned that Datatrac's "valuable strengths and features more than offset the cost savings that might be gained by going with the much lower technically rated L3 proposal." He selected Datatrac for the second award because its "proposal provide[d] the best mix of technical capability and price and represent[ed] the best value to the Government."

The USCIS awarded contracts to Aspen and Datatrac. L-3 filed a protest with Government Accountability Office on May 15. The GAO dismissed that protest, however, after L-3 failed to submit timely comments to the agency report.

## PROCEDURAL HISTORY

Plaintiff filed its Complaint in this court on July 6, and its application for a Temporary Restraining Order and motion for a permanent injunction. The parties stipulated that the USCIS would stay performance on the contracts until the court decided the parties' motions

Case 1:06-cv-00498-RHH Document 75 Filed 10/03/2006 Page 7 of 17

for judgment. The court issued a protective order on July 7. Plaintiff filed a motion to supplement the Administrative Record and compel discovery on July 10. Many of plaintiff's requests became moot when the Government filed the Record on July 14. We granted plaintiff leave to file its First Amended Complaint on July 25. Defendant voluntarily supplemented the Record with certain documents plaintiff requested on August 11.

Intervenors filed a motion to dismiss on July 12, which the Government did not join. We conducted a hearing on plaintiff's and intervenors' motions on August 3. Several telephone conferences followed to permit plaintiff additional opportunities to explain its reasons for seeking discovery from government officials familiar with this procurement.

We dismissed Count I, the conflict of interest claim. Microdyne Outsourcing, Inc. v. United States, No. 06-498, --- Fed. Cl. --- , 2006 WL 2455755 (Aug. 8, 2006). This court denied the intervenors' motion to dismiss the Amended Complaint in its entirety, however, ruling that plaintiff had standing to assert its protest because its proposal ranked third place in the procurement and the Agency awarded contracts to two offerors. Id. This case is before us on the parties' cross-motions for judgment on the Administrative Record. We heard oral arguments on August 22.

## APPLICABLE LAW

This court's review of bid protests is narrow. See 28 U.S.C. § 1491(b)(4) (adopting the Administrative Procedure Act standard, 5 U.S.C. § 706(2)(A)). We set aside agency awards generally in two circumstances: where the decision lacked a rational basis, or where the procurement procedure violated applicable statutes or regulations. See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001).

With respect to the first ground, "[t]he touchstone is not whether the court would have made a different decision . . . but, rather, whether the [agency] had a rational basis for the decision it did make." Blue & Gold Fleet, LP v. United States, 70 Fed. Cl. 487, 495 (2006). A "disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." Impresa, 238 F.3d at 1333 (citations omitted). Courts grant agencies wide discretion when deciding whether an agency acted without a rational basis in making its procurement decisions. E.g., E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996). "This deference is particularly great when a negotiated procurement is involved and is greater still when the procurement is a 'best value' procurement." Bean Stuyvesant, LLC v. United States, 48 Fed. Cl. 303, 320 (2000).

Ratings for technical quality are the "minutiae of the procurement process . . . [and] involve discretionary determinations of procurement officials that a court will not second guess." E.W. Bliss, 77 F.3d at 449. A contractor's mere disagreements with agency

evaluations "fall far short of meeting the heavy burden of demonstrating that the findings in question were the product of an irrational process and hence arbitrary and capricious." Banknote Corp. of Am. v. United States, 56 Fed. Cl. 377, 384 (2003). A court will not disturb an agency award unless it is "wholly without reason." TRW, Inc. v. Unisys Corp., 98 F.3d 1325, 1328 (Fed. Cir. 1996).

Reviewing courts may set aside a procurement decision challenged on the second ground where the protestor demonstrates both "a significant error in the procurement process, . . . [and] that the error prejudiced it." Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996). This means that a protestor must show that "there was a substantial chance it would have received the award" but for the alleged error. Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999). Plaintiff protests the award on both grounds, which are intertwined in this case.

**DISCUSSION**

Plaintiff's principal arguments are those relating to the BEC Addendum.[2] Plaintiff first claims that the USCIS unlawfully evaluated proposals using criteria not disclosed in the RFP. Plaintiff contends that the Solicitation's discussion of the factors and subfactors never referred to "staffing calculations" or a "call industry standard," yet the USCIS relied on [redacted]'s staffing calculation, which applied a purported industry standard, to justify the higher cost award to Datatrac.

Plaintiff correctly points out that in government procurements an award must be "based solely on the factors specified in the solicitation." 10 U.S.C. § 2305(b)(1); 41 U.S.C. § 253b(a). The FAR requires all factors and significant subfactors that will affect contract award and their relative importance be stated clearly in the Solicitation. 48 C.F.R. § 15.304(d); see 48 C.F.R. § 15.101-1 (obligating rule where agencies engage in tradeoffs to "award to other than the lowest priced, or the highest technically rated offeror"). Nevertheless, "an agency still has great discretion in determining the scope of an evaluation factor." Banknote, 56 Fed. Cl. at 386-87 (citations omitted). "[T]o show entitlement to relief on a claim that the agency used undisclosed evaluation factors, plaintiff must prove that the government evaluated the proposals received on a significantly different basis than announced in the solicitation and that the plaintiff has been prejudiced as a result." Hydro Eng'g, Inc. v. United States, 37 Fed. Cl. 448, 471 (1997) (emphasis added).

---

[2] Because the BEC Addendum served "[a]s a means to account for the significant dollar difference between #2 [Datatrac] and #3 [L-3] offerors considered for award," this section relates only to those claims by plaintiff with respect to the second award. We address plaintiff's arguments pertaining to the USCIS's awards to Datatrac and Aspen later in this Opinion.

The RFP issued by the USCIS provided that staffing would be an important part of the evaluations. For example, offerors were to propose "qualified, trained staff in sufficient quantity to respond to inbound inquiries in accordance with performance parameters stated [in the Solicitation] and instructions provided by USCIS." The RFP announced the relative importance of staffing. The USCIS credited staffing as one of the most heavily weighted criteria within Technical Capability, the most important evaluation factor. The Technical Capability component included five subfactors of varying degrees of importance: Facilities, Equipment and Personnel (35%); Corporate Experience (30%); Program Management Plans (15%); Key Personnel Qualifications; (10%); and Understanding of the Work (10%). Within the "Facilities, Equipment and Personnel" subfactor, USCIS considered "whether [an offeror's] proposed . . . <u>staffing plans</u> [we]re adequate and appropriate to meet all performance requirements . . . ." (emphasis added).

[redacted]'s analysis is not an "undisclosed evaluation criterion," as plaintiff asserts. It is an assessment of whether the number of Customer Service Representatives L-3 proposed would satisfy the Agency's technical needs. [redacted] conducted his analysis using the information in Datatrac's and L-3's proposals. He applied the same Productivity Rate and Average Handling Time per call to both proposals based on his industry experience. These figures are contained in the Record. [redacted] used an algebraic formula, in which the only variable was the Occupancy Rate. This refers to the ratio of total minutes of calls expected to total available minutes to take calls based on the number of employees proposed.

The term "industry standard" is somewhat of a misnomer. In this procurement it signifies what role staffing served as a function of the cost of the proposals, and [redacted]'s analysis was a means to define that role. The results were twofold. It revealed that 90% of the difference in price between Datatrac's and L-3's proposals was attributable the number of employees each proposed. Datatrac offered [redacted] people to perform the work that L-3 planned to do with [redacted]. Also, [redacted]'s experience in the call center industry led him to identify certain risks inherent in L-3's conservative staffing model. The USCIS attributed value in avoiding these risks, and it sought to obtain that value even if it was at a premium.

Plaintiff also argues that the court should enjoin the award because the USCIS did not evaluate its proposal according to the specified process in the Source Selection Plan. That [redacted] performed the analysis, and not the individual Technical Evaluation Committee members, is not evidence that the Agency sought to circumvent the process in the source selection plan. [redacted] was not a member of either Committee, but he retained a role in the procurement as an advisor because he has extensive industry experience. He was the Director of the National Customer Service Center Program at the time of this procurement. He applied his experience to plaintiff's and Datatrac's proposals and made reasoned judgments about their prospective performance on the contract. The Chairman of the Business Evaluation Committee, who was also the Contracting Officer, used [redacted]'s analysis to prepare an Addendum to the BEC Report. The RFP said that advisors would

Case 1:06-cv-00498-RHH Document 75 Filed 10/20/2006 Page 10 of 17

assist the procurement in their areas of expertise, if requested. It was appropriate for [redacted] to advise the BEC in the manner he did.

Plaintiff concedes that the BEC was responsible for price considerations. The BEC Addendum contained a second price reasonableness analysis that specifically examined proposal pricing with respect to the number of staff offered. The issue was, is there a reasonable basis for Datatrac's more costly proposal? Answering this question falls within the scope of the BEC's defined roles. Moreover, the BEC Addendum was one consideration the Source Selection Authority relied upon when deciding to whom he would award contracts. He also used the Committee reports. The Addendum was not a replacement for the TEC's and BEC's original conclusions.

Plaintiff theorizes that the USCIS did not ask the technical evaluators to reexamine plaintiff's staffing because the technical evaluators would have realized that [redacted]'s analysis was fabricating risk in L-3's proposal and therefore would have disagreed with his conclusions. Plaintiff cites positive comments from the TEC about its proposed staffing approach in support. Plaintiff also argued at the hearing that "never once do [the evaluators] say anything negative about our staffing . . . not once." The Administrative Record, however, does not show that any member of the TEC felt [redacted]'s analysis caused an unfair portrayal of plaintiff's ability to perform the work. One excerpt about L-3's proven staffing approaches was cited in an individual's evaluation worksheet, but it was a reference to plaintiff's corporate experience, and not related to the equipment, facilities, and personnel subfactor that includes staffing considerations. Neither the TEC Chairman nor the Source Selection Authority mentioned the evaluator's remark in their reports, in any event. The Record does not show that any individual or either Committee favored L-3 for an award. Plaintiff's inferences and assumptions have scant evidence to support them.

Plaintiff contends that the e-mail correspondence in the Record make it "unquestionably clear" the post-hoc manner in which the USCIS manufactured a justification to award the contract to Datatrac. Our review of the Record found discussions about potential edits to the decision document. For example, on April 19, a DHS procurement official wrote to USCIS:

> [i]n general, the document is well written and provides relevant information to support the award. Notwithstanding, the document should stand alone and therefore it must include language that speaks to the specific differences (in terms of strengths, weaknesses and risks, as it pertains to the evaluation factors/criteria) between the proposals that were considered in the determination of the technical superiority of one proposal over the other . . . Specifically, it is suggested that the following paragraphs be revised: . . .

The paragraphs of suggested revisions that follow undercut plaintiff's theory that the USCIS

created justification for the awards after the fact. The first paragraph does not even mention Datatrac or L-3. The second paragraph states, "please address the price differences between the proposals in dollars and/or percentages. The following paragraphs that describe the differences between Datatrac and L-3 are good . . . and comparisons between other proposals should contain the same level of detail and more." (emphasis added). Other e-mails that L-3 contests are among the following:

> . . . I have reviewed your 3 April Source Selection Decision Document and believed it required some additional tweaking in order to withstand any protests. We have therefore made numerous suggested changes without changing your intent.
> (*Contracting Officer to Source Selection Authority, April 18, 2006*)
>
> Just a quick note to update you on the call center awards. We have been asked by DHS OPO to revise the Source Selection Decision Document to strengthen and articulate more fully the basis for your Selection decision. . . . .
> (*Contracting Officer to Source Selection Authority, April 20, 2006*)
>
> We continue to get comments on the Source Selection Decision Document from OPO. They believe that even through we made substantial changes yesterday, the document needs to be stronger yet in order to defend the decision in light of the substantial price differences in proposals.
>
> Bottom line: no one is objecting to the decision. It[']s just the document needs to be stronger.
> (*Contracting Officer to Source Selection Authority, April 21, 2006*)

(emphasis added). We understand that these may be subject to differing interpretations, but the court operates under the strong presumption that the Government acts in good faith. The e-mail discussions from Homeland Security seeking justification did not have the tone of disapproval with regard to the final decision, or of questioning the need for more staff; the issue was the need to document the file properly. Agencies must account for many of their activities and responsibilities, as well as the manner in which they spend money. This exchange of e-mails struck the court as merely a manifestation of such concerns.

The Administrative Record shows unequivocally that the awards to Datatrac and Aspen are grounded in reason. The Solicitation stated that USCIS would emphasize technical capability over price and when combined, technical scores and past performance history would be "significantly more important" than price. The overall rankings were: *first*, Datatrac; *second*, Aspen; and *third*, L-3 Communications. Datatrac received "[redacted]" ratings in Facilities, Equipment and Personnel and in Corporate Experience, the two most heavily weighted technical subfactors. L-3 received "[redacted]" ratings in these categories.

The Technical Capacity ratings are summarized in the following table:

| Offeror | Facilities, Equipment & Personnel (35%) | Corporate Experience (30%) | Program Mgmt. Plans (15%) | Key Personnel Qualificat. (10%) | Under-standing of the Work (10%) |
|---|---|---|---|---|---|
| Datatrac | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Aspen | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| L-3 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

Key: O = Outstanding; B = Better; A = Acceptable[3]

The Business Evaluation Committee found that "[a]dequate price competition was obtained. Price reasonableness [wa]s established based on the existence of adequate competition." The Committee noted "Aspen and L-3 Communications were consistently at the low priced end of the spectrum at all three call levels during all potential performance periods." However, "[f]rom a business perspective, award could likely be made to any of the offerors . . . without discussions." The BEC found that "[b]ased on the existence of adequate price competition, the proposed prices at the total evaluated price level are considered fair and reasonable."

The Source Selection Authority relied upon the TEC and BEC Reports, and the BEC Addendum in preparing his final Source Selection Decision. He discussed the relevant findings from each and concluded that "[t]hree proposals are the most likely to offer the government the best value - Aspen Systems, Datatrac and L3." With respect to the price and non-price factors of each proposal and the value of each when compared to the other two, he found:

> The Aspen technical rating is significantly superior to the L3 proposal rating and only slightly lower [than] the Datatrac technical rating. . . . [T]here are several important features distinguishing the Aspen proposal from the L3 proposal:
>
> The technical evaluation report identified that providing contract/call Center services for Government Organizations, since 1974, is a core business for Aspen Systems. While L3 has experience in operating call centers, L3 itself did not

---

[3] These ratings for the technical criteria are listed in descending order. A proposal warranted an "Outstanding" rating where it "very significantly exceeds most or all solicitation requirements." A "Better" rating meant a proposal "fully meets all solicitation requirements and significantly exceeds many of the solicitation requirements." An "Acceptable" rating implied the proposal "meets all solicitation requirements."

demonstrate any experience in operating Government call centers but rather its proposal relied on the experience of its subcontractors to fulfill this evaluation criterion.

. . .

While L3's strengths are noteworthy they are not as substantial as the added value features of the Aspen proposal. Aspen's value added features are all found in the most important subfactors of the Technical Capability Factor, which is the most important factor in the evaluation.

I have also considered Aspen's offered price, which is lower than the Datatrac price in every call tier and only slightly higher than the L3 pricing in every call tier.[4] . . . Considering the added technical value that Aspen offers over the L3 proposal, the slightly higher price offered by Aspen at the higher call volumes is well worth the extra money.

(emphasis added). The SSA determined that Aspen offered "the best mix of technical capability and price and therefore offer[ed] the best value to the Government." First award was made to Aspen Systems.

Acting under the discretion in the RFP to make two awards, the SSA conducted a second price/technical trade-off between Datatrac and L-3. Mr. Aytes wrote, "Datatrac's very strong technical proposal along with the past performance rating ranked first amongst all proposals submitted." He described in detail "important factors . . . which clearly distinguished the strengths of Datatrac as compared to the L3 proposal." These included:

Datatrac's stated ability to commence operations providing at least 20% capacity within 45 days of contract award with full capability within 70 days is a desirable feature. The RFP indicted that the ability to start early [within 45-60 days] with an ability to handle at least 20% of the call volume was a capability that would merit extra consideration. . . . Datatrac's stated ability to start early is a valuable feature as it mitigates the amount of time we are forced to continue in our current unsatisfactory environment.

USCIS has had previous positive experience with Datatrac and the NCSC. Datatrac was the predecessor contractor several years ago and performed in an exemplary manner. Additionally, Datatrac is currently providing call center services to USCIS under another contract. Datatrac's technical proposal talks to

---

[4] The BEC Report indicated Aspen's proposal actually offered the lowest price for calls at the 200,000 call level.

> this previous and current experience. While Datatrac and L3 both received Outstanding ratings for relevant Past Performance, some of the Datatrac past performance is specific to the NCSC program. This positive experience with this offeror on the NCSC program provides additional confidence in Datatrac's ability to perform the requirements and provide the necessary services.
>
> Datatrac is proposing to use conventional technology while both Aspen and L3 are intending to use Voice Over Internet Protocol (VOIP). . . . As the SSA, I am willing to accept the VOIP risk in the Aspen proposal in order to take advantage of a superior rated technical proposal, which included several valuable features, at very favorable pricing. In making the second selection, however, overall program risk must be considered. . . . Datatrac's use of conventional technology reduces the overall program risk to the agency.
>
> Datatrac is proposing to place one of their facilities in a southeastern Kentucky HubZone and this is a valuable feature. The Source Selection Plan and the RFP clearly state that extra consideration would be given to offerors proposing a facility in a southeastern KY HubZone. . . . The value in locating in southeastern KY is that there are currently two NCSC call centers . . . located there. Thus, there are a significant number of employees (approximately 500) already working on this initiative. The 500 employees represent a vast amount of training, knowledge and experience to the NCSC program that is potentially available to a successor contractor.
>
> One of Datatrac's core business lines is providing call center services to [g]overnment organizations. While L3 has experience in operating call centers, L3 itself did not demonstrate any experience in operating Government call centers but rather the proposal relied on the experience of its subcontractors to fulfill this evaluation criterion.

The SSA then incorporated the BEC Addendum in his discussion of the cost proposals. Citing the price difference between L-3 and the higher cost Datatrac, the SSA explained that L-3's proposal appeared to contain an Occupancy Rate of [redacted]%, while the industry standard is between 75-85%. He described the risks involved with this higher Rate. He concluded that "the majority of the price differences between Datatrac and L3 is directly attributable to the large difference in staffing proposed." More staff meant less risk to the Agency that the contractor would not perform in a satisfactory manner. In making a second best value award, the SSA noted that Datatrac's "<u>valuable strengths and features more than offset the cost savings that might be gained by going with the much lower technically rated L3 proposal</u>." (emphasis added). Plus, the USCIS's apportionment of "more calls to the lower priced contractor [Aspen] . . . [could] significantly mitigate[] the price difference between L3 and Datatrac . . . ." The SSA therefore decided that "the Datatrac proposal

provide[d] the best mix of technical capability and price and represent[ed] the best value to the Government for the second award."

The Solicitation did state that the Government would not pay substantially more money for minor technical differences among bidders. Ultimately, the SSA did not consider the technical differences between plaintiff and Datatrac minor. The Record suggests procurement officials at the Office of Procurement Operations at DHS expressed concern about the price differential. This concern was derived from OPO's belief that the documentation supporting the award was not adequate. Those engaged in peer review of the selection decision wanted its language to be stronger; no one disagreed with the outcome. Government agencies must account properly for their spending. We do not have a legitimate basis upon which to question the procurement officials' decisions regarding staffing or otherwise. We find only that the procurement office wanted to ensure a higher cost proposal was justified. The USCIS addressed DHS's legitimate concerns.

The Administrative Record portrays the Source Selection Authority as a conscientious decision maker who carried out his duties according to established standards. Not only do the government employees involved enjoy a presumption of regularity and good faith in the performance of their duties, in this case the procurement appeared routine. The issue that concerned us at the beginning was the possibility that one or more evaluation criteria were undisclosed. We became satisfied that the criteria were applied fairly to all bidders, however, and that the primary consideration was staffing. Any unfamiliar terms in the Record or elements reducible to mathematical calculations nevertheless were inherent in the staffing criterion. The bottom line is, the Government preferred more staff to "man" the phones. It was willing to pay for it, and the RFP clearly afforded the USCIS the discretion to make this choice.

## NONE OF PLAINTIFF'S OTHER ARGUMENTS SUPPORT ENJOINING THE CONTRACTS TO INTERVENORS

Plaintiff offers additional arguments in support of its request that the court enjoin the awards to Datatrac and Aspen. Many pertain to the USCIS's evaluation of the relative merits of the proposals. For instance, plaintiff argues that the evaluators misunderstood its staffing proposal; that the Agency downgraded plaintiff as a result; and that the USCIS awarded "Outstanding" ratings to awardees on the mistaken belief that their proposals met minimum requirements in the Solicitation. These are the kinds of determinations for which the procuring agency takes responsibility because "it must bear the burden of any difficulties incurred by reason of a defective evaluation." Banknote, 56 Fed. Cl. at 381. A procuring agency's "small errors . . . are not sufficient grounds for rejecting an entire procurement." Grumman Data Sys. Corp. v. Widnall, 15 F.3d at 1044, 1048 (Fed. Cir. 1994). The law clearly limits our review to whether the evaluators were reasonable and conducted the procurement lawfully and in accordance with the stated criteria. The court already has found

that to be the case here. The Administrative Record lacks any basis for which we could substitute our judgment for the USCIS on these technical matters. Moreover, plaintiff argued to this court on August 3 that the USCIS determined L-3's proposal met or exceeded the Solicitation's requirements. Plaintiff cannot take the inconsistent position that its proposal was somehow downgraded as a result of some imputed noncompliance.

Plaintiff also claims that the USCIS breached its duty to conduct the procurement in good faith. L-3 believes that the USCIS was unable to convince the Department of Homeland Security that contracting with Datatrac was worth the additional cost and thus "scrambl[ed] to find pretext to justify its decision." Any "pretext" to which plaintiff refers depends upon this court's reading a series of e-mail exchanges among procurement officials in the same fashion as plaintiff. The court has explained in detail its dissent from plaintiff on this point. These communications suggest ways the Source Selection Authority could better articulate his rationale for the awards. The e-mails do not show pretext; they portray diligence.

Plaintiff maintains the USCIS favored awardees. Its claims of agency bias or favoritism principally involve one official, [redacted], and the role he had in the procurement process. Plaintiff never explains how his actions amounted to agency favoritism. [redacted] had been an employee of both awardees at one time. He also had worked for the incumbent contractor who submitted a proposal but was not selected, and another unsuccessful offeror. The Record does not support L-3's accusations that the USCIS "inexplicably preferred" Aspen and Datatrac. The evidence does not suggest, let alone prove that the award was preordained.

To the extent plaintiff raised protests not specifically addressed in this Opinion, they are similarly unavailing, or they involve the "minutiae" of the procurement process that we will not second guess. E.W. Bliss, 77 F.3d at 449. We decided to rule from the bench in this case because litigation delays were causing hardship for the contract awardees and their employees. However, we were able to rule from the bench because a careful review of the Record and the parties' briefs and arguments made clear the necessary outcome. The Record shows careful review by a conscientious procurement team. It is replete with examples of the SSA's and others' carrying out their duties according to established standards. We gave plaintiff every opportunity to discuss its allegations, and we considered them carefully. Plaintiff had suspicions, but the Record contains no clear evidence of wrongdoing or unfairness.

**CONCLUSION**

The Clerk of Court entered judgment for defendant and intervenors and dismissed plaintiff's Complaint on August 25. The parties may file jointly any proposed redactions of proprietary material contained in this Opinion with the Clerk of Court by September 22, so a

Case 1:06-cv-00498-RHH Document 75 Filed 12/08/2008 Page 17 of 17

copy may be made available for the public record.

s/ Robert H. Hodges, Jr.
Robert H. Hodges, Jr.
Judge